No. 26-____

IN THE

# United States Court of Appeals for the Seventh Circuit

HO-CHUNK NATION,

*Plaintiff-Respondent*,

v.

KALSHI INC. *and* KALSHIEX LLC,

*Defendants-Petitioners*.

On Petition for Permission to Appeal from the
United States District Court for the Western District of Wisconsin
No. 3:25-cv-00698-wmc (Hon. William M. Conley)

## PETITION FOR PERMISSION TO APPEAL PURSUANT TO 28 U.S.C. § 1292(b)

GRANT R. MAINLAND
MILBANK LLP
55 Hudson Yards
New York, NY 10001

SARAH A. ZYLSTRA
BOARDMAN & CLARK LLP
1 S. Pinckney St., Ste. 410
P.O. Box 927
Madison, WI 53701

OLIVIA S. CHOE
*Counsel of Record*
JOSHUA B. STERLING
MILBANK LLP
1101 New York Ave. NW
Washington, DC 20005
Telephone: (202) 835-7500
ochoe@milbank.com

*Counsel for Defendants-Petitioners Kalshi Inc. and KalshiEX LLC*

September 21, 2026

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: _______________

Short Caption: Ho-Chunk Nation v. Kalshi Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

_______________

_______________

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

_______________

_______________

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

Kalshi, Inc.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Olivia S. Choe Date: September 21, 2026

Attorney's Printed Name: Olivia S. Choe

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ☑ No ☐

Address: Milbank LLP

1101 New York Avenue NW, Washington, D.C. 20005

Phone Number: 202-835-7511 Fax Number: 202-263-7586

E-Mail Address: ochoe@milbank.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: _______________

Short Caption: Ho-Chunk Nation v. Kalshi Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

_______________

_______________

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

_______________

_______________

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

Kalshi, Inc.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Joshua B. Sterling Date: September 21, 2026

Attorney's Printed Name: Joshua B. Sterling

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ☐ No ☑

Address: Milbank LLP

1101 New York Avenue NW, Washington, D.C. 20005

Phone Number: 202-835-7535 Fax Number: 202-263-7586

E-Mail Address: jsterling@milbank.com

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: _______________

Short Caption: Ho-Chunk Nation v. Kalshi Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

_______________

_______________

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

_______________

_______________

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

Kalshi, Inc.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Grant R. Mainland Date: September 21, 2026

Attorney's Printed Name: Grant R. Mainland

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: Milbank LLP

55 Hudson Yards, New York, NY 10001

Phone Number: 212-530-5251 Fax Number: 212-530-5219

E-Mail Address: gmainland@milbank.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: _______________

Short Caption: Ho-Chunk Nation v. Kalshi Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

_______________

_______________

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

_______________

_______________

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

Kalshi, Inc.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Sarah A. Zylstra Date: September 21, 2026

Attorney's Printed Name: Sarah A. Zylstra

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ☐ No ☑

Address: Boardman & Clark LLP

1 South Pinckney Street, Suite 410, P.O. Box 927, Madison, WI 53701

Phone Number: 608-257-9521 Fax Number: 608-283-1709

E-Mail Address: szylstra@boardmanclark.com

## TABLE OF CONTENTS

Page

INTRODUCTION .......... 1

STATEMENT OF JURISDICTION .......... 4

QUESTIONS PRESENTED .......... 5

RELIEF SOUGHT .......... 6

BACKGROUND .......... 6

A. Factual Background .......... 6

B. District Court Proceedings .......... 7

REASONS FOR GRANTING THE PETITION .......... 9

A. The Certified Questions Present Controlling Questions of Law. .......... 10

B. There Is Substantial Ground for Difference of Opinion. .......... 12

1. Both Questions Are Questions of First Impression .......... 13

2. The Questions Have Produced Conflicting Decisions. .......... 15

C. An Immediate Appeal Will Materially Advance the Termination of This Litigation. .......... 18

D. The Court Should Exercise Its Discretion to Accept This Appeal. .......... 20

CONCLUSION .......... 22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

APPENDIX

APPENDIX CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**CASES:** Page(s)

*Ahrenholz v. Bd. of Trs. of Univ. of Ill.*,
219 F.3d 674 (7th Cir. 2000) ....................3, 9, 10

*Ashley W. v. Holcomb*,
34 F.4th 588 (7th Cir. 2022).................... 5

*Blue Lake Rancheria v. Kalshi Inc.*,
No. 25-cv-6162, 2025 WL 3141202 (N.D. Cal. Nov. 10, 2025) ...... 2, 16, 18

*Blue Lake Rancheria v. Kalshi Inc.*,
No. 25-7504, 2026 WL 2728466 (9th Cir. Sep. 16, 2026)........2, 16, 17, 18

*Boim v. Quranic Literacy Inst.*,
291 F.3d 1000 (7th Cir. 2002) ....................10, 13

*Boone v. Ill. Dep't of Corr.*,
71 F.4th 622 (7th Cir. 2023) .................... 10, 11, 12, 19

*In re Brand Name Prescription Drugs Antitrust Litig.*,
123 F.3d 599 (7th Cir. 1997) ....................11

*California v. Iipay Nation of Santa Ysabel*,
898 F.3d 960 (9th Cir. 2018).................... 18

*Cent. Soya Co. v. Voktas, Inc.*,
661 F.2d 78 (7th Cir. 1981) .................... 4

*Comanche Nation v. Ware*,
174 F.4th 717 (10th Cir. 2026) ....................17

*Demkovich v. St. Andrew the Apostle Par.*,
3 F.4th 968 (7th Cir. 2021) .................... 5

*Intercon Sols., Inc. v. Basel Action Network*,
791 F.3d 729 (7th Cir. 2015) .................... 10

*Johnson v. Burken*,
930 F.2d 1202 (7th Cir. 1991) ....................11

## TABLE OF AUTHORITIES—Continued

Page

*KalshiEX LLC v. Assad*,
No. 25-7516, 2026 WL 2543846 (9th Cir. Aug. 28, 2026) ......................17

*KalshiEX LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) ..........................................................17

*In re Lion Air Flight JT 610 Crash*,
110 F.4th 1007 (7th Cir. 2024)........................................................ 5

*Lu Junhong v. Boeing Co.*,
792 F.3d 805 (7th Cir. 2015)........................................................... 5

*Metrou v. M.A. Mortenson Co.*,
781 F.3d 357 (7th Cir. 2015) .......................................................... 4

*Michigan v. Bay Mills Indian Cmty.*,
572 U.S. 782 (2014) ......................................................................14

*Sokaogon Gaming Enter. Corp. v. Tushie-Montgomery Assocs., Inc.*,
86 F.3d 656 (7th Cir. 1996)....................................................11, 19

*Sterk v. Redbox Automated Retail, LLC*,
672 F.3d 535 (7th Cir. 2012)...................................................11, 19

*Stockbridge-Munsee Cmty. v. Wisconsin*,
922 F.3d 818 (7th Cir. 2019)..........................................................14

*T.S. v. Cnty. of Cook*,
568 F. Supp. 3d 940 (N.D. Ill. 2021) ...............................................15

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) .......................................9, 11, 13, 20

*Thompson v. Burnett*,
No. 15-cv-1712, 2017 WL 6606536 (S.D. Ind. Dec. 27, 2017) ..................15

*United States v. Kmart Corp.*,
No. 12-cv-881, 2015 WL 11181734 (S.D. Ill. Jan. 12, 2015).......................15

## TABLE OF AUTHORITIES—Continued

Page

*United States v. Wisconsin*,
No. 26-cv-749, 2026 WL 2474512 (E.D. Wis. July 29, 2026) ................20

*Wisconsin v. Ho-Chunk Nation*,
512 F.3d 921 (7th Cir. 2008)................................................................14, 16

*Woodman's Food Mkt., Inc. v. Clorox Co.*,
No. 14-cv-734, 2015 WL 13547584 (W.D. Wis. July 17, 2015) ................13

**STATUTES:**

7 U.S.C. §§

2(a)(1)(A) ..........................................................................2, 15

7(d)(1)(A) ..........................................................................6

7a-2(c)(1)..........................................................................6

7a-2(c)(4) ..........................................................................6

7a-2(c)(5)(C)(i)-(ii) ..............................................................6

25 U.S.C. § 2710(d)(7)(A)(ii) ....................................................1

28 U.S.C. § 1292(b)...................................................3, 4, 12, 20

31 U.S.C. § 5362(1)(E)(ii) .....................................................2, 18

**RULES AND REGULATIONS:**

17 C.F.R. § 40.11 .....................................................................6

Fed. R. App. P. 5 ......................................................................20

Fed. R. App. P. 5(a)(2)...............................................................4

**OTHER AUTHORITY:**

Order Staying Case, *Blue Lake Rancheria v. Kalshi Inc.*,
No. 3:25-cv-06162 (N.D. Cal. May 22, 2026), Dkt. No. 87......................21

# INTRODUCTION

This petition presents two questions of first impression in this Circuit at the intersection of three federal statutes: the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* ("CEA"), the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721 ("IGRA"), and the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. §§ 5361-5367 ("UIGEA"). The district court resolved both questions against Kalshi Inc. and KalshiEX LLC (collectively, "Kalshi") in an opinion that, by the court's own account, addressed "novel and complex questions for which there is no controlling precedent in this circuit." Ex. B at 6. The court then certified its order for immediate appeal and stayed the case, explaining that the questions are "percolating up to federal courts of appeals around the country and likely to the Supreme Court." *Id.* at 2. Kalshi respectfully asks this Court to grant interlocutory review.

The first question is whether a tribe may invoke IGRA's enforcement provision, 25 U.S.C. § 2710(d)(7)(A)(ii), against a nonparty to a compact. That provision confers jurisdiction over "any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact . . . that is in effect." The district court read that language to reach Kalshi—which is neither a signatory to the compact between the Ho-Chunk Nation (the

"Nation") and Wisconsin nor directly or indirectly referenced in the compact—on the theory that the Nation's Gaming Ordinance is incorporated by reference into the compact and that the two together operate as a "regulatory devi[c]e." Ex. A at 11-12. On that reasoning, an alleged violation of a tribal ordinance becomes an actionable compact violation under federal law. The district court acknowledged, however, that neither the Supreme Court nor this Court has addressed the question. *Id.* at 11. The only other district court to consider it reached the opposite conclusion, and the Ninth Circuit reversed that decision just days before this petition was filed. *See Blue Lake Rancheria v. Kalshi Inc.*, No. 25-cv-6162, 2025 WL 3141202, at *6 (N.D. Cal. Nov. 10, 2025), *rev'd in relevant part*, No. 25-7504, 2026 WL 2728466 (9th Cir. Sep. 16, 2026).

The second question is whether IGRA authorizes a tribe to regulate derivatives transactions on a CFTC-designated contract market ("DCM"), notwithstanding the CEA's grant of "exclusive jurisdiction" to the Commodity Futures Trading Commission ("CFTC") over transactions on such markets, 7 U.S.C. § 2(a)(1)(A), and notwithstanding Congress's decision in UIGEA to carve CEA-regulated transactions out of the definition of a "bet or wager," 31 U.S.C. § 5362(1)(E)(ii). The district court held that even if Kalshi's sports event contracts "are swaps subject to the CFTC's jurisdiction,"

tribes may still regulate them under IGRA. Ex. A at 22. It further held that UIGEA—which regulates internet gambling but exempts DCMs from its scope—was not to the contrary. *Id.* at 18.

Both rulings satisfy every criterion for interlocutory review, as the district court found. *See* 28 U.S.C. § 1292(b); *Ahrenholz v. Bd. of Trs. of Univ. of Ill.*, 219 F.3d 674, 675 (7th Cir. 2000). Each question turns solely on statutory interpretation; the district court held that the motions presented "only questions of law, not fact." Ex. A at 2, 3 n.1. Each is controlling: reversal on the first question requires dismissal—at a minimum—of the IGRA claim at the core of the Nation's case, and reversal on the second requires dismissal of all remaining claims. Ex. B at 5-6. Each is contestable, as courts have divided sharply on both the reach of IGRA and the preemptive force of the CEA. And immediate review promises to speed up the litigation, which is why the district court stayed all proceedings.

There is a further reason to take the appeal. The district court's construction of IGRA is novel, and its consequences reach well past these parties. The proper relationship among the CEA, IGRA, and UIGEA determines whether the approximately 240 tribes around the country that offer gaming can regulate markets that Congress delegated to the CFTC's exclusive authority. And while the many other cases involving prediction

markets are different—they address whether the CEA preempts state law as applied to trading on DCMs, as opposed to how to reconcile three federal statutes—the wide diversity of outcomes and reasoning in the state preemption cases catalogued by the district court (Ex. B at 3) underscores the novelty and importance of the issues in this area.

Kalshi's petition should be granted.

## STATEMENT OF JURISDICTION

This Court may permit an appeal from an interlocutory order when the district court certifies in writing that the order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b); *see Metrou v. M.A. Mortenson Co.*, 781 F.3d 357, 359 (7th Cir. 2015); *Cent. Soya Co. v. Voktas, Inc.*, 661 F.2d 78, 79 n.4 (7th Cir. 1981). The district court made the requisite findings in its September 11, 2026 opinion and order (Ex. B), which certified for immediate appeal its May 11, 2026 opinion and order granting in part and denying in part Kalshi's motion to dismiss (Ex. A). This petition is timely because it is filed within ten days of the certification order. 28 U.S.C. § 1292(b); Fed. R. App. P. 5(a)(2).

## QUESTIONS PRESENTED

The district court certified the following two questions:

1. Can the Nation bring a claim under IGRA to enjoin class III gaming, unauthorized by the tribe but offered on tribal land by an entity that is not party to the Tribal-State compact? (The district court answered "yes.")

2. Does the CEA or UIGEA preempt the Nation's authority under IGRA to regulate class III gaming activity that is offered on tribal lands in the form of sports events contracts on a derivatives exchange? (The district court answered "no.")

Ex. B at 5.[1]

---

[1] The district court reframed the questions Kalshi had proposed, which were: (1) whether an alleged violation of a tribal gaming ordinance is actionable as a compact violation under IGRA; and (2) whether the CEA's grant of exclusive jurisdiction to the CFTC bars Indian tribes such as the Nation from regulating derivatives traded on DCMs, as confirmed by UIGEA's express carve-out for transactions on DCMs in the context of internet gaming legislation. Ex. B at 5. The difference is immaterial to this petition, because "[o]nce an order has been certified, every legal question affecting the order's propriety is open on appeal." *Ashley W. v. Holcomb*, 34 F.4th 588, 592 (7th Cir. 2022); *see also In re Lion Air Flight JT 610 Crash*, 110 F.4th 1007, 1011 (7th Cir. 2024); *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 974 (7th Cir. 2021) ("An appeal under § 1292(b) brings up the whole certified order."); *Lu Junhong v. Boeing Co.*, 792 F.3d 805, 811 (7th Cir. 2015) (court of appeals reviews district court's entire order rather than particular issues presented). Accordingly, this Court "may address any issue fairly included within the certified order." *Demkovich*, 3 F.4th at 974 (citation omitted).

## RELIEF SOUGHT

Kalshi requests permission to appeal the district court's May 11, 2026 opinion and order denying in part Kalshi's motion to dismiss (Dkt. No. 97, Ex. A), as certified by the district court on September 11, 2026 (Dkt. No. 114, Ex. B).

## BACKGROUND

### A. Factual Background

Kalshi operates a derivatives exchange on which traders buy and sell "event contracts"—instruments providing for payment based on the occurrence of an event or contingency, including the outcomes of elections, weather events, measures of inflation, and sporting events. Ex. A at 5. The CFTC first approved Kalshi as a DCM in 2020. *Id.* As a DCM, Kalshi must comply with the CEA and the CFTC's rules and regulations. *Id.* at 5-6; *see* 7 U.S.C. § 7(d)(1)(A). A DCM may list a new contract either by obtaining CFTC approval, 7 U.S.C. § 7a-2(c)(4), or by self-certifying that the contract complies with applicable law, subject to CFTC review, *id.* § 7a-2(c)(1). Ex. A at 5-6. Event contracts are subject to an additional "Special Rule" under which the CFTC may conduct a public-interest review and may prohibit a DCM from listing a contract determined to be contrary to the public interest. *Id.* at 6; *see* 7 U.S.C. §§ 7a-2(c)(5)(C)(i)-(ii); 17 C.F.R. § 40.11. Beginning in

January 2025, Kalshi self-certified sports event contracts with the CFTC. Ex. A at 6. To date, the CFTC has not exercised its discretion to conduct a public-interest review of these contracts under the Special Rule. *Id.*

The Nation is a federally recognized Indian tribe with jurisdiction over trust land in Wisconsin. *Id.* at 3. It conducts gaming under a 1992 Tribal-State Gaming Compact with the State of Wisconsin (the "Compact"), since amended four times, most recently in 2024. *Id.* at 3; Ex. C. The Compact authorizes the Nation to accept wagers on the outcomes of and occurrences within sports and non-sports competitions. Ex. A at 4. The Nation does not currently accept such wagers. Ex. C at 7-9. The Nation has also enacted a Gaming Ordinance, approved by the Chairman of the National Indian Gaming Commission. *Id.* Kalshi is not a party to the Compact, nor is it directly or indirectly referenced in the Compact.

### B. District Court Proceedings

The Nation filed this action on August 20, 2025, alleging that Kalshi's sports event contracts constitute unlawful class III gaming on the Nation's lands in violation of IGRA, that Kalshi violated the Nation's Gaming Ordinance and infringed its sovereignty, that Kalshi violated the Lanham Act, 15 U.S.C. § 1125, and that Kalshi violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). Ex. A at 1, 7-8. The

Nation moved for a preliminary injunction and Kalshi moved to dismiss for failure to state a claim. Ex. B at 1.

On May 11, 2026, the district court granted Kalshi's motion as to the RICO and Lanham Act claims and denied it as to the IGRA, ordinance, and sovereignty claims, which it analyzed together as "ultimately . . . grounded in IGRA." Ex. A at 8. The court concluded that § 2710(d)(7)(A)(ii)'s "broad language" was adopted "to ensure that tribes could enforce the Tribal-State compact and ordinances," *id.* at 14, and that the Compact "creates a framework for the regulation of gaming on Indian lands," *id.* at 11-12. It accordingly held that "plaintiff can sue Kalshi under IGRA for violating its Tribal-State compact and Gaming Ordinance[.]" *Id.* at 15. Addressing the CEA, the court held that even if Kalshi's contracts "are swaps subject to the CFTC's jurisdiction, defendants have not shown that the CEA would necessarily preempt or repeal IGRA, nor limit plaintiff's tribal authority." *Id.* at 22. Addressing UIGEA, it held that the statute is a "non-substantive, payment-processing law" that "neither creates any substantive prohibitions for gaming itself, nor supersedes other gaming laws." *Id.* at 19. The court denied the Nation's preliminary-injunction motion, finding that although the Nation had shown a likelihood of success on its IGRA claim, it had "failed to show that it will suffer the kind of immediate and irreparable harm

required," "particularly in light of the substantial legal and regulatory questions involved." *Id.* at 24.

Kalshi moved to certify the order under § 1292(b) and to stay proceedings. Ex. B at 2. On September 11, 2026, the district court granted that motion, reframing the certified questions in the terms set out above and finding each of the four *Ahrenholz* criteria satisfied. *Id.* at 5-6. Observing that "this case presents novel and complex questions for which there is no controlling precedent in this circuit," the court certified the order and stayed all proceedings "provided defendants seek leave to appeal from the Seventh Circuit expeditiously." *Id.* at 6, 8. This petition follows.

## REASONS FOR GRANTING THE PETITION

This Court may accept an interlocutory appeal "when the statutory criteria [of 28 U.S.C. § 1292(b)] are met." *Ahrenholz*, 219 F.3d at 677. Specifically: "there must be a question of law, it must be controlling, it must be contestable, and its resolution must promise to speed up the litigation." *Id.* at 675. A § 1292(b) appeal is well suited to "an abstract issue of law, . . . resolution of which could (because it [i]s indeed a controlling issue) head off protracted, costly litigation." *Id.* at 677. This Court has cautioned against "a narrow interpretation of [what constitutes a] 'question of law,'" *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 626 (7th Cir. 2010), and has

accepted appeals where a district court "ha[s] taken sides on an important and debatable issue that is open in the Seventh Circuit," *Intercon Sols., Inc. v. Basel Action Network*, 791 F.3d 729, 731 (7th Cir. 2015). The district court applied the same standard in certifying the issues appropriate for appeal. *Ahrenholz*, 219 F.3d at 675 ("the standard is the same for the district court and for us"); *accord Boone v. Ill. Dep't of Corr.*, 71 F.4th 622, 625 (7th Cir. 2023) ("Section 1292(b) requires us to independently decide whether to accept the certified question for interlocutory appeal."). Each criterion is satisfied here.

### A. The Certified Questions Present Controlling Questions of Law.

A "question of law" for § 1292(b) purposes is a "question of the meaning of a statutory or constitutional provision, regulation, or common law doctrine" that "the court of appeals could decide quickly and cleanly without having to study the record." *Ahrenholz*, 219 F.3d at 676-77. Statutory definitions and the scope of permissible claims are questions of law. *Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1007-09 (7th Cir. 2002).

Both certified questions are pure questions of law. Each turns solely on the interpretation of IGRA and its relationship to the CEA, UIGEA, and the Nation's compact, and neither requires review of any factual record. The district court said as much: the motion to dismiss "present[s] only questions

of law, not fact," and in any event "the material facts are essentially undisputed." Ex. A at 2, 3 n.1 (emphasis omitted). The Nation itself conceded that the order "turns on pure questions of law." Ex. B at 5 (citing Dkt. No. 105 at 4).

A question is controlling if its resolution is "likely to affect the further course of the litigation, even if not certain to do so." *Sokaogon Gaming Enter. Corp. v. Tushie-Montgomery Assocs., Inc.*, 86 F.3d 656, 659 (7th Cir. 1996). That includes "sav[ing] time for the district court, and time and expense for the litigants"; "controlling means serious to the conduct of the litigation, either practically or legally." *Johnson v. Burken*, 930 F.2d 1202, 1206 (7th Cir. 1991) (citation modified). Where the remaining claims hinge on the certified issues, resolution on appeal is at a minimum quite likely to be controlling. *See Boone*, 71 F.4th at 625; *In re Text Messaging*, 630 F.3d at 624 ("It is a controlling question, because [reversal would mean that] the case is likely (though . . . not certain) to be over."). Nor must a question be dispositive to be controlling. *See Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 536 (7th Cir. 2012). And "the fact that [an issue] may in the end not prove decisive does not show that the [courts] were wrong to certify [a] ruling on the issue under 28 U.S.C. § 1292(b)." *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 605 (7th Cir. 1997).

Here, the questions are not merely controlling but dispositive of the claims that remain. If this Court holds that § 2710(d)(7)(A)(ii) does not reach an entity that is not a party to the Compact or otherwise subject to its terms and does not give rise to claims for violations of tribal ordinances, the Nation has no statutory right of action under IGRA. If it holds instead that the CEA's grant of exclusive jurisdiction to the CFTC—confirmed by UIGEA's carve-out for DCM transactions—forecloses tribal regulation of contracts traded on a DCM, all remaining claims likewise fail. Either way, as the district court recognized, "plaintiff's claims against defendants must be dismissed." Ex. B at 6.[2]

### B. There Is Substantial Ground for Difference of Opinion.

Establishing "substantial ground for difference of opinion," 28 U.S.C. § 1292(b), is not a high bar. The question need only be "contestable," such that there is room for debate. *Boone*, 71 F.4th at 625. A movant need not

---

[2] Kalshi maintains that there are additional, independent grounds for dismissal of the Nation's ordinance and sovereignty claims. *See* Br. in Supp. of Mot. to Dismiss, Dkt. No. 29 at 21-28 (arguing that the Nation lacks authority to exercise tribal jurisdiction over Kalshi, a nonmember; that the CEA preempts the Ordinance; and that the Nation lacks standing to sue for infringement of tribal sovereignty). Clarity from this Court on the Nation's IGRA claim could aid in defining and resolving the issues raised by those claims.

show that reversal is likely. Courts have found contestability where an issue is novel or subject to conflicting authority.

### 1. Both Questions Are Questions of First Impression.

"[Q]uestions of first impression" are "certainly contestable." *Boim*, 291 F.3d at 1007-08. Where legal standards are "in ferment," "seeking a clarifying decision that might head off protracted litigation is within the scope of section 1292(b)." *In re Text Messaging*, 630 F.3d at 627. And "there are substantial grounds for differences of opinion" where "no federal court has addressed" a disputed question or the question is "by no means settled in [the] circuit." *Woodman's Food Mkt., Inc. v. Clorox Co.*, No. 14-cv-734, 2015 WL 13547584, at *3 (W.D. Wis. July 17, 2015), *appeal permitted*, No. 15-8016 (7th Cir. Sep. 8, 2015).

As to the first question, the district court expressly recognized that "neither the United States Supreme Court nor Seventh Circuit has addressed the question whether an Indian tribe can sue an entity under § 2710(d)(7)(A)(ii) that is not a party to the underlying Tribal-State compact." Ex. A at 11. When the order issued, it was, to Kalshi's knowledge, the first ever to hold that an alleged violation of a tribal gaming ordinance is actionable as a compact violation under IGRA, and no court of appeals had addressed the question. The question is also one on which existing authority

in this Circuit points the other way. In *Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 933 (7th Cir. 2008), this Court held that jurisdiction under § 2710(d)(7)(A)(ii) "exists only when the alleged violation relates to a compact provision agreed upon pursuant to the IGRA negotiation process" described in 25 U.S.C. § 2710(d)(3). The district court read that holding to accommodate the Nation's theory, Ex. A at 12-13; whether it does is a debatable question of statutory interpretation squarely within this Court's province. *See Stockbridge-Munsee Cmty. v. Wisconsin*, 922 F.3d 818, 824 (7th Cir. 2019) ("[W]hen a federal statute creates specific private rights of action, the judiciary cannot add others."). The Supreme Court's guidance that § 2710(d)(7)(A)(ii) is best understood as delineating the extent to which Congress abrogated tribal sovereign immunity, *see Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788, 791 (2014), makes the district court's expansive reading all the more contestable.

The second question is equally novel. As the district court observed, "there have been no 'definitive' decisions regarding whether the CEA may preempt IGRA on the issue of so-called 'sports events contracts' now listed on a derivative exchange." Ex. B at 4. The court itself declined to resolve whether Kalshi's contracts are swaps, holding instead that even if they are "swaps subject to the CFTC's jurisdiction," the CEA would not "necessarily

preempt or repeal IGRA." Ex. A at 22. Whether a federal statute conferring "exclusive jurisdiction" on a federal agency, 7 U.S.C. § 2(a)(1)(A), leaves room for a competing sovereign to regulate the same transactions is a paradigmatic legal question, and it is open in this Circuit.

### 2. The Questions Have Produced Conflicting Decisions.

Contestability is confirmed by the differing outcomes and analysis among courts that have addressed these questions. Conflicting decisions are a paradigmatic basis for certification: courts assessing contestability consider "whether other courts have adopted conflicting positions regarding the issue of law proposed for certification." *Thompson v. Burnett*, No. 15-cv-1712, 2017 WL 6606536, at *2 (S.D. Ind. Dec. 27, 2017) (citation omitted). This Court has accordingly granted permission to appeal where courts had divided over a question of statutory interpretation that remained open in this Circuit. *See T.S. v. Cnty. of Cook*, 568 F. Supp. 3d 940 (N.D. Ill. 2021), *appeal permitted*, Nos. 21-8018, 21-8032 (7th Cir. Dec. 6, 2021); *United States v. Kmart Corp.*, No. 12-cv-881, 2015 WL 11181734, at *3 (S.D. Ill. Jan. 12, 2015) (certifying where there was "an intra-circuit and circuit split" on an issue that had "yet to be presented to the Seventh Circuit for resolution"), *appeal permitted*, No. 15-8002 (7th Cir. Feb. 23, 2015).

On the first question, the courts to consider whether IGRA reaches Kalshi's sports event contracts have not agreed. The only other district court to address the question held that IGRA supplies no cause of action against a third party whose conduct is not governed by the terms of the compact. *See Blue Lake Rancheria*, 2025 WL 3141202, at *6. The district court here acknowledged the conflict, noting that "the only two courts to have considered the specific question regarding IGRA and online sports events contracts have reached differing conclusions." Ex. B at 3-4. On September 16, 2026, the Ninth Circuit reversed the *Blue Lake* decision, holding that § 2710(d)(7)(A)(ii) reaches a nonparty and that "IGRA does not require that a compact or secretarial procedures name nonparties in order to apply to them." *Blue Lake Rancheria*, 2026 WL 2728466, at *12. That development underscores rather than removes the need for review. A district court and a court of appeals have now reached opposite conclusions on the same question in the same case; the Ninth Circuit's decision is the first appellate word on a provision this Court has construed only in a different setting, *see Wisconsin v. Ho-Chunk Nation*, 512 F.3d at 933-34; and the Ninth Circuit itself observed that it was writing where "no court of appeals" had adopted the competing construction, relying in part on the Tenth Circuit's recent reading of the provision, *see Blue Lake Rancheria*, 2026 WL 2728466, at *6-

8, *11-12 (citing *Comanche Nation v. Ware*, 174 F.4th 717, 728 (10th Cir. 2026)).[3]

The same courts have come out differently on the second question as well. In *Blue Lake Rancheria*, the Ninth Circuit reversed the district court's holding that transactions on DCMs—including sports event contracts—were subject to the exclusive authority of the CFTC, precluding regulation by Indian tribes. 2026 WL 2728466, at *14-15. And while prediction market litigation with states is fundamentally different in that it involves a clash between federal and state law, not reconciliation of different federal statutes, the federal courts have split in those cases as well.[4]

The related UIGEA question is subject to conflicting interpretations as well. The district court held that UIGEA "does not make gambling legal or

---

[3] A third district court is now addressing related issues, and any appeal would lie to the Tenth Circuit. *See Mescalero Apache Tribe v. Kalshi Inc.*, No. 2:26-cv-01517 (D.N.M. filed May 12, 2026) (claims by four New Mexico tribes invoking sovereign authority and IGRA and alleging violations of their tribal gaming laws and compacts).

[4] *Compare KalshiEX LLC v. Flaherty*, 172 F.4th 220, 227-29 (3d Cir. 2026) (holding that Kalshi's sports event contracts are swaps and that the CEA field- and conflict-preempts state gambling laws as applied to contracts traded on a DCM), *with KalshiEX LLC v. Assad*, No. 25-7516, 2026 WL 2543846, at *9, *11-12, *17 (9th Cir. Aug. 28, 2026) (holding that the same contracts are not swaps because they turn on the outcome of a sporting event rather than the occurrence of an "event" inherently associated with a financial consequence, and expressly disagreeing with *Flaherty*'s field-preemption holding), *petition for reh'g en banc filed* (9th Cir. Sep. 9, 2026).

illegal" because it is a "non-substantive" law that "does not create any additional substantive prohibitions." Ex. A at 17-19. The district court in *Blue Lake Rancheria* understood UIGEA very differently, agreeing with Kalshi that Congress's decision to exclude "any transaction conducted on or subject to the rules of a registered entity . . . under the [CEA]," 31 U.S.C. § 5362(1)(E)(ii), confirms that the CEA's preemptive effect extends to the cross-border, internet-based activity at issue here. *See Blue Lake Rancheria*, 2025 WL 3141202, at *6. The Ninth Circuit has since taken yet another view, holding that "the best reading of these two interrelated statutes" is that each governs a different subject. 2026 WL 2728466, at *13. Three courts have thus given three different accounts of how UIGEA bears on these contracts. Nor does *California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960 (9th Cir. 2018), resolve the question; *Iipay* did not consider UIGEA in the context of event contracts and the CEA, and to the extent it addressed UIGEA at all, it recognized that IGRA did not contemplate the kind of internet-based gaming activity that Congress later addressed in UIGEA—the statute that expressly carved DCM transactions out of its scope. *See id.* at 964 nn.6-7.

### C. An Immediate Appeal Will Materially Advance the Termination of This Litigation.

The final requirement sets a low threshold: merely that "an immediate appeal may materially advance the ultimate termination of the litigation."

*Sterk*, 672 F.3d at 536. Resolution "promises to speed up the litigation" where the court of appeals may conclude that no relief is available to the plaintiff, or where identification of any available relief "would narrow the issues moving forward." *Boone*, 71 F.4th at 625. Where an appeal creates the possibility that the controlling issues will be resolved without trial, that strongly favors review. *See Sokaogon*, 86 F.3d at 659 (requirement satisfied because "if [defendant] wins this appeal, the case will be over without the district court's having to try the issue").

That bar is comfortably cleared. If this Court reverses on the first question, the district court must—at a minimum—dismiss the IGRA claim at the heart of the Nation's case, and if it reverses on the second, it must dismiss all remaining claims. Ex. B at 6. If it affirms, the statutory framework will be settled in this Circuit, permitting the litigation to proceed on a firm foundation. The district court agreed that "resolution of these questions will unquestionably speed up the litigation," and explained that absent an appeal "the next stage would likely be summary judgment, during which this court would face the very same legal questions, albeit far less definitively." *Id.* at 6-7. Deferring review would not avoid these questions but merely postpone them, after the parties and the district court have spent the resources an immediate appeal would save.

### D. The Court Should Exercise Its Discretion to Accept This Appeal.

Because the § 1292(b) criteria are met, and because both the district court and the prediction market industry need guidance, this Court should accept the appeal. Fed. R. App. P. 5; 28 U.S.C. § 1292(b) ("The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order."). This Court has granted review in comparable circumstances, taking up appeals where a district court resolved an important and unsettled question of statutory interpretation and where the governing standards were still "in ferment." *In re Text Messaging*, 630 F.3d at 626-27.

The rulings below break new ground, and their ramifications extend well beyond the parties to this suit. The proper interpretation of IGRA could affect the availability of claims that states, and not just tribes, might bring under § 2710(d)(7)(A)(ii) as well as the scope of tribal sovereign immunity. The intersection of IGRA with the CEA, UIGEA, and the activities of DCMs could affect federally regulated financial exchanges nationwide. The United States' and the CFTC's suits defending the CFTC's exclusive jurisdiction against states seeking to regulate DCMs underscore the public interest at stake. *See, e.g.*, *United States v. Wisconsin*, No. 26-cv-749 (E.D. Wis. Apr. 28, 2026), *preliminary injunction denied*, No. 25-cv-749, 2026 WL 2474512

(E.D. Wis. July 29, 2026), *appeal docketed*, No. 26-2636 (7th Cir. Aug. 10, 2026); *United States v. Illinois*, No. 26-cv-3659 (N.D. Ill. filed Apr. 2, 2026).

Appellate review now will substantially reduce the uncertainty the rulings below create and promote judicial efficiency by avoiding the expenditure of resources on claims that may ultimately be foreclosed. By contrast, allowing novel and contested statutory holdings to govern discovery, dispositive motions, and trial risks duplicative litigation, inconsistent rulings, and piecemeal appellate review across multiple districts and circuits. The district court in *Blue Lake Rancheria* recognized that danger in staying its own proceedings, observing that appellate resolution "will offer guidance," "will likely simplify core issues," and will "avoid[] inconsistent rulings." Order Staying Case at 4, *Blue Lake Rancheria v. Kalshi Inc.*, No. 3:25-cv-06162 (N.D. Cal. May 22, 2026), Dkt. No. 87. The Ninth Circuit's intervening decision bears that out: these questions are now being answered by courts of appeals, and there is no reason for this Court to defer consideration until after years of proceedings premised on a construction of IGRA that this Court has never reviewed.

Finally, the district court's own assessment of the equities counsels in favor of review. Having found no irreparable harm to the Nation, the court pointed to the substantial legal and regulatory questions the case presents.

Ex. A at 24. Those same questions—now stayed below and awaiting this Court—are the ones presented here. With no interim relief in place and the case at a standstill, there is no reason to defer their resolution.

## CONCLUSION

Kalshi respectfully requests that this Court grant permission to appeal the district court's May 11, 2026 opinion and order, as certified for interlocutory appeal on September 11, 2026.

September 21, 2026

Respectfully submitted,

<u>*/s/ Olivia S. Choe*</u>

OLIVIA S. CHOE
JOSHUA B. STERLING
MILBANK LLP
1101 New York Ave. NW
Washington, DC 20005
Telephone: (202) 835-7500
ochoe@milbank.com

GRANT R. MAINLAND
MILBANK LLP
55 Hudson Yards
New York, NY 10001

SARAH A. ZYLSTRA
BOARDMAN & CLARK LLP
1 S. Pinckney St., Ste. 410
P.O. Box 927
Madison, WI 53701

*Counsel for Defendants-Petitioners Kalshi Inc. and KalshiEX LLC*

## CERTIFICATE OF COMPLIANCE

I certify that this petition complies with the type-volume limitation of Federal Rule of Appellate Procedure 5(c)(1) because it contains 5,002 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f).

This petition complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) and Circuit Rule 32(a) because it has been prepared in 14-point Georgia font using Microsoft Office Word for Office 365.

September 21, 2026

*/s/ Olivia S. Choe*
Olivia S. Choe

*Counsel for Defendants-Petitioners Kalshi Inc. and KalshiEX LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2026, the foregoing document and its exhibits were electronically filed with the Clerk of the United States Court of Appeals for the Seventh Circuit by email to USCA7_Clerk@ca7.uscourts.gov. I further certify that on September 21, 2026, I caused a copy of this filing to be served by email on counsel for Plaintiff-Respondent:

Emily M. Feinstein
Bryce A. Loken
QUARLES & BRADY LLP
33 East Main Street, Suite 900
Madison, WI 53703
Telephone: 608.251.5000
Facsimile: 608.251.9166
Emily.Feinstein@quarles.com
Bryce.Loken@quarles.com

Michael P. Murphy, Legislative Counsel for Ho-Chunk Nation
THE HO-CHUNK NATION
P.O. Box 667
Black River Falls, WI 54615
Telephone: 715.284.9343
Michael.Murphy@ho-chunk.com

Lester J. Marston
Cooper M. DeMarse
THE LAW OFFICES OF RAPPORT AND MARSTON
405 West Perkins Street
Ukiah, CA 95482
Telephone: 707.462.6846
Facsimile: 707.462.4235
ljmarston@rmlawoffice.net

*/s/ Olivia S. Choe*
Olivia S. Choe

*Counsel for Defendants-Petitioners Kalshi Inc. and KalshiEX LLC*

# APPENDIX

# TABLE OF CONTENTS

Opinion and Order, *Ho-Chunk Nation v. Kalshi Inc.*, No. 25-cv-698 (W.D. Wis. May 11, 2026), Dkt. No. 97 .................... Exhibit A

Opinion and Order, *Ho-Chunk Nation v. Kalshi Inc.*, No. 25-cv-698 (W.D. Wis. Sep. 11, 2026), Dkt. No. 114 .................. Exhibit B

Ho-Chunk Nation Gaming Compact of 1992, with Amendments ........................................................................... Exhibit C

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

HO-CHUNK NATION,

Plaintiff,

v.

KALSHI INC., KALSHIEX LLC,
ROBINHOOD MARKETS, INC. and
ROBINHOOD DERIVATIVES LLC,

Defendants.

OPINION and ORDER

25-cv-698-wmc

---

This case principally concerns the ability of plaintiff Ho-Chunk Nation, a federally-recognized Indian tribe, to prohibit online sports betting from occurring on its tribal land. Defendants Kalshi Inc. and KalshiEX LLC (collectively, "Kalshi") have partnered with defendants Robinhood Derivatives LLC, and Robinhood Markets, Inc. (collectively, "Robinhood") to advertise and operate a "nationwide, internet-based, prediction market," which purports to offer users so-called "event contracts" based on the occurrence of real-world events, including sports matches, that are solely governed by the U.S. Commodities Trading Futures Commission ("CFTC"). The Ho-Chunk Nation ("Nation") claims that Kalshi's sports event contracts amount to unlawful gaming being offered and advertised on the Nation's tribal lands in violation of the Indian Gaming Regulatory Act, 25 U.S.C. § 2701-2721 ("IGRA"). The Nation also claims that Kalshi's advertisements for "legal" sports betting are false or misleading in violation of the Lanham Act, 15 U.S.C. § 1125, and that all defendants have engaged in criminal racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c).

Pending before the court are defendants' motions to dismiss plaintiff's complaint in full for failure to state any viable claim, as well as lacking standing to assert a Lanham Act claim. (Dkt. #28 and Dkt. #31.) In addition to opposing those motions, plaintiff has filed its own motion for the entry of a preliminary injunction under IGRA and the Lanham Act. (Dkt. #37.) As to IGRA, plaintiff seeks to enjoin Kalshi from offering class III gaming on the Nation's lands; and as to the Lanham Act, plaintiff seeks to enjoin Kalshi from advertising that its sports events contracts are "legal" in every state. (*Id.* at 2.)

The Indian Gaming Association, National Congress of American Indians, Washington Indian Gaming Association, California Nations Indian Gaming Association, Arizona Indian Gaming Association, Oklahoma Indian Gaming Association, Native American Finance Officers Association, and sixteen federally-recognized Indian Tribes filed an Amicus Brief in support of the Nation's motion for a preliminary injunction. (Dkt. #56.) The parties have also made the court aware of relevant authority issued since their motions were filed. (Dkt. ##83, 85, 87, 88, 89.) Having reviewed the parties' filings and the growing body of relevant case law, the court concludes that the pending motions present only questions of law, not fact, alleviating the need for an evidentiary hearing. Further, for reasons discussed below, plaintiff's complaint states a claim under IGRA, so defendants' motions to dismiss will be denied as to that claim, while plaintiff's complaint fails to state a viable claim under either the Lanham Act or RICO, so those claims will be dismissed. Finally, although plaintiff has shown a likelihood of success on the merits of their IGRA claim, its motion for a preliminary injunctive will be denied because plaintiff has not shown *irreparable* harm absent such relief.

## BACKGROUND[1]

### A. Ho-Chunk Nation's Gaming Compact and Ordinance

Formerly known as the Wisconsin Winnebago, the Ho-Chunk Nation is a federally recognized Indian tribe with jurisdiction over tribal land held in trust by the United States, covering some 17 square miles across 14-counties in Wisconsin. The Nation faces unusual challenges, complications and obstacles in providing essential government services to its tribal members because its people and land are so spread out. Accordingly, the Nation has pursued various avenues of economic development to fund government programs and services and to meet the needs of its members. In particular, gaming is now the Nation's primary source of revenue, as conducted at casinos located on the Nation's trust land under a Tribal-State Gaming Compact with the State of Wisconsin.

The Nation first entered a Tribal-State Gaming Compact with the State of Wisconsin in 1992 ("Compact"). (Dkt. #41-1.) The Compact has since been amended four times and affords the Nation primary responsibility for the regulation of its gaming facilities and activities to ensure: the fairness of class III games;[2] the games are shielded from criminal activity; the

[1] For purposes of deciding defendants' motions to dismiss, the background facts recounted here are based on the allegations of plaintiff's complaint viewed in the light most favorable to the Nation, as modified by the parties' proposed facts and responses submitted with the preliminary injunction filings. *See* Fed. R. Civ. P. 12(b)(1); *Evers v. Astrue*, 536 F.3d 651, 656–57 (7th Cir. 2008) (In considering subject matter jurisdiction, the court must accept all well-pleaded facts within the complaint as true, but may also consider evidence outside of the pleadings to ensure jurisdiction is proper.) As explained below, however, the *material* facts are essentially undisputed, including for purposes of deciding plaintiff's motion for a preliminary injunction.

[2] "Class III gaming activities" include "the types of high-stakes games usually associated with Nevada-style gambling," including slot machines, card games and betting on sporting and non-sporting events. *In re Indian Gaming Related Cases*, 331 F.3d 1094, 1097 (9th Cir. 2003).

Nation is the primary beneficiary of gaming activities; and promotion of tribal economic development and self-sufficiency. (*Id.* § II, at 2.) Under the Compact, the Nation is authorized: (1) to operate slot machines, lottery games, banked and percentage card games; and (2) to accept wagers on the outcomes of and occurrences within, sports and non-sports games, competitions, and matches, with the exception of pari-mutuel wagering on horse, harness, and dog racing events. (*Id.* § IV, at 3–5.) The Compact only authorizes the Nation (or an entity authorized by the Nation under a management contract) to conduct gaming activities on the Nation's tribal lands, and *explicitly* prohibits "operation of any Class III gaming activities under this Compact" by any other person or entity. (*Id.* § VI.) In exchange, as approved by the United States Department of the Interior, the Nation also makes annual payments to the State of Wisconsin under the terms of the Contract. (*Id.* at 46.)

Further, the Nation enacted a Gaming Ordinance (also called the "Gaming Code") as approved by the Chairman of the National Indian Gaming Commission, a federal agency within the Department of the Interior. (Dkt. #41-6.) This ordinance purports to comprehensively regulate gaming activities on the Nation's territorial lands and is incorporated by reference into the Compact itself. (Dkt. #41-1, at 38 ("The Gaming Code of the Tribe, as it may be from time-to-time amended, is incorporated by reference into this Compact.").) The Gaming Ordinance also establishes the Nation's "Tribal Gaming Commission," which is granted the authority to adopt and enforce regulations that establish standards for conducting all gaming on the Nation's Indian lands. Finally, the Gaming Ordinance specifies what games can be conducted on the Nation's Indian lands *and* prohibits the operation of *any* gaming not authorized by the Nation's Compact or Gaming Ordinance, including unlicensed or privately owned gaming operations within the jurisdiction of the Nation. (Dkt. #41-6, § 6.C ("No

person or entity, other than the Ho-Chunk Nation, shall conduct gaming without providing proper notice and obtaining a license, if required, from the Ho-Chunk Nation Commission.").) Thus, the Gaming Ordinance expressly states, "Privately owned gaming operations are prohibited within the jurisdiction of the Nation." (*Id.* § 6.D.)

**B. Kalshi's Involvement with Sporting "Event Contracts" and Regulation by the Commodities Futures Trading Commission**

Kalshi purports to operate as a "derivatives exchange" on which traders buy and sell "event contracts," which are instruments that provide for payment based on the occurrence of an event or contingency. For example, Kalshi offers contracts on the outcomes of elections, weather events, inflation and sporting events. More specifically, Robinhood Markets, Inc. operates as an investment platform that permits trading on stocks, ETFs, and other commodities, while Robinhood Derivatives LLC is its wholly owned subsidiary operating as a futures commission merchant and providing options on futures trading. Of particular relevance here, Robinhood has partnered with Kalshi to open -- on the "Robinhood investment platform" -- a "prediction market hub," allowing people to place unregulated wagers in the form of event contracts.

Kalshi was first approved as a designated contract market ("DCM") by the CFTC in 2020. As a DCM, Kalshi must comply with the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*, which regulates futures trading, and any CFTC rules and regulations. 7 U.S.C. § 7(d)(1)(A). A DCM can list new contracts for trading on its exchange in two ways: it can either (1) request approval from the CFTC, 7 U.S.C. § 7a- 2(c)(4), and then list the contract as

"preapproved," *or* (2) "self-certify" that the contract complies with all applicable law, then list the contract, subject to an opportunity for CFTC review, 7 U.S.C. § 7a-2(c)(1).

Event contracts are subject to an additional "Special Rule" for CFTC review and approval. 7 U.S.C. §§ 7a-2(c)(5)(C)(i), (ii). Under the Special Rule, the CFTC has explicit authority to conduct a "public-interest review" of newly listed event contracts that "involve" unlawful activity, terrorism, assassination, war, gaming, or other similar activity. *Id*. The CFTC further retains the authority to prohibit a DCM from listing an event contract that has been determined to be against the public interest. *Id*. By rulemaking, the CFTC has also concluded that event contracts involving enumerated activities are contrary to the public interest and, therefore, DCMs may not list them. 17 C.F.R. § 40.11.

For five years now, Kalshi has partnered with Robinhood to offer a platform for trading event contracts on a variety of substantive areas. Beginning in January 2025, Kalshi specifically filed self-certifications with the CFTC to trade "sports event contracts," which allow buyers to predict the winner of a sport event title and other outcomes related to American sports leagues. These event contracts take the form of a binary "yes/no" in response to questions such as: "Will <team> win <title>?"; "Will <team> win <event>?"; "Will <player/team> score <first/last/any/count> touchdown(s) in <time_period> of <game>?"; "Will <team> win <game> by <above/below/between/exactly/at least> <count> points?"; "Will <game> have <over/under> <count> points in <time period> of <game>?"; and "Will <outcomes> occur in <events>?" While the CFTC has the discretion to review each of these contracts, it has not done so as to *any* of Kalshi's "sports events contracts."

Kalshi promotes its products across major social media platforms such as TikTok, Instagram, X.com, and YouTube, including opportunities to bet on the outcome of sports

events. For example, on its Instagram account, @kalshi_official, Kalshi has published advertisements stating that Kalshi offers "The First Nationwide Legal Sports Betting Platform," making "Sports Betting Legal in all 50 States on Kalshi." (Dkt. #44-8.) Similarly, on TikTok, Kalshi advertised, "To the guy that told me that sports trading is legal in all 50 states on Kalshi, I love you." (Dkt. #44-10.) So, too, one user commented on this advertisement stating, "It not [sic] legal" to which Kalshi replied, "It literally is." (*Id.*) And on February 3, 2025, Kalshi itself re-posted an article with the headline, "Robinhood to Offer Super Bowl Betting via Kalshi," on its Instagram account. (Dkt. #43-5.)

**C. This Lawsuit**

Because people on its tribal land can access Kalshi's online platform to bet on sports event contracts, the Nation claims that Kalshi is offering illegal class III gaming on tribal land in violation of IGRA, the Nation's Tribal-State Gaming Compact, and its Gaming Ordinance. The Nation further claims that Kalshi is in direct competition with the Nation's own gaming businesses, and as a result is depriving the Nation of revenue that it could be collecting through its own sports betting and other gaming opportunities. Specifically, in its complaint, the Nation asserts the following claims against Kalshi: (1) violation of the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721; (2) violation of the Nation's Gaming Ordinance, which was enacted under IGRA; (3) racketeering activity, including wire fraud under 18 U.S.C. § 1343, the illegal transmission of wagering information in violation of 18 U.S.C. § 1084, and the operation of an illegal gambling business in violation of 18 U.S.C. § 1955; (4) infringement of the Nation's sovereignty and interference with its tribal self-governance; and (5) false

advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). Plaintiff names Robinhood as a defendant only on the RICO claim (claim 3).

## OPINION

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts that plausibly lead to a claim upon which relief could be granted. *Gogos v. AMS Mech. Sys.*, 737 F.3d 1170, 1172 (7th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In resolving a motion to dismiss under Fed. R. Civ. P. 12(b)(1) or 12(b)(6), the court accepts as true all facts in the complaint, drawing all reasonable inferences in the plaintiff's favor. *Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016); *Sykes v. Cook Cnty. Circuit Court Probate Div.*, 837 F.3d 736, 739 (7th Cir. 2016).

In contending that plaintiff's complaint should be dismissed in full, defendants argue that plaintiff: (1) fails to state a claim under IGRA or its Gaming Ordinance (counts 1 and 2); (2) lacks standing to sue for infringement of its tribal sovereignty (count 4); (3) lacks standing and fails to state a claim under the Lanham Act (count 5); and (4) fails to state a civil RICO claim (count 3). Because the court sees little distinction between plaintiff's claims based on IGRA, its Gaming Ordinance and tribal sovereignty (claims 1, 2, and 4), as all three claims ultimately are grounded in IGRA, it will consider those claims together. After concluding that plaintiff's allegations are sufficient to state a claim under IGRA, and defendants have identified no other persuasive basis to dismiss that claim, the court will next consider whether plaintiff is entitled to preliminary injunctive relief. Finally, the court will proceed to address plaintiff's Lanham Act and RICO claims.

## I. Indian Gaming Regulatory Act

In 1988, Congress passed IGRA to enable regulation of gaming on Indian lands following the Supreme Court's ruling in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), which held that states lacked that authority. Generally, to "provide a statutory basis for the operation of gaming by Indian tribes," 25 U.S.C. § 2702(1), Congress adopted a system of federal, state and tribal oversight. Specifically, IGRA permits "class III gaming activities" on Indian lands provided three conditions are met: (1) it is authorized by the tribal government; (2) it is permitted in the state where the Indian lands are located; *and* (3) it is "conducted in conformance with a Tribal-State compact," which is an agreement between the tribe and the state in which the activities occur. 25 U.S.C. § 2710(d)(1); 25 C.F.R. § 502.4(c). The National Indian Gaming Commission regulations include sports betting as one of the activities that falls into class III gaming. 25 C.F.R. § 502.4(c) ("Class III gaming means … [a]ny sports betting and parimutuel wagering [.]")

On its face, plaintiff's complaint states a straightforward claim that defendant Kalshi violated IGRA by offering class III gaming on Indian lands that are neither authorized by plaintiff nor conducted in conformance with a Tribal-State Compact. *See* ." *KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 3286282, at *8 (D. Nev. Nov. 24, 2025) (finding Kalshi's "sports event contracts" to be "sports wagers and everyone who sees them knows it," including Kalshi, who advertises itself as a "sports betting platform"). Moreover, Kalshi does not appear to dispute that: (1) its sports events contracts qualify as "class III gaming" under IGRA, (2) a person could access Kalshi's platform on plaintiff's territorial lands; or (3) Kalshi is operating without plaintiff's approval and outside a Tribal-State Compact. Instead, Kalshi argues that plaintiff's complaint fails to state a claim under IGRA on a variety

of grounds, as well as that preliminary injunctive relief should be denied even if such a claim exists. The court addresses each of these arguments below.

**A. Right of Action under IGRA**

As an initial matter, Kalshi argues that plaintiff lacks *any* statutory right of action to sue it for violations of IGRA. In relevant part, IGRA states that:

> The United States district courts shall have jurisdiction over…any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact…that is in effect.

25 U.S.C. § 2710(d)(7)(A)(ii). The United States Supreme Court has clarified that this provision does *not* limit the *subject matter jurisdiction* of federal district courts under the "general federal-question statute, 28 U.S.C. § 1331, which gives district courts jurisdiction to decide any claim alleging a violation of IGRA," and "nothing in [IGRA] limits that grant of jurisdiction (although those provisions may indicate that a party has no statutory right of action)." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014).

Despite this seeming broad grant of jurisdiction, Kalshi would latch onto the Supreme Court's parenthetical mention in *Bay Mills* of a "statutory right of action" to argue that plaintiff cannot bring an IGRA-based claim against it. In other words, Kalshi would read § 2710(d)(7)(A)(ii) to only create a right of action to enjoin gaming conducted "in violation of any Tribal-State compact," meaning the statutory right of action created by IGRA can only be brought against a *State* or *Indian tribe* that is both a party to and in breach of the particular Tribal-State compact at issue. Thus, Kalshi argues in essence that Congress only empowered tribes or states to sue each other for breach of contract under IGRA, not to sue third parties

like Kalshi, who by implication would now be free to engage in gaming activities on tribal lands without regulation.

While neither the United States Supreme Court nor Seventh Circuit has addressed the question whether an Indian tribe can sue an entity under § 2710(d)(7)(ii) that is not a party to the underlying Tribal-State compact, this reading appears without basis in the text, legislative history or common sense. To begin, nothing in § 2710(d)(7)(ii), IGRA itself or Congress's findings, purposes, or legislative history in passing IGRA supports an intent to restrict the reach of § 2710(d)(7)(A)(ii) to breach of contract claims between the parties to a gaming compact. Instead, by the terms themselves, "Tribal-State compacts" are not merely an agreement between two private parties. Rather, they represent agreement as to gambling regulation and enforcement between two governmental bodies -- a tribe and a state -- under the imprimatur of the federal government.

Indeed, the Tribal-State compact here incorporates the Nation's Gaming Ordinance, which plaintiff was required by IGRA to adopt. In particular, tribes engaging in or authorizing class II and class III gaming on their lands must pass a gaming ordinance that includes several provisions governing gaming operations, including that the "Indian tribe will have the sole proprietary interest and responsibility for the conduct of any gaming activity" *and* net gaming revenue must be used for designated purposes. 25 U.S.C. § 2710(b)(2)(A)–(F); §2710(d)(1). The gaming ordinance is then reviewed and approved by the National Indian Gaming Commission ("NIGC"), a federal agency within the Department of the Interior, and is published in the Federal Register. *Id.* § 2710(d)(2)(B). Once the ordinance is published, "class III gaming activity on the Indian lands of the Indian tribe *shall be fully subject* to the terms and conditions of the Tribal-State compact." *Id.* § 2710(d)(2)(C) (emphasis added). Thus, once

the Gaming Ordinance was approved by the NGIC and incorporated into the Tribal-State compact, the compact becomes not just a private contract between a tribe and state, but also a regulatory devise that creates a framework for the regulation of gaming on Indian lands, which expressly applies to *all* class III gaming activity. *See Coeurd'Alene Tribe v. Idaho*, 842 F. Supp. 1268, 1282 (D. Idaho 1994), *aff'd* 51 F.3d 876 (9th Cir. 1995) ("in absence of a tribal gaming ordinance and a compact, neither the Tribe nor any non-tribal entity, including the State of Idaho, may conduct Class III gaming on the reservation"); *Cayuga Nation v. New York State Gaming Comm'n*, 775 F. Supp. 3d 651, 666 (N.D.N.Y. 2025) ("IGRA's restrictions on class III gaming applies to any class III gaming activity conducted on Indian lands."). Even Kalshi concedes in its brief that "Tribal gaming ordinances, if adopted pursuant to IGRA and approved by the Commissioner, permit tribes to regulate gaming activity, as defined in the statute, where that gaming activity is 'conducted' on tribal lands." (Kalsh Br. (dkt. #29) 35.)

While Kalshi cites *Wisconsin v. Ho Chunk Nation*, 512 F.3d 921 (7th Cir. 2008), for the proposition that only certain types of IGRA claims may be brought under 2710(d)(7)(A)(ii), the Seventh Circuit actually ruled that federal jurisdiction under this section of IGRA, "exists only when the alleged violation relates to a compact provision agreed upon pursuant to the IGRA negotiation process" as laid out in 25 U.S.C. § 2710(d)(3). *Id.* at 933–34. In fairness to Kalshi, the Seventh Circuit does explain in its *Ho Chunk* opinion that there are seven matters that a compact negotiated under IGRA may *address*, but this included: (1) the application of tribal laws and regulations relating directly to class III gaming; and (2) the allocation of criminal and civil jurisdiction between the state and the Indian tribe necessary for the enforcement of such laws and regulations. *Id.* Here, plaintiff contends just that: Kalshi violated the Tribal-State compact by conducting class III gaming on its Indian lands, when the Compact as

negotiated under 25 U.S.C. § 2710(d)(3) makes plain that: (1) *only* plaintiff may conduct Class II gaming; *and* (2) plaintiff has the power to prohibit third parties from conducting Class III gaming under its Compact and Gaming Ordinance.

Kalshi also points to *Blue Lake Rancheria v. Kalshi Inc.*, No. 25-CV-06162-JSC, 2025 WL 3141202 (N.D. Cal. Nov. 10, 2025), *appeal filed*, No. 25-7504 (9th Cir. Nov. 28, 2025), in support of its argument that only the parties to a Tribal-State compact may violate it, but again that is not what the court held. Rather, the court reviewed the language of the specific tribal-state compact at issue, finding it outlined *only* what the tribe was authorized to operate, while remaining "silent about what companies like [Kalshi]" could do. *Id.* at *6. In contrast, plaintiff's Tribal-State compact with Wisconsin and the incorporated Ordinance expressly prohibits "operation of any Class III gaming activities under this Compact" by any other person or entity except the Tribe itself. (Dkt. #41-1, § VI; Dkt. #41-6, § 6.C.)[3]

Treating the Tribal-State compact and incorporated Gaming Ordinance as a regulatory device is also supported by IGRA's legislative history, as well as its text. In particular, as the Senate Report on IGRA explains, "The major provisions of the bill required tribes to adopt ordinances governing gaming operations and a newly established Federal gaming commission to approve such ordinances before a game could be licensed. It provided a detailed system for the investigation and regulation of non-Indian investors and managers." S. REP. 100-446, 4, 1988 U.S.C.C.A.N. 3071, 3074. Thus, IGRA requires that regulation of class III gaming be

[3] Even less relevant is Kalshi's citation to the Seventh Circuit's decision in *Stifel, Nicolaus & Co. v. Lac du Flambeau Band of Lake Superior Chippewa Indians*, 807 F.3d 184 (7th Cir. 2015), which is wholly inapposite, addressing a question about tribal court jurisdiction over a commercial dispute *unrelated to any gaming compact or ordinance*.

carried out via Tribal-State compacts, approved by the Secretary of the Interior, and published in the federal register, just like agency regulations. 25 U.S.C. §§ 2710(d)(3)(B) & (d)(8)(D). And to ensure that tribes could enforce the Tribal-State compact and ordinances, Congress adopted broad language in IGRA's enforcement provision, § 2710(d)(7)(A)(ii), stating that a tribe could bring "*any* cause of action" to "enjoin a class III gaming activity" conducted "in *violation* of any Tribal-State compact."[4]

Of course, Congress could have limited enforcement actions to "breach of contract" claims, as Kalshi suggests, but *chose* not to limit the type of legal action or the class of defendants that could be sued, consistent with its stated, unambiguous intent in passing IGRA: to ensure that "Indian tribes have the **exclusive right to regulate** gaming activity on Indian lands . . ." 25 U.S.C. §2701(5) (emphasis added). IGRA was also intended "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments," 25 U.S.C. §2701(1); and "to provide a statutory basis for the regulation of gaming by an Indian tribe . . . to ensure that the Indian tribe is the primary beneficiary of the gaming operation." 25 U.S.C. §2701(2). Thus,

[4] As the Supreme Court has explained, a primary purpose of this provision was to delineate the extent to which Congress abrogated tribal sovereign immunity in passing IGRA. (*Id.* at 791 ("IGRA partially abrogates tribal sovereign immunity in § 2710(d)(7)(A)(ii) [by] authoriz[ing] a State to sue a tribe to 'enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal–State compact.'")); *see also Kiowa Tribe of Oklahoma v. Mfg. Techs., Inc.*, 523 U.S. 751, 758 (1998) (citing the provision as an example of legislation "restrict[ing] tribal immunity from suit in limited circumstances"); *Fla. v. Seminole Tribe of Fla.*, 181 F.3d 1237, 1242 (11th Cir. 1999) (With respect to § 2710(d)(7)(A)(ii), it is "clear that Congress abrogated tribal immunity only in the narrow circumstance in which a tribe conducts class III gaming in violation of an existing Tribal–State compact.")

IGRA's legislative history further explains that Congress intended to grant "United States district courts jurisdiction over actions by . . . a tribe or state to enjoin illegal gaming on Indian lands." S. REP. 100-446, 18, 1988 U.S.C.C.A.N. 3071, 3088. All of these purposes would be undermined if IGRA afforded no mechanism for tribes to prevent illegal, non-tribal class III gaming operations on their lands.

Finally, if there were any ambiguity as to a tribe's authority to enjoin class III gaming conducted on its tribal lands under IGRA, the well-established canons of statutory construction require that this court interpret that ambiguity to benefit the Nation tribe. *See, e.g.*, *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985) ("[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit ...."). Accordingly, the court concludes that plaintiff can sue Kalshi under IGRA for violating its Tribal-State compact and Gaming Ordinance by offering class III gaming on Indian lands absent authorization from plaintiff.

**B. "On Indian Lands"**

Defendants next argues that IGRA is irrelevant to their sports betting activities because their online activities do not take place "on Indian lands," since that is as defined by IGRA in relevant part as "all lands within the limits of any Indian reservation" and "any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual." 25 U.S.C. § 2703(4). While conceding that individuals on the Nation's Indian lands can use its platform to bet on sports, Kalshi specifically argues that running a derivatives exchange from New York, where it is headquartered, does not amount to conduct "located on Indian lands." Said differently, Kalshi asserts *ipse dixit* that IGRA applies only to "brick-and-

mortar gaming facilities physically located on Indian reservations," and thus, because it is from New York and its servers are in Ohio, IGRA does not apply. (Dkt. #29, at 25–26.)

The fundamental problem with defendant's argument is that the Supreme Court has already held in deciding whether gaming occurs on Indian lands under IGRA, that courts must look to where the *users* who are gaming are located. *Bay Mills*, 572 U.S. at 792. Indeed, in *Bay Mills*, the Court rejected the assertion that gaming activity occurs where the necessary administrative action for the gaming activity occurs. *Id.* As the Court explained, "numerous provisions of IGRA show that 'class III gaming activity' means just what is sounds like—the stuff involved in playing class III games," and thus, the "gaming activity" is not where the action occurred to oversee the gaming, but the "'gaming activity' is (once again) the gambling." *Id.* at 792–93. Since the activity at issue here is sports betting, the gaming activity similarly occurs where the bettor is physically located. *See Iipay Nation California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 967 (9th Cir. 2018) (holding that online bingo offered by tribe off Indian lands did not fall under IGRA because "the act of placing a bet or wager is the 'gambling in the poker hall,' not the 'off-site licensing or operation of the games.'"). *S. Ute Indian Tribe v. Polis*, no. 1:24-cv-01886, slip op. at 7-8 (D. Colo. Oct. 23, 2025) (same).

This holding is also consistent with IGRA's implementing regulations for internet gambling occurring on tribal land -- for example, a tribe offering internet gambling that is accessible on another tribe's Indian lands. Specifically, under IGRA regulations, tribes have jurisdiction over internet gaming transactions where the bettor is located on another tribe's lands, but only if the other tribe has "lawfully consented." 25 C.F.R. § 293.26(c). Similarly, in other areas of the law, interjurisdictional gaming is only legal where it is legal *both* where the bet originated and where it landed. *E.g.*, 18 U.S.C. § 1084(a)–(b) (gambling using wire

transmission is criminal offense unless gambling is legal in both state or foreign country where bet originated and was sent); 15 U.S.C. § 3002(3) (defining ""interstate off-track wager" as "legal wager" placed on outcome of a horserace "where lawful in each State involved"). And under the Unlawful Internet Gaming Enforcement Act ("UIGEA"), transactions involving bets that are illegal "in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made" are prohibited when made via the internet. 31 U.S.C. § 5362(10)(A). Thus, IGRA's enforcement provision and other regulations, as well as other federal laws, recognize that internet gambling occurs *at least* in the place where the bettor places a bet, and plaintiff has adequately alleged that Kalshi is offering unauthorized gaming on its lands.

**C. The Unlawful Internet Gambling Enforcement Act ("UIGEA")**

As mentioned above, defendants also argue is that the UIGEA affirmatively authorizes its online sports betting, even if it occurs on Indian lands without permission from and regulated by a tribe. Enacted by Congress in 2006, UIGEA regulates online gambling. 31 U.S.C. § 5361(a)(4). However, unlike IGRA or other gambling regulations, UIGEA does not make gambling legal or illegal. Indeed, Congress expressly *disavowed* any intent to "alter[], limit[], or extend[]" existing federal, state and tribal gaming regulations, including IGRA. 31 U.S.C. § 5361(b). Instead, UIGEA makes it illegal for a "person engaged in the business of betting or wagering" to accept knowingly certain financial payments from an individual who is engaged in "unlawful Internet gambling." 31 U.S.C. § 5363.

Unlawful internet gambling occurs when an individual places or receives a "bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands *in which the*

*bet or wager is initiated, received, or otherwise made*." 31 U.S.C. § 5362(10)(A) (emphasis added). A "bet or wager" includes "staking or risking" something of value, purchasing a lottery ticket, or transmitting "any instructions or information pertaining to the establishment or movement of funds by the bettor or customer in, to, or from an account with the business of betting or wagering." 31 U.S.C. § 5362(1). Thus, at most, UIGEA allows for internet gambling that is otherwise legal; it neither creates nor even addresses a system in which a "bet or wager" is illegal where it is "initiated" or "received," including gaming on Indian lands. *See Iipay Nation of Santa Ysabel*, 898 F.3d at 965 (discussing application of UIGEA to Indian lands). In short, the UIGEA prevents using the internet to circumvent existing state, tribal and federal gambling laws, but does not create any additional substantive prohibitions.

If this was all UIGEA did, Kalshi's argument would be meritless on its face. In fairness, however, Kalshi's argument relies on an exception in the reach of the UIGEA, which carves out CFTC-regulated transactions from its scope. In particular, the UIGEA definition of "bet or wager" excludes "any transaction conducted on or subject to the rules of a registered entity or exempt board of trade under the [CEA]." 31 U.S.C. § 5362(1)(E)(ii). As a result of this exclusion, Kalshi argues that sports event contracts on Kalshi's platform are by implication lawful gaming activity, regardless of the lawfulness of gambling in the states or tribal lands in which the "event contracts" are initiated or received. However, this argument goes too far. To begin, just because Kalshi's conduct is not *prohibited* by the UIGEA, does not make its offering of sports betting contracts legal anywhere, much less on Indian lands where it is expressly prohibited.

More importantly, plaintiff has not sued Kalshi under the UIGEA, and whether Kalshi's conduct violates that law is largely irrelevant to plaintiff's claim under IGRA, except perhaps

to the extent that it is notable Congress chose not to include or add a similar carve out in IGRA. Indeed, Kalshi cites no controlling legal authority to support its premise that UIGEA supplants all law applicable to internet gaming, nor that UIGEA somehow displaces IGRA's more elaborate system at the federal, state and tribal levels for regulating class III gaming conducted on Indian lands.

At most, Kalshi notes that as part of its decision to deny a motion for preliminary injunction, the Northern California district court in *Blue Lake Rancheria*, 2025 WL 3141202, found significant the plaintiffs' failure to "identif[y] any Tribal-State compact provision regulating gambling which the UIGEA, as applied here, alters, limits, or extends." *Id*. at *6. But that decision is certainly not controlling, and in any event, plaintiff in this case *has* identified provisions in the Tribal-State compact as well as in IGRA, that applying a UIGEA-like carve-out for CFTC-regulated transactions from the definition of "bet or wager" *would* alter, limit or extend. Moreover, as discussed, the UIGEA is a non-substantive, payment-processing law that Congress narrowly tailored *to prohibit* using certain kinds of financial transactions to fund gaming that is already unlawful; and that Act neither creates any substantive prohibitions for gaming itself, nor supersedes other gaming laws. Rather, UIGEA states just the opposite: "No provision of this section shall be construed as altering, superseding, or otherwise affecting the application of the Indian Gaming Regulatory Act[,]" *id.* § 5365(b)(3), or "as altering, limiting, or extending any Federal or … Tribal-State compact prohibiting, permitting, or regulating gambling within the United States." The UIGEA goes even further by directing that it should not even "be construed as" doing either. *Id.* § 5361(b). Thus, nothing about the UIGEA prevents plaintiff from pursuing its claim under IGRA. *See Ipay Nation*, 898 F.3d at

968 ("[T]here is no direct conflict between IGRA and the UIGEA and, thus, we give effect to the provisions of both statutes.")

**D. Commodity Exchange Act**

Defendants' final argument for dismissal of plaintiff's IGRA claim relates to Kalshi's separate regulation by the CFTC under the CEA. In defendants' view, the CEA grants exclusive jurisdiction to the CFTC over "designated contract markets" ("DCMs") and the event contracts Kalshi lists, and, therefore, the CEA preempts the application of plaintiff's Gaming Ordinance, as well as IGRA as a whole when it comes to those contracts. In support, defendants refer this court to CEA's provision stating that the CFTC:

> shall have exclusive jurisdiction … with respect to accounts, agreements …, and transactions involving swaps or contracts of sale of a commodity for future delivery …, traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution facility pursuant to section 7b-3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title.

7 U.S.C. § 2(a)(1)(A).

In response, plaintiff argues that Kalshi's sports-event contracts fall outside the CFTC's exclusive jurisdiction because they do not qualify as "swaps" or "contracts of sale of a commodity for future delivery." Notably, several *district* courts have reached a similar conclusion. *E.g.*, *Ohio Gambling Recovery, LLC, v. Kalshi Inc., et al.*, No. 4:25-CV-1573, 2026 WL 865788, at *6 (N.D. Ohio Mar. 30, 2026); *KalshiEX LLC v. Schuler*, No. 2:25-cv-1165, 2026 WL 657004, at *4 (S.D. Ohio Mar. 9, 2026); *KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 3286282 at *11 (D. Nev. Nov. 24, 2025); *N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd.*, No. 2:25-CV-00978-APG-BNW, 2025 WL 2916151, at *4-5 (D. Nev. Oct. 14, 2025) ("*Crypto*"). Finally, in a case concerning betting on election

results, Kalshi itself appears to have taken a different position than it does now regarding whether sports event contracts are "swaps." *See* Brief of Appellee KalshiEX LLC at 41, KalshiEX LLC v. CFTC, No. 24-5205 (D.C. Cir. Nov. 15, 2024) ("[A]s the legislative history directly confirms Congress did not want sports betting to be conducted on derivatives markets."); *see also* Kalshi's Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment at the district court level, ECF No. 17-1 (noting that a provision of the Commodity Exchange Act, which the court will discuss, "functions as a check on attempts to launder . . . sports gambling through the derivatives markets" (citing 7 U.S.C. 7a-2(c)(5)(C)(i)(V))).

However, the Third Circuit -- to date, the only circuit to have considered the issue -- recently issued a decision holding that because Kalshi's sports-related event contracts *are* swaps under the CEA, state law purporting to regulate Kalshi's event contracts is preempted. *KalshiEX, LLC v. Flaherty*, No. 25-1922, 2026 WL 924004, at *4 (3d Cir. Apr. 6, 2026). Kalshi also submitted three complaints recently filed in federal district courts by the CFTC itself, in which the agency argues that federal law preempts state law.[5]

Although these recent decisions and the CFTC complaints provide some regulatory guidance, none are dispositive of the issues before this court. Plaintiff has not asserted any state law claims, and all the discussions and arguments relating to federal preemption over state

[5] Notably, neither the Third Circuit decision nor CFTC complaints address the potentially absurd results that could flow from defining a "swap" to include sports-event contracts. Under this interpretation of the CEA, even if sports wagering and sports event contracts constitute "gambling" under state (or tribal) law, a sports event contract becomes a "swap" once it is listed on a DCM. (*See* Cpt. ¶¶ 82–83.) But under the CEA, it is "unlawful for any person ... to enter into a swap" outside of a DCM. 7 U.S.C. § 2. In other words, Kalshi's position would seem to require forcing *all* sports betting onto DCMs. As one court explains it, Kalshi's argument boils down to this: "if contracts are not traded on an exchange, then they are not swaps that must be traded on an exchange." *Hendrick*, 2025 WL 3286282 at *9. The same court rejected this logic as "self-fulfilling, circular, and inconsistent with the statutory text." *Id*.

law do not address the question whether the CEA preempts or repeals tribal authority under IGRA, plaintiff's Tribal-State compact and its Gaming Ordinance. In other words, even if this court were to agree with the Third Circuit or the CFTC, holding that Kalshi's sports-event contracts are swaps subject to the CFTC's jurisdiction, defendants have not shown that the CEA would necessarily preempt or repeal IGRA, nor limit plaintiff's tribal authority. On the contrary, "[a]lthough Congress has plenary authority over tribes," the U.S. Supreme Court cautions against "lightly assum[ing] that Congress in fact intends to undermine Indian self-government." *Bay Mills Indian Cmty.*, 572 U.S. at 790. Neither are courts to find Congress repealed its own laws "by implication," nor abrogate tribal sovereign authority without expressly and unequivocally saying it is doing so. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59 (1978); *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 18 (1987); *see also Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress ... does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions -- it does not, one might say, hide elephants in mouseholes.") All of these conditions appear particularly apt here, given that accepting Kalshi's position "would have a seismic impact on Indian tribes' authority to regulate gaming on tribal land[.]" *KalshiEX, LLC v. Schuler*, No. 2:25-CV-1165, 2026 WL 657004, at *6 (S.D. Ohio Mar. 9, 2026). Because Kalshi has developed no persuasive argument that the CEA and CFTC jurisdiction would abrogate, repeal or otherwise deny *tribal* authority (as opposed to state law) delegated by Congress under IGRA, the CEA is not a basis for dismissal of plaintiff's IGRA claim.

**E. Preliminary Injunctive Relief**

The final question relating to plaintiff's IGRA claim is whether the court should grant a preliminary injunction precluding Kalshi from offering sports event contracts on plaintiff's Indian land absent permission from the Nation. Although the court has concluded already that plaintiff's complaint states a claim under IGRA, there is a fundamental difference between stating a viable claim and obtaining preliminary injunctive relief. Stating a claim requires only plausible allegations, which plaintiff's complaint has done, while a "preliminary injunction is an extraordinary remedy intended to preserve the status quo until the merits of a case may be resolved." *Indiana Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 770 (7th Cir. 2001). To begin, a plaintiff seeking an injunction must make two, threshold showings: a likelihood of success on the merits *and* irreparable harm. *Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Dept. Health*, 699 F.3d 962, 972 (7th Cir. 2012). As noted, these are independent requirements, so if a plaintiff fails to establish irreparable harm, the court may deny an injunction on that ground alone, without considering a likelihood of success on the merits. *DM Trans, LLC v. Scott*, 38 F.4th 608, 618 (7th Cir. 2022). The mere possibility of harm is also not enough; the plaintiff must show that irreparable harm is *likely*. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008).

In this case, plaintiff alleges two types of harm: economic and non-economic. With respect to economic harm, plaintiff alleges that Kalshi's sports event contracts will deprive it of gaming revenue needed to fund its government, support economic development, and take care of its members. However, plaintiff has produced little evidence to support its assertions. In particular, despite Kalshi having operated sports event contracts for several months, plaintiff provides no evidence showing: a measurable change in customer visitation or attendance

numbers at its casinos; declines in consumer spending; changes in revenue or profitability at any of its casinos; or even anecdotal evidence from a single consumer stating that he or she has recently spent less money at plaintiff's facilities because of Kalshi's contracts being offered as an alternative. Thus, while one might infer *some* loss of revenue, plaintiff's assertions about *current* monetary harm, much less of a magnitude to present a risk to the Nation's economic livelihood, are largely unsupported by any evidence. Rather, it would seem likely that any interim loss is marginal at best and compensable at worst.[6]

As for non-economic harm, plaintiff claims that Kalshi's actions interfere with the Nation's sovereignty and rights granted under IGRA. Although the court agrees that such harm may be significant, the court is not persuaded that interfering with the status quo, particularly in light of the substantial legal and regulatory questions involved, is appropriate or even necessary, as plaintiff has to date failed to show that it will suffer the kind of immediate and irreparable harm required for entry of a preliminary injunction. Accordingly, the court will deny plaintiff's request for preliminary injunctive relief on its IGRA claim.

**A. Lanham Act Claim**

Plaintiff also brings a false advertisement claim against defendant Kalshi, contending its advertisements stating that Kalshi offers legal, nationwide sports betting are false under federal, state and tribal prohibitions on sports gambling. To state a false advertising claim under the Lanham Act, a plaintiff must allege: (1) the defendant made a material false

[6] Kalshi is strongly encouraged to monitor and preserve where online sports betting is occurring by whatever means available, including tracking originating bets, URLs, financial transactions or other means.

statement of fact in a commercial advertisement; (2) the false statement actually deceived or had the tendency to deceive a substantial segment of its audience; and (3) the plaintiff has been or is likely to be injured as a result of the false statement. *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 382 (7th Cir. 2018); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014). Kalshi argues that plaintiff has failed to show both that it made a false statement or that plaintiff has been injured as a result.[7]

A plaintiff can prove that advertising is false by showing that it contains a statement that is "literally false" or a statement that, while literally true, implicitly conveys a false message, is misleading, or is likely to deceive consumers. *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 382 (7th Cir. 2018). Literal falsity means a statement that is "bald-faced, egregious, undeniable, [and] over the top." *Id.* (quoting *Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 513 (7th Cir. 2009)). For the other category of statements -- those that are literally true but misleading -- the plaintiff must allege customer confusion. *Id.*

Here, Kalshi argues that its statements about the legality of its sports event contracts are not actionable as false or misleading statements under the Lanham Act, at least under the current state of the law, because there is no clear, legal authority on the issue. Although the Seventh Circuit has not addressed the question, many courts follow guidance from the D.C. and the Ninth Circuit Courts of Appeal regarding whether statements about legality are actionable under the Lanham Act. In *Dial A Car, Inc. v. Transportation, Inc.*, 82 F.3d 484 (D.C. Cir. 1996), the court of appeals addressed a situation in which two taxicab companies

[7] Notably, Kalshi does not argue that plaintiff lacks Article III standing to assert a false advertisement claim, but rather that plaintiff lacks "prudential or statutory" standing under the Lanham Act. (Dkt. #29, at 28–29.) Because the court is dismissing this claim for a different reason, it declines to address defendants' non-jurisdictional standing arguments.

advertised their legal authority to provide corporate services in the District of Columbia using cars not licensed there. The parties disputed the interpretation of a Taxicab Commission administrative order on the subject, which had not yet been tested in court. *Id.* at 486. In response to the defendants' motion to dismiss, the plaintiff presented a Declaration of the Commission's General Counsel purporting to opine that the defendants were acting in violation of the order. *Id.* However, the district court refused to consider it and dismissed the complaint, reasoning that the Commission had not yet resolved the question at the time of the defendants' statements, and the D.C. Circuit affirmed, holding that "there must be a clear and unambiguous statement *from the Taxicab Commission*" such that "the law was unambiguous *at the time [the] alleged misstatements were made*." *Id*. at 489 (emphasis in original). Similarly, in *Coastal Abstract Service, Inc. v. First American Title Insurance. Co*., 173 F.3d 725 (9th Cir. 1999), the statement at issue involved whether an escrow agent offered services in California despite not being licensed under that state's statute. *Id*. at 731. At the time the statement was made, however, the Ninth Circuit found no clear authority on the question of the legal requirement of a state license as a condition of offering services. Accordingly, that court also held the statement was not actionable under the Lanham Act. *Id.* at 732. In particular, the court instructed that "[a]bsent a clear and unambiguous ruling from a court or agency of competent jurisdiction, statements by laypersons … purport[ing] to interpret the meaning of a statute or regulation are opinion statements, and not statements of fact." *Id.* at 731.

Although the Seventh Circuit has not directly opined on the issue, many other courts have relied on *Coastal Abstract* and *Dial A Car* for the general rule that, to be actionable, a statement about legality or compliance is an "unactionable opinion" for purposes of the Lanham Act absent a "clear and unambiguous ruling" from a court or agency on the issue. *E.g.,*

*Azurity Pharms., Inc. v. Edge Pharma, LLC*, 45 F.4th 479, 493 (1st Cir. 2022); *Dental Recycling N. Am., Inc. v. Stoma Ventures, LLC*, No. 4:23 CV 670 CDP, 2023 WL 6389071, at *4 (E.D. Mo. Oct. 2, 2023); *McDavid Knee Guard, Inc. v. Nike USA, Inc.*, No. 08 CV 6584, 2010 WL 3000178, at *3 (N.D. Ill. July 28, 2010); *Sierra Shelving, Inc. v. Design Assistance Constr. Sys., Inc.*, No. 2:07CV281, 2008 WL 11512375, at *3 (E.D. Va. May 13, 2008). Applying that same guidance in this case, this court agrees that plaintiff has failed to provide any definitive guidance regarding the legality of Kalshi's sports event contracts. Instead, both sides have shown that courts, as well as federal, state and tribal agencies, have provided mixed opinions. Moreover, given that Kalshi has consistently taken the position that it is governed by the CFTC and only the CFTC, *and* no court agency has yet to reject its position in a definitive decision, plaintiff's allegations do not permit an inference that Kalshi's advertisements are false, misleading or lacking a good-faith belief in the opinion's truth. Accordingly, the court will dismiss plaintiff's Lanham Act claim.

**B. RICO**

Finally, plaintiff also asserts claims against Kalshi and Robinhood under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Enacted to strengthen criminal and civil remedies against organized crime, RICO has been construed more broadly to afford a private right of action for any person "injured in his business or property by reason of a violation of" that Act's substantive provisions. 18 U.S.C. § 1964(c). In pertinent part, the Act makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity

or collection of unlawful debt." 18 U.S.C. § 1962(c). "Racketeering activity" includes gambling chargeable under state law and punishable by imprisonment for more than one year, as well as wire and mail fraud. 18 U.S.C. § 1961(1)(A)–(B). Thus, to advance a civil RICO claim, a plaintiff must allege that the defendant committed a crime (a so-called "predicate act").

Here, plaintiff's complaint identifies three such predicate acts: wire fraud (18 U.S.C. § 1343); transmitting wagering information in violation of the Wire Act (18 U.S.C. § 1084); and operation of an illegal gambling business (18 U.S.C. § 1955). (Dkt. #1, ¶ 153.) However, the court agrees with defendant that none are adequately alleged. As an initial matter, the elements of mail fraud are: (1) the defendant's participation in a scheme to defraud; (2) defendant's commission of the act with intent to defraud; and (3) use of the mails in furtherance of the fraudulent scheme. 18 U.S.C. §§ 1341, 1343; *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 657 (7th Cir. 2015). The elements of wire fraud as alleged by plaintiff are the same, except that it requires use of interstate wires rather than mail in furtherance of the scheme. *Id.* Thus, both mail and wire fraud require "proof of intent to defraud, proof that the defendant willfully participated in a scheme with knowledge of its fraudulent nature[,] and the intent to achieve illicit objectives." *United States v. Hagen*, 917 F.3d 668, 672 (8th Cir. 2019); *see also United States v. Filer*, 56 F.4th 421, 434 (7th Cir. 2022) (intent to defraud requires a "willful act . . . with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another") (internal citation and quotations omitted).

In contrast, plaintiff has failed to allege that defendants had a plan or scheme to defraud and an intent to defraud. As discussed above, plaintiff's allegations also do not permit an inference that defendants willfully schemed or intended to defraud customers or consumers

criminally to achieve illicit objectives. Rather, plaintiff's allegations suggest that defendants have acted openly, offering a federally-regulated, derivatives market to participants, and under at least a colorable argument that their activities are legal under the CEA as insulated by the CFTC. Indeed, the "victims" of the fraud -- those gambling on sports outcome -- do not appear to be defrauded at all, except to the extent they may be unwittingly violating tribal law, since they are apparently getting similar renumeration as bettors with Kalshi as they would with the Nation. Certainly, plaintiff has every right to seek to shut down defendants operating its otherwise legal gambling enterprise on its tribal lands, but claiming they are engaged in a *criminal* enterprise under RICO goes too far. Accordingly, plaintiff's RICO claim will be dismissed for failure to state a claim upon which relief may be granted.

## ORDER

IT IS ORDERED that:

1) Defendants' motions to dismiss (dkt. #28 and dkt. #31) are GRANTED IN PART and DENIED IN PART. The motions are GRANTED with respect to plaintiff's claims under the Lanham Act and Racketeer Influenced and Corrupt Organizations Act. The motions are DENIED in all other respects.
2) Robinhood Derivatives, LLC, and Robinhood Markets, Inc. are DISMISSED as defendants.
3) Defendants' request for judicial notice of the Tribal-State Compact (dkt. #34) is GRANTED.
4) Plaintiffs' motion for preliminary injunctive relief (dkt. #37) is DENIED.

5) The motion for leave to file amicus brief (dkt. #56) by various entities is GRANTED.

Entered this 11th day of May, 2026.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

HO-CHUNK NATION,

Plaintiff,

v.

KALSHI INC., KALSHIEX LLC,
ROBINHOOD MARKETS, INC. and
ROBINHOOD DERIVATIVES LLC,

Defendants.

OPINION and ORDER

25-cv-698-wmc

---

Plaintiff Ho-Chunk Nation, a federally-recognized Indian tribe, filed this lawsuit to prohibit defendants Kalshi Inc. and KalshiEX LLC (collectively, "Kalshi") and Robinhood Derivatives LLC, and Robinhood Markets, Inc. (collectively, "Robinhood") from offering online sports betting on its tribal land. Specifically, plaintiff claims that: (1) the sports-related "event contracts" that defendants offer on their nationwide prediction markets amount to unlawful gaming in violation of the Indian Gaming Regulatory Act, 25 U.S.C. § 2701-2721 ("IGRA"); (2) Kalshi's advertisements for "legal" sports betting are false or misleading in violation of the Lanham Act, 15 U.S.C. § 1125; and (3) all defendants are engaged in criminal racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c). Early in the case, defendants filed a motion to dismiss, which the court granted as to plaintiff's claims under the Lanham Act and RICO, but denied as to the IGRA claims. (Op. & Order (dkt. #97).) Plaintiff also filed a motion for a preliminary injunction, which the court denied after finding that, although plaintiff had shown a likelihood of success on the merits of its IGRA claim, it had not shown irreparable harm absent preliminary injunctive relief. (*Id.*)

Now before the court is plaintiff's motion to amend its complaint to replead its Lanham Act claims to include allegations that defendants' statements about the legality of sports betting are false under IGRA as well. (Dkt. #99.) That motion will be denied for the reasons set forth below. Also before the court is defendants' motion for a certificate of appealability and to certify for interlocutory appeal the court's order denying in part and granting in part their motion to dismiss. (Dkt. #101.) Because the issue here is novel, as well as percolating up to federal courts of appeals around the country and likely to the Supreme Court, that motion will be granted and this case will be stayed pending the outcome of defendants' interlocutory appeal.

## OPINION

### I. Plaintiff's Motion for Leave to File an Amended Complaint

Plaintiff's original Lanham Act claim was for false advertising based on Kalshi's allegedly false offering of *legal* sports betting in all 50 states. But the court dismissed that claim because under the current state of the law, there is no "clear and unambiguous" authority resolving whether Kalshi's sports event contracts are legal. *See Coastal Abstract Service, Inc. v. First American Title Insurance. Co.*, 173 F.3d 725, 731 (9th Cir. 1999) ("Absent a clear and unambiguous ruling from a court or agency of competent jurisdiction, statements by laypersons … purport[ing] to interpret the meaning of a statute or regulation are opinion statements, and not statements of fact."); *Dial A Car, Inc. v. Transportation, Inc.*, 82 F.3d 484, 489 (D.C. Cir. 1996) (there must be a definitive statement from the relevant governing agency that "the law was unambiguous *at the time [the] alleged misstatements were made*" (emphasis in original)). As this court explained in dismissing plaintiff's Lanham Act claim, courts have so far reached

"mixed opinions" as to the legality of Kalshi's sports event contracts. (Op. & Order (dkt. #97) 27). Since that dismissal, several more courts have weighed in, again with mixed results. *Compare KalshiEX, LLC v. Assad*, No. 25-7516, 2026 WL 2543846, at *7, 14 (9th Cir. Aug. 28, 2026) (holding that "[t]he CEA likely does not preempt Nevada's gaming regulations as applied to Kalshi's sports event contracts[,]" and "accepting Kalshi's argument that Congress delegated its power to regulate gambling (a power traditionally exercised by the States and Tribes) to the CFTC … would create a major-questions problem"), and *CFTC v. Wisconsin*, *et al.*, No. 26-C-749, 2026 WL 2474512, at *11 (E.D. Wis. July 29, 2026) ("CFTC has not shown that it is likely to prevail on its argument that the CEA's definition of 'swaps' covers the event contracts offered by entities such as Kalshi"), *with United States v. Minnesota*, No. 26-CV-2661 (KMM/DTS), 2026 WL 2150211, at *12 (D. Minn. July 27, 2026) (granting Kalshi's motion for preliminary injunction on grounds that CEA likely preempts state gambling law).

Nonetheless, plaintiff contends that it should be allowed to revive its false advertising claim by pleading that *IGRA*, 25 U.S.C. § 2710(d)(3), as opposed to state or other federal law, provides "definitive guidance that sports betting is not legal in all 50 states on Kalshi." (Plt.'s Br. (dkt. #99) 2.) Specifically, plaintiff argues that IGRA provides clear and unambiguous language prohibiting class III gaming on tribal lands unless expressly authorized by the tribe or conducted in conformance with a tribal-state compact. However, IGRA's statutory language is not as "definitive" or "unambiguous" as plaintiff asserts with respect to the legality of Kalshi's sports event contracts. Not only does that statute *not* expressly address multiple, complex questions at issue here, including whether Congress must authorize federal regulation of gambling before an agency may claim that right, but to date, the only two courts to have considered the specific question regarding IGRA and online sports events contracts have

reached differing conclusions. *Compare* Op. & Order (dkt. #97) 8, *with Blue Lake Rancheria v. Kalshi Inc.*, 2025 WL 3141202, at *6 (N.D. Cal. Nov. 10, 2025) (finding that IGRA does not govern Kalshi's sports event contracts). Moreover, there have been no "definitive" decisions regarding whether the CEA may preempt IGRA on the issue of so-called "sports events contracts" now listed on a derivative exchange. Thus, even though this court concluded that plaintiff had shown a likelihood of success on its IGRA claim, that is not sufficient to revive plaintiff's false advertising claim.

Alternatively, plaintiff argues that Kalshi's original advertisements purporting to offer "sports betting" or "sports gaming" are false or materially misleading to consumers on their face, since Kalshi actually purports to be offering event contracts on a derivative exchange. Thus, plaintiff argues, by using the terms "betting" and "gaming," Kalshi is either in violation of IGRA *or* is misrepresenting the nature of its services in violation of the Lanham Act. However, as this court recognized throughout its earlier opinion, Kalshi *does* offer sports betting. (Op. & Order (dkt. #97) ("the activity at issue here is sports betting"); *see Assad*, No. 25-7516, 2026 WL 2543846, at *11 ("Kalshi's attempts to distinguish its sports event contracts from sportsbooks betting are unpersuasive."). The fact that Kalshi changed its business strategy to emphasize its betting as "sports event contracts" does not make its original advertisements false or misleading unless definitively found to be in violation of the law.

Because plaintiff's proposed amended complaint does not state a claim under the Lanham Act for false advertising, therefore, plaintiff's motion for leave to amend will be denied as futile. *See Indiana Funeral Directors Ins. Tr. v. Trustmark Ins. Corp.*, 347 F.3d 652, 655 (7th Cir. 2003) (courts can deny leave to amend under Fed. R. Civ. P. 15 if amendment would be futile).

## II. Defendants' Motion for Certification of Interlocutory Appeal

That leaves the question whether to certify for interlocutory appeal the following legal questions proposed by defendants:

> (1) whether an alleged violation of a tribal gaming ordinance is actionable as a compact violation under IGRA; and
>
> (2) whether the CEA's grant of exclusive jurisdiction to the CFTC bars Indian tribes such as Plaintiff from regulating derivatives traded on DCMs, as confirmed by UIGEA's express carve-out for transactions on DCMs in the context of internet gaming legislation.

(Dfts.' Br. (dkt. #102) 2.) Before certifying an order for interlocutory appeal, a court must find that "[its] order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Said another way: (1) there must be a question of law, (2) that is controlling, (3) contestable and (4) its resolution must promise to speed up the litigation. *Ahrenholz v. Bd. of Trs. of Univ. of Ill.*, 219 F.3d 674, 675 (7th Cir. 2000) (citation omitted).

As an initial matter, the court agrees with plaintiff that the questions as phrased by defendants above do not accurately reflect the court's reasoning and conclusions as set forth in the May 11, 2026, opinion and order granting in part and denying in part defendants' motion to dismiss. Instead, the controlling questions in the court's view are more accurately phrased as follows:

> (1) Can the Nation bring a claim under IGRA to enjoin class III gaming, unauthorized by the tribe but offered on tribal land by an entity that is not party to the Tribal-State compact? (This court answered "yes.")
>
> (2) Does the CEA or UIGEA preempt the Nation's authority under IGRA to regulate class III gaming activity that is offered on tribal lands in the form of sports events contracts on a derivative exchange? (This court answered "no.")

Phrased as such, the court agrees with defendants that the four criteria for certifying the court's opinion and order for interlocutory appeal are satisfied. First, even plaintiff concedes that the court's opinion "turns on pure questions of law." (Plt.'s Opp. Br. (dkt. #105) 4.) Second, the questions are controlling. If the Seventh Circuit disagrees with this court's ruling on either question, plaintiff's claims against defendants must be dismissed. Third, the questions are contestable as reflected by mixed decisions from courts around the country as to both questions. *See* discussion, *supra*. Finally, resolution of these questions will unquestionably speed up the litigation. In particular, regardless how this court rules ultimately on the merits, the case will certainly be appealed all the way up to the Supreme Court. Asking the Seventh Circuit to address these questions now creates a possibility that controlling legal issues may be more efficiently resolved without summary judgment or trial. The court recognizes that interlocutory appeals under § 1292(b) are "'not intended merely to provide review of difficult rulings in hard cases.'" *Union County v. Piper Jaffray & Co.*, 525 F.3d 643, 646 (8th Cir. 2008) (quoting *U.S. Rubber Co. v. Wright*, 359 F.2d 784, 785 (9th Cir. 1966) (per curiam)). Given that this case presents novel and complex questions for which there is no controlling precedent in this circuit, the court concludes that permitting an interlocutory appeal is appropriate in this case.

A final remaining question is whether this case should be stayed pending the outcome of an interlocutory appeal. The parties address defendants' entitlement to a stay under under standards mirroring those for granting a preliminary injunction. *See In re A & F Enters., Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014) ("The standard for granting a stay pending appeal mirrors that for granting a preliminary injunction.") In brief, this means courts consider the likelihood of success on the merits, the irreparable harm that each side stands to incur, and the public's

interest in the outcome. (*Id.*) However, "the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Tex. Indep. Producers & Royalty Owners Ass'n v. E.P.A.*, 410 F.3d 964, 980 (7th Cir. 2005) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)); *see also Munson v. Butler*, 776 F. App'x 339, 342 (7th Cir. 2019) ("[A] district court has inherent power to exercise its discretion to stay proceedings to avoid unnecessary litigation of the same issues.")

Aside from possible disputes over damages, the outcome of this case is not likely to turn on the resolution of factual disputes, but rather on resolution of legal questions that the Seventh Circuit could consider now if it accepts defendant's interlocutory appeal. If the case were to continue simultaneously in this court, the next stage would likely be summary judgment, during which this court would face the very same legal questions, albeit far less definitively. To avoid duplication of effort and unnecessary resources and expense that would arise from litigating the same claims in two courts, the court will stay this case pending the outcome of defendants' interlocutory appeal.

ORDER

IT IS ORDERED that:

1) Plaintiff Ho-Chunk Nation's motion for leave to amend its complaint (dkt. #99) is DENIED.
2) Defendants' motion for certification of interlocutory appeal (dkt. #101) is GRANTED, and this court CERTIFIES its May 11, 2026, opinion and order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

3) Consistent with this order, the court will STAY all proceedings pending resolution of the legal questions certified for interlocutory appeal provided defendants seek leave to appeal from the Seventh Circuit expeditiously.

Entered this 11th day of September, 2026.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge

# EXHIBIT C

United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, D.C. 20240

JUL 30 1992

Honorable John R. Mann
Vice-Chairman, Wisconsin Winnebago Tribe
P.O. Box 667
Black River Falls, Wisconsin 54615

Dear Vice-Chairman Mann:

On June 19, 1992, we received the Wisconsin Winnebago Tribe (Tribe) and State of Wisconsin Gaming Compact of 1992, dated June 11, 1992, accompanied by Exhibit A, Tribal Resolution No. 6-10-92 B, and Exhibit B, identified as a list of mechanical games operated by the Tribe. Exhibit A contains the approval of the Business Committee for the tribal/state compact; authorizes Vice-Chairman John R. Mann to execute the contract; and requests approval by the Secretary of the Interior. Exhibit B, at this time, states "NONE." Pursuant to delegated authority and Section 11 of the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2710, we approve the compact.

The compact shall take effect when notice of approval is published in the FEDERAL REGISTER, pursuant to Section 11 (d)(3)(B) of the IGRA. We have the following general comments on the compact.

We note that Subsection IX(B) of the compact, p. 11, authorizes the hiring of a convicted felon in the conduct of Class Ill gaming under certain circumstances. Although the inclusion of this provision does not require that we disapprove the compact, we could not approve a management contract based upon such a provision. This provision may also be unacceptable under the National Indian Gaming Commission (Commission) regulations when the Commission promulgates such regulations and assumes responsibility for approval of gaming contracts. See Memorandum dated March 26, 1992, from Assistant Solicitor, Branch of Tribal Government and Alaska, a copy of which is enclosed.

Subsection V(F) of the compact provides for the serving of alcoholic beverages at locations where authorized games are conducted. The Tribe does not currently have a valid liquor ordinance. The possession or sale of liquor in Indian country is a violation of Federal criminal law unless the liquor is sold in

compliance with a duly-adopted tribal ordinance authorizing such sale, certified by the Secretary of the Interior and published in the FEDERAL REGISTER. 25 U.S.C. §1161. The Area Director, Minneapolis Area Office, can provide the necessary technical assistance.

The IGRA provides that any tribal-state compact for Class III gaming activity may provide for "the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity...." 25 U.S.C. §2710(d)(3)(C)(iii). The IGRA further provides that, except for such assessments, the IGRA does not confer on the State any authority to impose any tax, fee, charge or other assessment upon an Indian tribe for Class III gaming activity. Section XXV of the Compact provides for the reimbursement of state costs. The Compact provides that (1) for fiscal year ending June 30, 1992, the Tribe shall pay the State $2083.33, (2) thereafter, until all tribes which requested negotiations have concluded compacts, the Tribe will pay $25,000 per fiscal year, and (3) when all the tribes have concluded compacts, annual reimbursement will be based on each tribe's share of $350,000, determined by each tribe's proportionate share of the gross annual gaming handle for all Class III gaming in the State of Wisconsin. Both the tribal attorney, Jim Townsend, and the attorney for the State, Michael Lethien, have informed us that both the Tribe and the State consider that a compact is "concluded" for the purposes of this provision when the Tribe and the State have signed the Compact. All tribes which requested negotiation have now concluded compacts. The $25,000 provision will therefore never become applicable.

The annual total assessment of $350,000 does not appear unreasonable for eleven tribes and for the degree of regulation proposed under the Compact. An additional issue is raised, however, by Subsection XXV(D) of the Compact, which provides that the Tribe "shall also directly reimburse the Department of Justice and the Lottery Board for their actual and necessary costs of providing services and assistance at the request of the Tribe." The tribal attorney and the state attorney have informed us that this provision allows the State to bill the Tribe only for additional services rendered at the request of the Tribe which are above and beyond the responsibilities of the State under the Compact, such as additional background investigations or audits. We have therefore concluded that the provision for reimbursement of state costs does not violate the IGRA.

Subsection XXIV(C) of the Compact provides that, for purposes of an action in Federal court for declaratory and injunctive relief, an allegation that an official or employee violated the compact shall be deemed "as an allegation that said official or employee is acting in excess of his/her authority for purposes of jurisdiction only." It is not certain that a court would accept jurisdiction under such an agreement. While the possible unenforceability of this provision does not require that we disapprove the Compact, we suggest that the Tribe consider the possibility of an amendment to the Compact setting forth specific mediation or

arbitration procedures.

For your information, Section 11 (d) of the IGRA requires that the Chairman of the Commission approve tribal ordinances authorizing Class III gaming. The Commission has not yet issued final regulations governing such approvals. When those regulations are issued, you must submit the tribal ordinances to the Commission for approval.

We wish the Tribe and the State success in this economic venture.

Sincerely,

William D. Bettenberg

Acting Assistant Secretary - Indian Affairs

Enclosures

Identical Letter to: Honorable Tommy G. Thompson
Governor of Wisconsin Madison,
Wisconsin 53707

cc: Minneapolis Area Office with copy of approved amendment
Supt., Great Lakes Agency w/copy of approved amendment National Indian Gaming Commission w/copy of approved amendment Penny Coleman, SOL
Twin Cities Regional Solicitors w/copy of approved amendment
U.S. Attorney - State of Wisconsin

DEPARTMENT OF THE INTERIOR

Bureau of Indian Affairs

Indian Gaming

AGENCY: Bureau of Indian Affairs. Interior.

ACTION: Notice of approved Tribal-State Compact.

SUMMARY: Pursuant to 25 U.S.C. 2710 of the Indian Gaming Regulatory Act of 1988 (Pub. L. 100--497), the Secretary of the Interior shall publish, in the Federal Register, notice of approved Tribal-State Compacts for the purpose of engaging in Class III (casino) gambling on Indian reservations. The Assistant Secretary-Indian Affairs, Department of the Interior, through his delegated authority has approved the Wisconsin Winnebago Tribe and State of Wisconsin Gaming Compact of 1992 executed on June 11. 1992.

DATE: This action is effective August 5, 1992.

ADDRESS: Office of Tribal Services, Bureau of Indian Affairs, Department of the Interior, MS/MIB 4603, 1849 C Street NW., Washington, DC 20240.

FOR FURTHER INFORMATION CONTACT: Chief, Division of Tribal Government Services, Bureau of Indian Affairs. Washington, DC 20240, (202) 206-7446.

Dated: July 30, 1992.

William D. Bettenberg.

*Acting Assistant Secretary. Indian Affairs.* [FR Doc. 92-18542 Filed 8-4-92: 8:45 am)

BILLING CODE 4310-02 M

# WISCONSIN WINNEBAGO TRIBE

and

# STATE OF WISCONSIN

# GAMING COMPACT OF 1992

# WINNEBAGO/STATE OF WISCONSIN GAMING COMPACT OF 1992

Contents


I. TITLE . . . . . . . . . . 2

II. DECLARATION OF POLICIES AND PURPOSES . . . . . . . . . . 2

III. DEFINITIONS . . . . . . . . . . 2

IV. AUTHORIZED CLASS III GAMING . . . . . . . . . . 3

V. CONDUCT OF GAMES; GENERALLY . . . . . . . . . . 5

VI. PROPRIETARY INTEREST . . . . . . . . . . 5

VII. GAMING-RELATED CONTRACTOR; CONTRACTOR TO HOLD STATE CERTIFICATE 6

VIII. MANAGEMENT CONTRACTS . . . . . . . . . . 9

IX. CRIMINAL AND BACKGROUND RESTRICTIONS . . . . . . . . . . 11

X. RECORDS . . . . . . . . . . 12

XI. CONFLICTS OF INTEREST PROHIBITED . . . . . . . . . . 13

XII. AUDITS . . . . . . . . . . 13

XIII. WITHHOLDING WISCONSIN INCOME TAX . . . . . . . . . . 14

XIV. PUBLIC HEALTH AND SAFETY . . . . . . . . . . 15

XV. ELECTRONIC GAMES OF CHANCE . . . . . . . . . . 15

XVI. BLACKJACK, REGULATION AND PLAY OF . . . . . . . . . . 26

XVII. PULL-TABS OR BREAK-OPEN TICKETS . . . . . . . . . . 35

XVIII. AMENDMENTS TO REGULATORY AND TECHNICAL STANDARDS FOR ELECTRONIC GAMES OF CHANCE AND BLACKJACK. . . . . . . . . . . 35

XIX. ALLOCATION OF JURISDICTION 36

XX. LIABILITY FOR DAMAGE TO PERSONS AND PROPERTY 36

XXI. ENFORCEMENT 37

XXII. INCORPORATION 38

XXIII. DISPUTE RESOLUTION 38

XXIV. SOVEREIGN IMMUNITY; COMPACT ENFORCEMENT 38

XXV. REIMBURSEMENT OF STATE COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

XXVI. DURATION .................................................. 40

XXVII. GAMING LOCATIONS .......................................... 40

XXVIII. TRIBAL GAMING ORDINANCES AND STATE LAW ..................... 41

XX.IX. RIGHTS UNDER THE ACT ............................. 41

XXX. NOTICES 41

XXXI. AGREEMENT DATE 41

XXXII. AMENDMENT 41

XXXIII. SEVERABILITY 41

**WISCONSIN WINNEBAGO TRIBE**
**and**
**STATE OF WISCONSIN**

**GAMING COMPACT OF 1992**

This TRIBAL/STATE COMPACT is made and entered into this 11th day of June, 1992, by and between the WISCONSIN WINNEBAGO TRIBE, a federally acknowledged Indian Tribe acting through the Wisconsin Winnebago Business Committee, the Tribe's governing body, and the STATE OF WISCONSIN, acting through its Governor, the Honorable Tommy G. Thompson:

WHEREAS, the Wisconsin Winnebago Tribe is a sovereign government possessed of all sovereign powers and rights thereto pertaining; and

WHEREAS, the Constitution of the Wisconsin Winnebago Tribe authorizes the Tribe's Business Committee to negotiate agreements with the State of Wisconsin on behalf of the Tribe; and

WHEREAS, the Wisconsin Winnebago Business Committee is authorized, pursuant to the Constitution of the Tribe, to enter into this Compact on behalf of the Tribe and has resolved to enter into this Compact pursuant to the Business Committee Resolution attached hereto as Exhibit A; and

WHEREAS, the State of Wisconsin is a sovereign state of the United States with all the rights and powers thereto pertaining; and

WHEREAS, the Constitution and laws of the State of Wisconsin permit certain Class III gaming activities; and

WHEREAS, the Governor is authorized by s. 14.035, Wis. Stats., to enter into gaming compacts with the several Indian tribal governments within the State of Wisconsin; and

WHEREAS, the Congress of the United States has enacted into law the Indian Gaming Regulatory Act, P.L. 100-497, 25 U.S.C. sec. 2701, et seq., which provides in part that a tribal/state compact may be negotiated between a tribe and a state to set forth the rules, regulations and conditions under which a tribe may conduct Class III gaming, as defined in the Act, on Indian lands within a state permitting Class III gaming; and

WHEREAS, the Indian Gaming Regulatory Act provides that an Indian tribe has the right to regulate Class III gaming activities on its lands concurrently with the State pursuant to a compact with the State; and

WHEREAS, the Wisconsin Winnebago Tribe and the State of Wisconsin have mutually agreed that the conduct of Class III gaming under the terms and conditions set forth below will benefit the Tribe and protect the citizens

of the Tribe and the citizens of the State of Wisconsin, consistent with the objectives of the Indian Gaming Regulatory Act; and

WHEREAS, the Wisconsin Winnebago Tribe and the State of Wisconsin have mutually agreed to the terms and conditions unor which certain Class III gaming may be conducted on the Tribe's lands;

**NOW, THEREFORE, THE WISCONSIN WINNEBAGO TRIBE and THE STATE OF WISCONSIN** do enter into this Tribal/State Compact.

I. **TITLE.** This document shall be cited as "The Wisconsin Winnebago/State of Wisconsin Gaming Compact of 1992" (hereinafter, "Compact").

II. **DECLARATION OF POLICIES AND PURPOSES.** The State and the Tribe agree that this Compact is entered for the following purposes and is to be construed and implemented to give effect to these policies:

A. To authorize the operation of certain Class III gaming by the Tribe on the Tribe's lands in the State of Wisconsin as a means of promoting Tribal economic development, self-sufficiency, and strong Tribal government;

B. To assure that the Tribe's Class III games under this Compact are operated so as to protect against organized crime and other corrupt influences, and to assure that any Class III gaming is operated fairly and honestly by both the Tribe and by the players;

C. To assure effective concurrent regulation by the Tribe and the State of gaming operated under this Compact as provided herein;

D. To fulfill the purpose and intent of the Indian Gaming Regulatory Act by providing for certain Class III gaming operated by the Tribe as a means of generating Tribal revenues to fund programs that provide vital services to members of the Tribe, including education, health and human resources, and economic development for the benefit of the Tribe.

III. **DEFINITIONS.**

For purposes of this Compact:

A. "Act" shall mean the Indian Gaming Regulatory Act, P.L. 100-497, 25 u.s.c. sec. 2701, et. seq.

B. "Cash Basis" means payment in the form of currency, personal checks, certified checks, or money orders.

C. "Department of Justice" means the Department of Justice of the State of Wisconsin, its authorized officials, agents and representatives.

D. "Executive Director" means the Executive Director of the Wisconsin Lottery.

E. "Lottery Board" means the Wisconsin Lottery Board or its successor, and the authorized officials, agents and representatives of the Lottery Board.

F. "Management contract" means an agreement covering the overall management and operation of a Tribal game or gaming facility by an entity other than the Tribe or its employes, including all collateral agreements to such agreement that relate to gaming activity. The term does not include agreements for the procurement of particular services, materials or supplies related to the Tribe's operation of Class III gaming under this Compact, such as the supply of gaming aids, communications and other equipment, computers and software and instant scratch tickets.

G. "Person" means an individual and any partnership (general and limited), association, corporation, or other legal entity.

H. "Primary Business Purpose" means the business generating more than 50 percent of the net revenue of the facility.

I. "State" means the State of Wisconsin, its authorized officials, agents and representatives.

J. "The Tribe's Lands" for purposes of this Compact has the following meaning:

1. All lands within the State of Wisconsin held in trust by the United States for the benefit of the Wisconsin Winnebago Tribe or held by the Tribe subject to restriction by the United States against alienation and over which the Tribe exercised governmental power as of October 17, 1988; and
2. All lands within the State of Wisconsin which may be acquired by the Tribe subject to restriction by the United States against alienation, or in trust by the United States for the benefit of the Tribe after October 17, 1988, and which meet the requirements of section 20 of the Act.

K. "Tribe" means the Wisconsin Winnebago Tribe, its authorized officials, agents and representatives, including but not limited to the Wisconsin Winnebago Business Committee and the Casino Board established or to be established under tribal laws with jurisdiction to oversee and regulate tribal gaming operations and enterprises.

## IV. AUTHORIZED CLASS III GAMING.

A. The Tribe shall have the right to operate the following Class III games during the term of this Compact but only as provided in this Compact:

1. Electronic games of chance with video facsimile displays;
2. Electronic games of chance with mechanical displays;
3. Blackjack; and
4. Pull-tabs or break-open tickets when not played at the same location where bingo is being played.

B. Except as provided in par. XV.D.17. of this Compact, the Tribe shall not conduct or permit any Class III gaming or any

component thereof outside Tribal lands, including use of common carriers (such as telecommunications, postal or delivery services) for the purpose of sale of a ticket or playing card to, or placement of a wager by, a person who is not physically present on Tribal lands to purchase the ticket or card or place the wager. The State acknowledges that certain incidental activities involved in the Tribe's overall Class III gaming operations may take place outside of the Tribe's Lands including banking, accounting, monitoring, computing, and other activities incidental to the actual playing of the games by persons physically present on the Tribe's Lands, and that such incidental activities and ordinary and necessary telecommunications links to such activities shall not be considered to be gaming or any component thereof for purposes of this Compact.

C. The Tribe may not operate any Class III gaming not expressly enumerated in this section of this Compact unless this Compact is amended pursuant to section XXX.

D. In the event that the State, after the date on which this Compact becomes binding on the parties, commences actual operation, or licenses or permits the operation, of games not specifically enumerated under subsec. A. for governmental, charitable or commercial purposes, and other than games presently operated, licensed or permitted by the State, the Tribe may upon written notice to the State, commence operation of any such game(s) subject to the same State operational rules, procedures and requirements for such game(s) as they may from time-to-time be amended or revised by the State. Upon such written notice from the Tribe under this subsection, this Compact shall be reopened, and the State shall then consent to amendments enumerating such game(s) under subsection A., above, and to negotiating amendments establishing the Tribal regulation and State oversight requirements for such game(s).

E. Should the State, after this Compact becomes binding on the parties, agree to include any additional game in a tribal/state gaming compact, other than as a substitute for one or more of the games listed in paragraphs A.l. through 3., above, and other than games presently operated or licensed by the State, this Compact shall be reopened on the written request of the Tribe, and the State shall then consent to amendments enumerating such game(s) in subsec. A. and incorporating the same terms and conditions for the conduct of such game(s) under the tribal state gaming compact permitting such game(s).

F. In the event that game(s) not included in pars. A.l. through A.3., above, are included in procedures prescribed for another Wisconsin Indian tribe by the Secretary of the Interior pursuant to section 11 (d)(7)(B)(vii) of the Act, then this Compact shall be reopened on the written request of the Tribe, but only after the State and the other tribe have exhausted their remedies under the federal administrative

procedure act. Upon reopening, the State shall consent to amendments enumerating such game(s) in subsection A., above, and incorporating all the same procedures for such games as have been prescribed by the Secretary.

G. Two hundred eighty days after this Compact becomes binding upon the parties, and annually thereafter, upon written request of the Tribe specifying the need to operate additional games in order to realize a reasonable return on its investment, the parties shall meet for the purpose of discussing the matter and considering the addition of games essential to meet the Tribal need.

**V. CONDUCT OF GAMES; GENERALLY.**

A. No person under 18 years of age may play, or be permitted by the Tribe to play, any game authorized by this Compact. If any person below the age of 18 plays and otherwise qualifies for a prize or winnings, the prize or winnings shall not be paid, and the estimated amount wagered during the course of the game shall be returned to the minor.

B. No person under 18 years of age may be employed in the conduct of gaming under this Compact.

C. No person who is visibly intoxicated shall be permitted to play any game authorized by this Compact.

D. All gaming shall be conducted on a Cash Basis. Except as herein provided, no person shall be extended credit for gaming by any tribal gaming facility, nor shall the Tribe permit any other person to offer such credit for a fee. This section shall not restrict the right of the Tribe to install or accept bank card or credit card transactions in the same manner as would normally be permitted at any retail business within the State.

E. The Tribe shall provide and publish procedures for impartial resolution of a player dispute concerning the conduct of a game which shall be made available to customers upon request.

F. Alcohol beverages may be served at locations where games authorized under this Compact are conducted only during the hours prescribed by applicable Tribal law and by sec. 125.32 (3), Wis. Stats., as it may be amended from time-to-time. Alcohol beverages may not be sold for the purpose of off-premises consumption at locations where games authorized under this Compact are conducted.

**VI. PROPRIETARY INTEREST.**

The Tribe shall have the sole proprietary interest in all Class III gaming activities operated under this Compact and shall not authorize, permit, or license the operation of any Class III gaming activity under this Compact by any other person, except that the Tribe may enter a management contract subject to the provisions of section VIII. of this Compact and section (ll)(d)(9) of the Act.

**VII. GAMING-RELATED CONTRACTOR; CONTRACTOR TO HOLD STATE CERTIFICATE.**

A. "Gaming-related Contract" means any agreement under which the Tribe procures for Class III gaming materials, supplies, equipment or services which are unique to the operation of gaming and not common to ordinary Tribal operations (such as accounting or legal services); the term includes, but is not limited to:

1. Management contracts related to Class III gaming.
2. Management consultation services regarding the administration, supervision, or training of one or more functions related to Class III gaming management or operations under this Compact.
3. Contract security services related to Class III gaming.
4. Prize payout agreements or annuity contracts related to Class III gaming.
5. Procurement (including lease) of Class III gaming materials, supplies, equipment or services involving marketing, maintenance or repair of gaming-related equipment, tickets and other gaming supplies or materials, the receiving or recording of a player's gaming selections or wagers, and the determination of winners.
6. Financing of facilities in which gaming under this Compact is operated, except financing by a state or federally chartered financial institution.

B. The Tribe shall not enter or maintain a gaming-related contract involving total consideration exceeding $10,000 in any year with any person unless that person holds a Certificate issued by the Lottery Board under this section.

C. No person may enter or maintain a gaming-related contract with the Tribe involving total consideration exceeding $10,000 in any year unless the person holds a Certificate issued by the Lottery Board under this section.

D. Certificate issued by Lottery Board.

1. A Certificate shall be issued to a person, and the person may continue to hold a Certificate, unless the person:
   a. Has been convicted of, or entered a plea of guilty or no contest to, any of the following during the immediately preceding 10 years, unless the person has been pardoned:
      (1) A felony.
      (2) Any gambling-related offense.
      (3) Fraud or misrepresentation in any connection.
      (4) A violation of any provision of chs. 562 or 565, Wis. Stats., a rule promulgated by the Lottery Board or Wisconsin Racing Board, or a Tribal ordinance regulating or prohibiting gaming.
   b. Is determined by the Lottery Board to be a person whose prior activities, criminal record if any, or reputation, habits, and associations (including

employes and agents in relation to a gaming-related contract) pose a threat to the public interest or to the effective regulation and control of gaming, or create or enhance the dangers of unsuitable, unfair, or illegal prattices, methods, or activities in the operation of gaming or the carrying on of the business and financial arrangements incidental thereto; provided, however, that the fact that a person provided materials, supplies, equipment or services to the Tribe in relation to Class III gaming prior to the date on which this Compact becomes binding on the parties shall not be considered in making determinations under this subdivision.

c. Is determined by the Lottery Board to have knowingly and wilfully provided materially important false information to the Lottery Board or to the Tribe, or has refused to respond to questions propounded pursuant to subdiv. D.3.a.

d. Determinations of the Lottery Board under subdivs. a., b., and c. are subject to judicial review as provided in sec. 227.52, Wis. Stats.

e. Except as provided in subdiv. f., if the person i**s--**
   (1) A partnership, then subdiv. a. applies to the partnership and each general and limited partner of the partnership.
   (2) An association, then subdiv. a. applies to the association and each officer and director of the association.
   (3) A corporation, then subdiv. a. applies to the corporation, each officer or director of the corporation and each owner, directly or indirectly, of any equity security or other ownership interest in the corporation. In the case of owners of publicly held securities of a publicly traded corporation, subdiv. a. applies only to those persons who are beneficial owners of 5% or more of the publicly held securities.

f. The restrictions under subdiv. a. do not apply to the partnership, association or corporation if the Lottery Board determines that the partnership, association or corporation has terminated its relationship with the partner, officer, director or owner who was convicted or entered the plea or with the partner, officer, director, owner or other individual whose actions directly contributed to the partnership's, association's or corporation's conviction or entry of plea.

g. Any conviction, guilty plea or plea of no contest of any partnership, limited partnership,

association or corporation shall be imputed to any individual who, though not convicted, directly contributed to the transaction giving rise to the conviction, guilty plea or plea of no contest.

2. Investigations necessary for the determinations under this section shall be conducted by the Lottery Board with the assistance of the Department of Justice. Persons holding Certificates under this section shall be subject to periodic review in order to determine continuing compliance with the requirements of this section.
3. Any person applying for or holding a Certificate under this section shall--
   a. Respond, under oath, to such written or oral questions that the Lottery Board may propound in the performance of its responsibilities under this section.
   b. Pay to the State the amount of the State's actual costs in conducting investigations and making determinations under this section.
   c. Be fingerprinted on 2 fingerprint cards each bearing a complete set of the person's fingerprints. The Department of Justice may submit the fingerprint cards to the Federal Bureau of Investigation for the purpose of verifying the identity of the person fingerprinted and obtaining records of his or her criminal arrests and convictions.
   d. Submit to the Lottery Board a list of all states in which the person has done business within the last three years. The list shall include license or permit numbers (if issued) and the operative dates of the license(s) or permit(s).

E. Cooperation and Consultation Between Tribe and State.

1. Upon receipt of an application for a certificate under this section, the state will promptly:
   a. Submit to the Tribe a copy of the application with its supporting documentation;
   b. Invite the Tribe to provide information concerning the fitness and eligibility of the applicant for a certificate under this section; and
   c. Invite the Tribe's recommendation as to whether a certificate should issue and the Tribe's reasons therefor.
2. Where the Tribe has elected to consult with the State under par. 1., above, and in the event it appears that a certificate should not be issued to the applicant:
   a. The Executive Director of the Lottery Board shall, before making a determination under this section, offer to consult with the Tribe concerning the factual basis and reasons for the proposed denial; and

b. If, after consultation under subpar. a., the Executive Director determines that a certificate should not issue to the applicant, the Tribe shall have the right to appeal the matter to the Lottery Board and be heard thereon. Any decision of the Lottery Board shall designate the Tribe as an interested party for purposes of judicial review under ch. 227, Stats.

F. The Tribe shall include the following provisions in any gaming-related contract:

1. The contract shall be terminated if, during the term of the contract or any extension thereof, the person's Certificate under this section is revoked by the Lottery Board.
2. The contract is subject to the provisions of this Compact.
3. A Certificate issued under this section of the Compact shall not constitute a property interest under state or federal law.

G. Transitional provision. Subsections B. and C., above, notwithstanding, a person who has a gaming-related contract in effect with the Tribe on the date this Compact becomes binding on the parties may continue to perform under such contract pending final decision on issuance of a Certificate under this section to such person; provided that:

1. Within 10 days after this Compact becomes binding on the parties, the Tribe provides to the Lottery Board a list of all such persons, with their addresses and a specification of the materials, supplies, equipment or services under contract; and
2. Within 20 days after this Compact becomes binding on the parties, such person included in the list applies to the Lottery Board for a Certificate under this section.

## VIII. MANAGEMENT CONTRACTS.

A. The Tribe agrees that, subject to the Certificate requirements of section VII. of this Compact, the Tribe may enter into a management contract for the operation and management of a class III gaming activity permitted under this Compact. Before approving such contract, the Tribe shall insure that the following information is supplied to the Lottery Board at least 60 days prior to the Tribe's approval of the contract:

1. The name, address, and other additional pertinent background information on each person or entity (including individuals comprising such entity) having a direct financial interest in, or management responsibility for, such contract, and, in the case of a corporation, those individuals who serve on the board of directors of such corporation and each of its

stockholders who hold (directly or indirectly) 5 percent or more of its issued and outstanding stock;

2. A description of any previous experience that each person listed pursuant to par. 1. has had with other gaming contracts with Indian tribes or with the gaming industry generally, including specifically the name and address of any licensing or regulatory agency which has issued the person a license or permit relating to gaming or with which such person has had a contract relating to gaming;
3. A complete financial statement of each person listed pursuant to par. 1.; and
4. A copy of any proposed contract, and, thereafter any proposed amendment.

B. Any person listed pursuant to subsec. A. shall be required to respond under oath to such written or oral questions that the Tribe or the Lottery Board may propound in accordance with their responsibilities under this section.

C. The Tribe shall not enter a management contract unless the contract provides at least:

1. For adequate accounting procedures that are maintained, and for verifiable financial reports that are prepared, by or for the tribal governing body on a monthly basis;
2. For access to the daily operations of the gaming activities to appropriate officials of the Tribe, the Lottery Board or the Department of Justice who shall also have a right to verify the daily gross revenues and income made from any such tribal gaming activity;
3. For a minimum guaranteed payment to the Tribe, that has preference over the retirement of development and construction costs;
4. For an agreed ceiling for the repayment of development and construction costs;
5. For a contract term not to exceed five years, except that the Tribe may approve a contract term that exceeds five years but does not exceed seven years if, after consultation with the Lottery Board, the Tribe is satisfied that the capital investment required, and the income projections, for the particular gaming activity require the additional time;
6. For a complete, detailed specification of all compensation to the Contractor under the contract; and
7. For grounds and mechanisms for terminating such contract, including summary termination upon revocation of the management contractor's Certificate under section VII. of this Compact.

D. The Tribe may approve a management contract providing for a fee based upon a percentage of the net revenues of a tribal gaming activity, which shall not exceed thirty percent, unless the Tribe, after consultation with the Lottery Board, determines that the capital investment required, and income projections, for such gaming activity, require an additional

fee, which in no event shall exceed forty percent of net revenues of such gaming activity. A contract providing for a fee based upon a percentage of net revenues shall include a provision describing in detail how net revenues will be determined. The consultation described in this section shall in no way limit the authority of the Tribe to make independent business decisions under the Act.

**IX. CRIMINAL AND BACKGROUND RESTRICTIONS.**

A. The Tribe agrees that no person may be employed in the operation or conduct of gaming under this Compact, and the Tribe shall not permit a gaming related contractor to employ any person in the course of performance under the contract, if that person:

1. Has been convicted of, or entered a plea of guilty or no contest to, any of the following, unless the person has been pardoned:
   a. A felony, other than a felony conviction for an offense under subdiv. b., c. or d., during the immediately preceding 10 years.
   b. Any gambling-related offense.
   c. Fraud or misrepresentation in any connection.
   d. A violation of any provision of chs. 562 or 565, Wis. Stats., a rule promulgated by the Lottery Board or Wisconsin Racing Board, or a Tribal ordinance regulating or prohibiting gaming.
2. Has been determined by the Tribe to be a person whose prior activities, criminal record if any, or reputation, habits, and associations pose a threat to the public interest or to the effective regulation and control of gaming, or create or enhance the dangers of unsuitable, unfair, or illegal practices, methods, or activities in the operation of gaming or the carrying on of the business and financial arrangements incidental thereto.

B. The restriction in par. A.l. shall not disqualify an applicant or employe if the Wisconsin Winnebago Business Committee waives such restriction by legislative resolution after the applicant or employe has demonstrated to the Committee evidence of sufficient rehabilitation and present fitness.

C. The Tribe shall have primary responsibility for the investigations and determinations under this section, and shall retain for a period of at least 7 years, all records relating to such investigations and determinations.

D. Persons subject to this section shall be periodically reviewed (at least every two years) to determine whether they continue to meet the requirements and limitations of this section.

E. Criminal history data compiled by the Department of Justice on any person subject to subsection A. shall, subject to applicable federal or state law, be released to the Tribe as part of its report regarding each person, and the Tribe shall

reimburse the State for the Department's actual costs of compiling the data.

## X. RECORDS.

A. In addition to records specifically required under other provisions of this Compact, the Tribe shall also maintain, and the State shall have the right to inspect and copy, the following records related to Class III gaming for at least seven years after the record is created:

1. All accounting records, which shall be kept on a double entry system of accounting, including detailed, supporting and subsidiary records.
2. Revenues, expenses, assets, liabilities and equity by game at each location where any component of Class III gaming, including ticket sales, is conducted.
3. Daily cash transactions for each game at each location at which any component of Class III gaming is conducted, including but not limited to transactions relating to each gaming table bank, game drop box and gaming room bank.
4. For electronic games of chance, analytic reports which, by each machine, compare actual hold percentages to theoretical hold percentages.
5. Contracts, correspondence and other transaction documents relating to all vendors and contractors.
6. Records of all Tribal enforcement activities relating to gaming operated under this Compact.
7. All audits prepared by or on behalf of the Tribe.
8. Personnel information on all Class III gaming employes or agents, including complete sets of each employe's fingerprints, employe photographs, and employe profiles and background investigations, except that employe work schedules shall be maintained for a period of at least 2 years. This provision shall not include personnel records of tribal members as to matters that are not related to gaming.
9. Records of background investigations and determinations under section IX. of this Compact.

B. Confidentiality of Tribal gaming records.

1. The Tribe requires that its gaming records be confidential. The State and the Tribe agree that the State does not otherwise have a right to inspect or copy tribal gaming records. However, in order to enable the State to perform its oversight and enforcement functions and responsibilities under this Compact, the Tribe required that the State pledge, and the State does so pledge, that any tribal records or documents submitted to the State, or of which the State has retained copies in the course of its gaming oversight and enforcement, will not be disclosed to any member of the public except as needed in a judicial proceeding to interpret or enforce the terms of this Compact. In return, the Tribe

has granted the State the right to inspect and copy the Tribal records as provided in this Compact.

2. This Compact is provided for by federal law and therefore supersedes state records law to the contrary.

C. The Tribe shall have the right to inspect and copy all State records concerning the Tribe's Class III gaming; provided, that the State may withhold access to records as permitted under the state public records law, sec. 19.35, et seq., Wis. Stats.

**XI. CONFLICTS OF INTEREST PROHIBITED.**

A .. The Tribe shall adopt within its Gaming Code provisions prohibiting gaming by persons employed by the Tribe at any site of employment or in the case of management contractors, at any site on the Tribe's Lands where gaming is conducted.

B. No person employed by the Tribe in the conduct of gaming under this Compact may have a direct or indirect interest in, or be employed by, any person who has entered a gaming-related contract with the Tribe.

C. Nothing in this section XI. shall impair the right of the Tribe to employ a person with a direct or indirect financial interest in a gaming-related contract which has been submitted to the Bureau of Indian Affairs ("BIA") for review and approval during the period of such review, provided that any employment pursuant to this subsection XI.C. shall terminate upon approval by the BIA of the contract.

**XII. AUDITS.**

A. Financial Audit. At the close of each fiscal year (commencing with the current tribal fiscal year), the Tribe shall engage an independent certified public accountant to audit the books and records of all gaming operations conducted under this Compact. The audit shall be completed within 90 days after the close of the fiscal year. Upon completion of the audit the Tribe shall forward copies of any audit reports and management letters to the Wisconsin State Auditor (hereafter, "State Auditor") and to the Lottery Board and shall make copies of all current internal accounting and audit procedures available to the State upon request.

B. Security Audit. Commencing with the current tribal fiscal year and at least once every two years thereafter, the Tribe shall engage a qualified independent auditor to conduct a security audit. The audit shall be completed within 120 days, and the Tribe shall forward copies of any audit reports and management letters to the State Auditor and the Lottery Board. The purpose of the security audit shall be to review and evaluate the effectiveness, adequacy and enforcement of at least the following:

1. Physical systems and administrative policies and procedures controlling access to non-public offices, warehouses, and computer rooms relating to the conduct of gaming under this Compact.

2. Physical systems and administrative policies and procedures for handling cash and for redemption of winning tickets or credit statements issued by electronic games of chance from their receipt by the Tribe to payment of the player, including procedures for receiving and routing incoming prize claims.
3. Policies, procedures and practices to prevent theft, loss or destruction of materials, equipment, or supplies associated with any of the games authorized by this Compact, including records required to be created and maintained by this Compact.
4. Policies, procedures and practices to ensure the randomness, accuracy, integrity and reliability of games operated pursuant to this Compact.
5. Fitness and integrity of computer software utilized for financial accounting and conduct of gaming under this Compact.

C. Engagement of Auditors.

1. The Tribe shall engage auditors experienced in auditing gaming who shall perform the audit in conformity with the most current edition of "Accounting and Audit Guide--Casinos," published by the American Institute of Certified Public Accountants.
2. The Tribe shall give the State Auditor and Lottery Board 30 days' written notice of its intent to engage an auditor under this section, and with the notice shall also forward a draft of the proposed engagement letter and audit procedures. The State Auditor or the Lottery Board may submit written comments or objections concerning the engagement to the Tribe.
3. The Tribe shall permit the State Auditor or the Lottery Board to consult with the auditors before or after any audits or periodic checks on procedures that may be conducted by the auditors; shall, upon written request, make the auditors' work papers available for review at the office of the accountant or the Tribe; and shall allow the State Auditor or Lottery Board to submit written comments or suggestions for improvements regarding the accounting and audit procedures. Within 30 days of receipt of any written comments or suggestions, the Tribe shall respond in writing to the comments or suggestions.

## XIII. WITHHOLDING WISCONSIN INCOME TAX.

A. The Tribe shall withhold Wisconsin income tax from any payment of a prize or winnings from which it must also withhold federal taxes under the Internal Revenue Code or Regulations, except that the Tribe shall not be required to withhold Wisconsin income tax from payments to:

1. Enrolled members of the Tribe; or
2. Individuals who certify to the Tribe that they are not legal residents of the State of Wisconsin, unless such

individuals are subject to Wisconsin income tax on such winnings under ch. 71, Wis. Stats., for the calendar year in which the payment is made.

B. The amount to be withheld under subsec. A. shall be determined by multiplying the amount of the payment by the greater of 6.93% (.0693), or the highest Wisconsin income tax rate applicable to individuals under s. 71.06 (1), Wis. Stats., for the calendar year in which the payment is made.

C. During the term of this Compact, the Tribe shall be registered with the Wisconsin Department of Revenue for withholding tax purposes and have a Wisconsin employer identification number. Wisconsin income tax withheld under subsec. A. shall be deposited on the same basis as taxes withheld from wages of employes are deposited by employers. Amounts withheld under subsec. A. shall be combined with amounts withheld from the wages of Tribal employes and a single deposit filed for the resulting total.

## XIV. PUBLIC HEALTH AND SAFETY.

A. In regard to any facilities utilized for Class III gaming under this Compact, the Tribe shall enact ordinances setting forth public health and safety standards for public buildings, electrical wiring, fire prevention, plumbing and sanitation that are at least as restrictive as those standards set forth in chapter 101 of the Wisconsin Statutes and the administrative rules adopted thereunder including, but not limited to chs. ILHR. 14 (Fire Prevention), 16 (Electrical Wiring), 28 (Smoke Detectors), 160 (Existing Buildings), 162 (Theatres and Assembly Halls), and 81-86 (Plumbing), Wis. Adm. Code. The Tribe shall periodically update its public health and safety ordinances in accord with changes in this law and the administrative rules.

B. The Tribe shall engage a state certified inspector to conduct inspections of all facilities for Class III gaming under this Compact on a periodic basis, but not less than annually, and shall promptly repair or correct any and all instances of non-compliance with the requirements of this section. An inspection report shall be prepared by the Tribe in connection with each inspection and copies of said reports shall be forwarded to the Lottery Board.

C. The tribal ordinance referred to in subsec. A. may exempt the Tribe's existing gaming facilities for a period of not more than one year from the date this Compact becomes binding on the parties.

## XV. ELECTRONIC GAMES OF CHANCE.

A. Definitions.

For the purposes of this section:

1. "Credit" means the smallest unit of value that may be used to play a game on an electronic game of chance or that may be redeemed in currency.

2. "Distributor" means a person who obtains an electronic game of chance from a manufacturer and who intends to furnish it to the tribe.
3. "Manufacturer" means a person who manufactures, produces, or assembles an el3ctronic game of chance, and who intends to furnish it to a distributor or the tribe.
4. "Electronic Game of Chance" means a microprocessor-controlled electronic device which allows a player to play games of chance, some of which are affected by skill, which device is activated by the insertion of a coin or currency, or by the use of a credit, and which awards game credits, cash, tokens, or replays, or a written statement of the player's accumulated credits, which written statements are redeemable for cash.
   a. Game play may be displayed by:
      (1) Video facsimile; or
      (2) Mechanical rotating reels whereby the software of the device predetermines the stop positions and the presence, or lack thereof, of a winning combination and pay out, if any.
   b. The term "electronic game of chance" does not include, and this Compact expressly prohibits, the operation and play of devices which utilize mechanical or optical sensors to evaluate reel positions when they come to rest after being spun for game play.

B. Testing of Electronic Games of Chance.

1. Testing and Approval of Electronic Games of Chance. No electronic game of chance may be operated by the Tribe unless: (1) the electronic game of chance is obtained from a manufacturer or distributor that holds a Certificate issued under section VII. of this Compact to sell, lease, or distribute electronic games of chance; and (2) the electronic game of chance, or a prototype thereof, has been tested, approved or certified by a gaming test laboratory as meeting the requirements and standards of this Compact. For purposes of this Compact, a gaming test laboratory is a laboratory agreed to and designated in writing by the Lottery Board and the Tribe as competent and qualified to conduct scientific tests and evaluations of electronic games of chance and related equipment. A laboratory operated by or under contract with the states of Minnesota, New Jersey, or South Dakota constitutes a designated gaming test laboratory.
2. Application for Approval of Prototype Electronic Games of Chance. The Tribe shall provide or require thatthe manufacturer provide to the gaming test laboratory two copies of electronic game of chance illustrations, schematics, block diagrams, circuit analyses, technical and operation manuals, program object and source codes,

hexadecimal dumps (the compiled computer program represented in base-16 format), and any other information requested by the gaming test laboratory.

3. Testing of Electronic Games of Chance. If required by the gaming test laboratory, the Tribe shall require the manufacturer to transport not more than two working models of the electronic games of chance and related equipment to a location designated by the laboratory for testing, examination, and analysis. The Tribe shall require the manufacturer to pay for any and all costs for the transportation, testing, examination, and analysis. The testing, examination, and analysis may include the entire dismantling of the electronic games of chance and related equipment and some tests may result in damage or destruction to one or more electronic components of the devices. If required by the laboratory, the Tribe must require the manufacturer to provide specialized equipment or the services of an independent technical expert to assist the testing, examination, and analysis.
4. Report of Test Results. At the conclusion of each test, the laboratory shall provide to the Lottery Board and the Tribe a report that contains findings, conclusions, and a determination that the electronic game of chance and related equipment conforms or fails to conform to the hardware and software requirements of this Compact. If modifications can be made which would bring the electronic game of chance or related equipment into compliance, the report may contain recommendations for such modifications.
5. Modifications of Approved Electronic Games of Chance. No modification to the assembly or operational functions of any electronic game of chance or related equipment may be made after testing and installation unless a gaming test laboratory certifies to the Lottery Board and the Tribe that the modified electronic game of chance conforms to the standards of this Compact. Any proposed modifications shall be subject to the requirements of pars. 1. through 4. above, before the modification may be implemented, and shall be reported as required under par. C.l., below.
6. Conformity to Technical Standards. The Tribe shall require the manufacturer or distributor to certify, in writing, to the Tribe and the Lottery Board that, upon installation, each electronic game of chance placed in a Tribal gaming facility:
    a. Conforms precisely to the exact specifications of the electronic game of chance prototype tested and approved by the gaming test laboratory; and
    b. Operates and plays in accordance with the technical standards prescribed in this section.

7. Machine Identification. A non-removable plate shall be affixed to each electronic game of chance. This plate shall have written upon it the machine's serial number, manufacturer, unique identification number assigned by the Tribe for purposes of reporting under Section C., and the date the unique identification number was assigned.

C. Tribal Reports to Lottery Board.

1. Installation and Operation. At least 10 days prior to installation of an electronic game of chance, the Tribe shall report to the Lottery Board, on a form prescribed by the Board, the following information for each electronic game of chance, including, but not limited to:
   a. The type of electronic game of chance;
   b. The game's serial number;
   c. The game's manufacturer;
   d. The person from whom the game was acquired; the means by which the game was transported into the State and the name and street address of any common carrier or other person transporting the game;
   e. The certification required under par. B.6., above;
   f. The unique identification number assigned by the Tribe under par. B.7, above;
   g. The EPROM chip's identification number;
   h. The location in which the game will be placed, and
   i. The date of installation.
2. Removal from play. Upon removal of an electronic game of chance from a tribal gaming facility, the Tribe shall provide to the Lottery Board the information required by par. 1, a. through g., along with a specification of:
   a. The date on which it was removed;
   b. The game's destination; and
   c. The name of the person to whom the equipment is to be transferred, including the person's street address, business and home telephone numbers; the means by which the game is to be transported and the name and street address of any common carrier or other person transporting the game.
3. Existing games. The Tribe shall provide, within 10 days after this Compact becomes binding on the parties, a listing of all electronic, electro-mechanical, and mechanical games installed, in service, or operated by the Tribe on or within the 14-day period immediately before the date of execution of this Compact. The Tribe warrants and represents that this listing, which shall be identified as Exhibit B to this Compact and incorporated herein by reference, shall be full and complete. The form of the Exhibit shall include:
   a. The type of electronic game of chance;
   b. The game's serial number;
   c. The game's manufacturer;

d. The person from whom the game was acquired;
e. The EPROM chip's identification number; and
f. The game's location.

D. Hardware Requirements for Electronic Games of Chance.

1. Physical Hazard. Electrical and mechanical parts and design principles of the electronic games of chance may not subject a player to physical hazards.
2. Surge Protector. A surge protector must be installed on the line that feeds power to the electronic game of chance.
3. Battery Backup. A battery backup or an equivalent shall be installed on the electronic game of chance for the electronic meters and must be capable of maintaining the accuracy of all information required by this Compact for 180 days after power is discontinued from the machine. The backup device shall be kept within the locked microprocessor compartment.
4. On/Off Switch. An on/off switch that controls the electrical current used in the operation of a electronic game of chance and any associated equipment must be located in a place which is reaaily accessible within the interior of the machine.
5. Static Discharge. The operation of each electronic game of chance must not be adversely affected by static discharge or other electromagnetic interference.
6. Approved Coin and Bill Acceptors. At least one electronic coin acceptor must be installed in or on each electronic game of chance. The devices may also contain bill acceptors for denominations determined by the Tribe. Prior to operation, all models of coin and bill acceptors installed must have been tested and approved in writing by a gaming test laboratory as provided in subsec. B.
7. Cabinet Security.
   a. The cabinet or interior area of the electronic game of chance shall be locked and not readily accessible.
   b. The electronic game of chance shall have a single printing mechanism which must be capable of printing an original audit ticket and retaining an exact legible copy, either within the game or in an on-line electronic game management system approved by the independent gaming test laboratory, that provides permanent sequential tracking, and which permits monitoring of error conditions on a printed medium for future use, and which records the following information:
      (1) Amount deposited in the machine through coin collectors and bill acceptors;
      (2) Number of credits paid;
      (3) Value of the credits paid in dollars and cents displayed in numeric form;

(4) Amount of net revenue to the machine;
(5) Time of day in twenty-four hour format showing hours and minutes;
(6) Date;
(7) Machine serial number or unique asset number assigned by the Tribe;
(8) Terminal number;
(9) Number of times the microprocessor compartment has been opened;
(10) Number of times the cash compartment has been opened; and
(11) The number of times the cabinet has been opened.

c. Electronic games of chance utilizing coin drop hoppers are permitted, provided that as soon as is practical (as determined by the independent gaming test laboratory), but in no event later than 360 days from the date of execution of this Compact, such games shall be monitored by an on-line electronic game management/reporting system which has been approved by the independent gaming test laboratory.

d. The term "error conditions" as used in this subdivision includes:
(1) Cabinet door open and cash compartment door open.
(2) Coin-in tilt and reverse coin-in tilt.
(3) Hopper empty, hopper jam, or hopper runaway/malfunction.

8. <u>Repairs and Service.</u> An authorized agent or employee of the Tribe may open the gaming cabinet to effect repairs and service, but shall do so only in the presence of another Tribal agent or employee.

9. <u>Microprocessor Compartment.</u> The compartment containing the microprocessor-controlled device within the cabinet of the electronic game of chance must be locked and sealed, and unlocked by a different key than the key which unlocks the cabinet or cash compartment. The compartment may only be opened in the presence of a tribal official. The key to the microprocessor compartment shall be kept by the Tribe in a secure place.

10. <u>Secure Electronic Components.</u>

a. Logic Boards and software Erasable Programmable Read Only Memory (EPROM) chips and other logic control components shall be located in a separate compartment within the electronic game of chance and that compartment shall be sealed and locked with a different key or combination than that used for the main cabinet door, and cash compartment.

b. Upon installation, the Tribe shall affix or cause to be affixed to the EPROM chip(s) of each

electronic game of chance a strip of security tape, capable of evidencing the removal of an EPROM chip if the EPROM chip is removed from the circuit board. The security tape shall be secured and available only to the authorized personnel of the Tribe. The Tribe shall maintain accurate and complete records of the identification number of each EPROM chip installed in each electronic game of chance.

11. Secure Cash Compartment. The coins and currency compartment shall be locked separately from the main cabinet area, and secured with a different key or combination than used for the main cabinet door, except that a separate cash compartment shall not be required for coins necessary to pay prizes in a machine which pays prizes through a drop hopper as permitted in this section. Cash compartment keys must be kept in a secure location. Except as provided in this section, the compartment in which the inserted coins and bills are deposited shall be locked at all times. An employe or official of the Tribe may open the cash compartment in the gaming cabinet for the purpose of collecting the accumulated cash. The amount of accumulated cash shall be recorded.
12. Hardware Switches Prohibited. No hardware switches may be installed on an electronic game of chance or on any associated equipment which may alter the pay tables or payout percentages in the operation of the gaming device. Hardware switches may be installed to control the machine's sound.
13. Printing of Written Statement of Credits. Each electronic game of chance which awards credits or replays but not coins or tokens shall allow the player to request a written statement upon completing play. Upon printing a written statement, the printer must retain an exact, legible copy of the written statement within the machine.
14. Maximum Wagers. An electronic game of chance shall not allow any player to wager more than $5 during a game.
15. Minimum Age Warning. The minimum legal age requirement in subsec. V.A. of this Compact for a person to play an electronic game of chance must be displayed on the machine face under glass or on an unremovable plate on the front exterior of the game.
16. No Credit Cards Permitted. No electronic game of chance may be equipped with a device which permits the player to use a credit card rather than currency or coin to activate the game.
17. Operation as Part of a Network. The hardware requirements of this subsection shall not be construed to prevent the operation of the electronic game of

chance as part of a network with an aggregate prize or prizes; provided:

a. An electronic game of chance capable of bidirectional communication with external associated equipment ml...it utilize communication protocol which insures that erroneous data or signals will not adversely affect the operation of the game. The operation of the local network must be approved by the independent gaming test laboratory; and

b. Where the network links the Tribe's electronic games of chance to tribal games of chance on other Indian reservations, each Tribe participating in the network shall have in force a Class III gaming compact authorizing such gaming as part of a network and all segments of the network shall utilize security standards agreed between the Tribe and the Executive Director of the Lottery Board which are at least as restrictive as those used by the Yisconsin Lottery for its on-line games.

E. Software Requirements for Electronic Games of Chance.

1. <u>Randomness Testing.</u> Each electronic game of chance must have a true random number generator that will determine the occurrence of a specific card, symbol, number, or stop position to be displayed on the electronic screen or by the mechanical rotating reels. A selection process will be considered random if it meets all of the following requirements:

a. Chi-Square Analysis. Each card, symbol, number, or stop position which is wholly or partially determinative of the outcome of a game satisfies the 99 percent confidence limit using the standard chi-square analysis.

b. Runs Test. Each card, symbol, number, or stop position does not **as a** significant statistic produce predictable patterns of game elements or occurrences. Each card, symbol, number, or stop position will be considered random if it meets the 99 percent confidence level with regard to the "runs test" or any generally accepted pattern testing statistic.

c. Correlation Analysis. Each pair of cards, symbols, numbers, or stop positions is independently chosen without regard to any other card, symbol, number or stop position, drawn within that game play.
Each pair of cards, symbols, numbers, or stop positions is considered random if it meets the 99 percent confidence level using standard correlation analysis.

d. Serial Correlation Analysis. Each card, symbol, number, or stop position is independently chosen without reference to the same card, number, or stop

position in the previous game. Each card, number, or stop position is considered random if it meets the 99 percent confidence level using standard serial correlation analysis.

e. Live Game Correlation. Electronic games of chance that are representative of live gambling games must fairly and accurately depict the play of the live game.

2. Sofware Requirements for Percentage Payout. Each electronic game of chance must meet the following maximum and minimum theoretical percentage payout during the expected lifetime of the game:
   a. Electronic games that are not affected by player skill shall pay out a minimum of 80 percent and no more than 100.0 percent of the amount wagered. The theoretical payout percentage will be determined using standard methods of probability theory;
   b. Electronic games that are affected by player skill, such as electronic draw poker and blackjack, shall pay out a minimum of 83 percent and no more than 100.0 percent of the amount wagered. This standard is met when using a method of play that will provide the greatest return to the player over a period of continuous play.
3. Minimum Probability Standare for Maximum Payout. Each electronic game of chance must have a probability of obtaining the maximum payout which is greater than 1 in 17,000,000 for each play.
4. Software Requirements for Continuation of Game After Malfunction. Each game must be capable of continuing the current game with all current game features after a game malfunction is cleared. This provision does not apply if a game is rendered totally inoperable; however, the current wager and all player credits prior to the malfunction must be returned to the player.
5. Software Requirements for Play Transaction Records. Each game must maintain electronic accounting meters at all times, regardless of whether the machine is being supplied with power. Each meter must be capable of maintaining totals no less than six digits in length for the information required in subdivs a. through d., inclusive. The electronic meters must record the following information:
   a. Total number of coins inserted. The meter must count the total number of coins that are inserted by the player or the coin equivalent if a bill acceptor is being used;
   b. Number of credits wagered;
   c. Number of credits won;
   d. Credits paid out by a printed written statement;
   e. Number of times the logic area was accessed;
   f. Number of times the cash compartment was accessed;

g. Number of coins or credits wagered in the current game;
h. Number of coins or credits won in the last complete, valid game, commonly referred to as the credit meter; and
i. Number of cumulative credits representing money inserted by a player and credits for games won but not collected, commonly referred to as the credit meter.

6. No Automatice Clearing of Accounting Meters. No game may have a mechanism by which an error will cause the electronic accounting meters to automatically clear. All meter readings must be recorded and dated in the presence of a tribal official both before and after the electronic accounting meter is cleared.
7. Display of Information. The display information required in par. 8. shall be kept under glass or another transparent substance and at no time may stickers or other removable devices be placed on the machine face.
8. Rules Display. The software shall display:
   a. The rules of the game prior to each game being played;
   b. The maximum and minimum wagers, the amount of credits which may be won for each winning hand or combination of numbers or symbols; and,
   c. The credits the player has accumulated;

   Provided, however, in the case of an electronic game of chance with a mechanical display, the information required by subdivs. a. and b. shall be permanently affixed on the game in a location which is conspicuous to the player during play.

F. Transitional provision.
Electronic, electro-mechanical, and mechanical games of chance enumerated in Exhibit B, attached hereto, must be tested and approved by a gaming test laboratory as required under subsec. B., and reported to the Lottery Board under subsec. C., within 60 days of the Tribe's execution of this Compact. Notwithstanding the foregoing, if these games cannot comply with the technical standards of this Compact within the 60-day period due to circumstances beyond the control of the Tribe, these games shall be brought into compliance or replaced with complying equipment at the earliest date possible, but in no instance later than 360 days after the Tribe's execution of this Compact.

G. Non-complying games.
1. The following are declared to be non-complying games:
   a. All electronic, electro-mechanical and mechanical games of chance to which the Department of Justice or the Lottery Board have been denied access for inspection purposes;
   b. All electronic games of chance operated in violation of this Compact;

c. All electronic, electro-mechanical, or mechanical games not reported as required under par. C. or Exhibit B to this Compact.

2. Demand for Remedies for Non-Complying Games. Electronic games of chance believed to be non-complying shall be so designated, in writing, by the Lottery Board. Within 5 days of receipt of such written designation, the Tribe shall either:
   a. Accept the finding of non-compliance, remove the games from play, and take appropriate action to ensure that the Tribe, the manufacturer, distributor or other responsible person cures the problem; or
   b. Contest the finding of non-compliance by so notifying the Lottery Board in writing, and arrange for the inspection of the contested equipment, or single example thereof, by an independent gaming test laboratory as provided in subsec. B. within three days of the receipt of the finding of non-compliance. If the independent laboratory finds that the game or related equipment is non-complying, the non-complying game and related equipment shall be permanently removed from play unless modified to meet the requirements of this Compact. Games and related equipment removed from play under this paragraph may be returned to play only after tested, approved or certified as provided under subsec. B. and reported to the Lottery Board as provided under subsec. C.

H. Game locations.

1. <u>Definitions.</u> In this subsection:

   a. "Gaming facility" in regard to the Jackson County location means a single facility within the location whose Primary Business Purpose is gaming and two ancillary facilities, limited to 15 games each, within the location whose Primary Business Purpose is not gaming; provided, however, as to one of the ancillary facilities, the limit shall be 50 games if the ancillary facility is located on land which is accepted into trust by the United States for the benefit of the Tribe after the date on which this Compact becomes binding on the parties, and which is the subject of a determination by the Secretary of the Interior and concurrence by the Governor required by section 20 of the Act.
   b. "Gaming facility" in regard to the Sauk County location means a single facility within the location whose Primary Business Purpose is gaming and one ancillary facility, limited to 15 games, within the location whose Primary Business Purpose is not gaming.

c. "Gaming facility" in regard to any other location means a single facility whose Primary Business Purpose is gaming.

2. Locations. Unless the State by amendment to this Compact consents to additional locations, games authorized and operated under this section XV. shall be conducted at gaming facilities on the Tribe's Lands at not more than four locations, which locations shall be subject to the provisions of section XXVII. of this Compact; provided that the total number of games shall not exceed 400 among two of the locations.

## XVI. BLACKJACK, REGULATION AND PLAY OF.

A. Definitions. The following terms, when used in this section, shall have the following meanings unless the context clearly indicates otherwise:

1. "Blackjack" or "Twenty-one (21)" (hereinafter "Blackjack") means a card game in which each player opposes the dealer and the dealer opposes each player on behalf of the Tribe; it is played with a single deck or multiple decks of cards from which each player and a dealer are dealt two cards and may draw additional cards; wherein the object is to accumulate a total of twenty-one points or a total closer to twenty-one points than that of the opposing hand, without exceeding twenty-one points.
2. "A Blackjack" means the combination of an Ace and any card having a point value of ten dealt as the initial two cards to a player or a dealer, except that a blackjack is not the combination of an Ace and a ten value card drawn after splitting a pair of Aces or tens.
3. "Chip" means a non-metal or partly metal representative of value, redeemable for cash, and issued and sold by a gaming entity, for use in gaming other than in electronic gaming devices.
4. "Circle" or "Box" mean one of several areas of the Blackjack table marked-off in front of each player into which the players' hands are dealt and from which their hands are played.
5. "Dealer" means the person responsible for dealing the cards, taking wagers, and paying winnings.
6. "Double Down" means a wager made by a player who doubles the amount of his or her original wager after the first two cards of the player's hand have been dealt or who places such an additional wager on any first two cards of any split pair; provided however, that a player making such a wager may only draw one card.
7. "Hand" means either one game in a series, one deal of the cards, or the cards played by the dealer or a player.

8. "Hard Total" means the total point count of a hand which contains no aces or which contains aces that are each counted as one point in value.
9. "Hole" means one of several areas of the Blackjack table marked-off in front of each p1ayer into which the players' chips are placed.
10. "Insurance" means the election of a player to wager that the dealer does have a blackjack when the dealer has one card down and one card showing which is an ace.
11. "Payout" means the winnings earned on a wager.
12. "Player" means one person to whom a hand has been dealt.
13. "Propositional Wager" or "Proposition Bet" means any wager which is not specifically permitted under this section.
14. "Push" or "Standoff" (hereafter "push") means the circumstance in which a player and dealer have the same point total of twenty-one or less, resulting in a tie and cancellation of the player's wager; except that a push is not the circumstance in which both a player and the dealer have 21 points but only one of these opponents has a blackjack.
15. "Shoe" means the container from which one or more decks of cards are dealt that is designed to prevent dealer sleights of hand.
16. "Soft Total" means the total point value of a hand containing an ace when the ace is counted as eleven points in value.
17. "Split" means the election of a player who has been dealt two cards identical in value to split the single hand into two separate hands and concomitantly make a wager on the separately formed second hand which is equal in value to the original wager.
18. "Surrender" means the election of a player to discontinue play on that player's hand for that round by giving over to the Tribe one half of player's wager after the first two cards are dealt to the player and the player's point total is announced; except that where the dealer has Blackjack with an Ace showing, no surrender is permitted.
19. "Wager" means a sum of money, represented in blackjack by a chip, that is risked.

B. Game Locations and Times.

1. Locations. Unless the State by amendment to this Compact consents to additional locations, games authorized and operated under this section XVI shall be conducted at not more than two locations, subject to the provisions of section XXVII. of this Compact; provided that the games are conducted at only one facility, whose Primary Business Purpose is gaming, at each location.
2. Times. Blackjack may not be conducted at any gaming facility for more than 18 hours in any day.

C. Game regulations. The game of Blackjack shall be played as provided in these regulations:

1. Regulation of Players, Nonplayers and Consultations Between Them.
   a. No more than seven players shall be allowed to play Blackjack at any single Blackjack table for any given hand;
   b. No more than seven persons, exclusive of casino personnel, shall be seated at any single Blackjack table for any given hand;
   c. At the discretion of the Tribe, the number of nonplayers in proximity to the Blackjack tables may be limited at any time during the play of Blackjack provided that one nonplayer shall be permitted to remain for each player who requests such permission;
   d. Players may consult with nonplayers before making an election pursuant to these regulations; however, the Tribe shall respond only to an election communicated by a player.
2. Cards: Number of Decks; Value of Cards.
   a. Blackjack shall be played with one or more 52-card decks and one colored cutting card. Before being put into play, the cards shall arrive at the Blackjack table unused and still sealed within the cellophane wrapping originally applied by the card manufacturer,
   b. The Value of the Cards contained in each deck shall be as follows:
      (1) Any card from the 2 to the 10 shall have its face value;
      (2) Any Jack, Queen or King shall have a value of ten;
      (3) An Ace shall have a value of eleven unless that would give a player or the dealer a score in excess of twenty-one, in which case, it shall have a value of one.
3. Wagers.
   a. Only players may wager in the game of Blackjack.
   b. No more than seven players shall be allowed to make wagers at any single gaming table for any given hand.
   c. Prior to the first card being dealt for each round of play, each player at the game of Blackjack shall make a wager against the dealer.
   d. A player's wager shall win if:
      (1) The score of the player is 21 or less and the score of the dealer is in excess of 21;
      (2) The score of the player exceeds that of the dealer without either opponent exceeding 21; or

(3) Both the player and dealer have achieved a score of 21; however, the player has a blackjack and the dealer does not.

e. A player's wager shall lose if:
   (1) No matter what the score of the dealer, the score of the player is in excess of 21;
   (2) The score of the dealer exceeds that of the player without either opponent exceeding 21; or
   (3) Both the dealer and player have achieved a score of 21; however, the dealer has a blackjack and the player does not;

f. A player's wager shall be cancelled in the event of a push.

g. Except as otherwise provided in these regulations, no wager shall be made, increased or withdrawn after the first card of the respective round has been dealt.

h. Wagers shall be represented by gaming chips and by no other means including, but not limited to, United States and foreign currencies, promissory notes, and securities.

i. A player shall make a wager by placing gaming chips in the appropriate hole.

j. The maximum wager on any hand shall be $200 before double-downs or splits. Minimum and maximum wagers shall be conspicuously posted at each table.

k. Except for a blackjack, any winning wagers within the wager limit set in subdiv. j., and made in accordance with this paragraph shall be paid at odds of 1 to 1. At the Tribe's discretion, a blackjack may be paid at minimum odds of 3 to 2, and maximum odds of 2 to 1. The odds for the payment of a blackjack shall be conspicuously posted at each gaming table.

1. The dealer shall announce any blackjack obtained by a player or the dealer and pay off or collect as provided in these regulations either immediately or at the hand's conclusion.

m. Once the first card of any hand has been dealt by the dealer, no player shall handle, remove, or add any chips, or otherwise alter any wager, unless the floor supervisor or pit boss approves of such alteration in accordance with these regulations.

n. Once a wager on insurance, wager to double down, or wager to split pairs has been made and confirmed by the dealer, no player shall handle, remove, or add any chips, or otherwise alter any wager, unless the floor supervisor or pit boss approves of such alteration in accordance with these regulations.

o. The Tribe may preclude a person who has not made a wager on the first round of play from entering the

game on a subsequent round of play prior to a reshuffle of the cards occurring. Any person permitted by the Tribe to enter the game after the first round of cards has been dealt may be limited by the Tribe to a waget;of the minimum limit posted at the table until the cards are reshuffled and a new deal is commenced.

p. Any player who, after placing a wager on any given round of play, declines to place a wager on any subsequent round of play may be precluded by the Tribe from placing any further wagers until the dealer's shoe of cards is completed and a new shoe is commenced.

q. In the event a player is precluded from play under subdivs. o. or p., above, the Tribe may at its discretion request that the player leave the Blackjack table, provided that the player is allowed to join or rejoin that or any other game subject only to the conditions imposed on all players by the game regulations described in this compact.

r. Propositional wagers in the game of Blackjack are prohibited.

4. Opening of Table for Gaming,

a. After receiving the one or more decks of cards at the Blackjack table, the dealer shall sort and inspect the cards and the floor person assigned to the table shall verify the inspection.

b. After the cards are inspected, the cards shall be spread out face upwards on the table for visual inspection by the first player or players to arrive at the table. The cards shall be spread out in a horizontal fan shaped by columns by deck according to suit and in sequence.

5. Shuffle and Cut of the Cards.

a. Immediately prior to commencement of play and after any round as may be determined by the Tribe, the dealer shall shuffle the cards so that they are randomly intermixed.

b. After the cards have been shuffled, the dealer shall offer the stacks of cards with backs facing away from the dealer, to the players to be cut.

c. The player designated by subdiv. d., below, or the dealer as designated by subdiv. e., below, shall cut the cards by placing the cutting card in the stack at least 10 cards in from either end.

d. The player to cut the cards shall be:

(1) The first player to the table if the game is just beginning;

(2) The player on whose circle the cutting card appeared during the last round of play;

(3) The player at the farthest point to the right of the dealer if the cutting card appeared on the dealer's hand during the last round of play;
(4) The player at the farthest point to the right of the dealer if the reshuffle was initiated at the discretion of the Tribe.

e. If the player designated in subdiv. d., above, refuses the cut, the cards shall be offered to each other player moving clockwise around the table until a player accepts the cut. If no player accepts the cut, the dealer shall cut the cards.

6. Dealing from the Hands. Dealing from one or more decks of cards held in the hands of the dealer is prohibited in the game of Blackjack by this Compact.

7. Dealing from a Shoe.

a. All cards used to game at Blackjack shall be dealt from a multideck dealing shoe specifically designed for such purpose and located on the Blackjack table to the left of the dealer.

b. Each dealer shall remove the cards from the shoe with the left hand, turn the cards face upwards, and then with the right hand, place the cards on the appropriate area of the layout, except that the dealer has the option to deal hit cards to the first two circles with the left hand.

c. After each full set of cards is placed in the shoe, the dealer shall remove the first card therefrom face downwards and place it on the discard rack which shall be located on the table immediately to the right of the dealer. Each new dealer who comes to the table shall follow the same procedures as described in this subdivision before the new dealer deals any new cards to the players. The first card which has been placed face down in the discharge rack, otherwise known as the "burn card," shall be disclosed if requested by a player.

d. At the commencement of each round of play, the dealer shall, starting on the dealer's left and continuing around the table to the right, deal the cards in the following order:
(1) One card face upwards to each of the players' circles;
(2) One card face down to the dealer;
(3) A second card face upwards to each of the players' circles;
(4) A second card face down to the dealer, and then turning the dealer's first card face up.

e. After two cards have been dealt to each player and the dealer, the dealer shall, beginning on the dealer's left, indicate each player's turn to act. Such player shall indicate to the dealer whether he

wishes to stand, draw, or make any other election as permitted by these regulations.

f. As each player makes an election, the dealer shall deal face upwards whatever additional cards are necessary to effectuate such election consistent with these regulations.

g. At the conclusion of a round of play, all cards still remaining on the layout shall be picked up by the dealer in order and in such a way that they can be readily arranged to indicate each player's hand in case of questions or dispute. The dealer shall pick up the cards beginning with those of the player to the far right of the dealer and moving counter-clockwise around the table. After all the players' cards have been collected the dealer shall pick up his cards and place them in the discard rack on top of the players' cards.

h. Whenever the cutting card is reached in the deal of the cards, the dealer shall continue dealing the cards until that round of play is completed after which he shall reshuffle the cards. If at the beginning of a new round, the first card to be dealt is the cutting card, the dealing stops and the dealer shuffles the cards.

i. At no time shall a player or nonplayer be allowed to handle, alter or remove any cards used to game at Blackjack except as explicitly permitted in this section.

j. Each player at the table shall be responsible for correctly computing the point counts of his/her hand, and no player shall rely on any point counts announced by the dealer.

k. Whenever all players leave a table, the dealer must repeat the procedures contained in paragraphs 4 and 5, above.

8. Payment of a Blackjack.

a. If the first face up card dealt to the dealer is 2,3,4,5,6,7,8, or 9 and a player has Blackjack, the dealer shall announce and pay the winner at odds in play at that table, either immediately or at the hand's conclusion.

b. If the first face up card dealt to the dealer is an Ace, King, Queen, Jack or Ten and a player has a Blackjack, the dealer shall announce the Blackjack but shall make no payment nor remove any cards until all other cards are dealt to the players and the dealer receives a second card. If, in such circumstances, the dealer's second card does not give the dealer a Blackjack, the player having a Blackjack shall be paid at odds in play at that table. If, however, the dealer's second card gives

him a Blackjack, the wager of the player having a Blackjack shall constitute a tie or a push.

9. Surrender. The Tribe may allow all players to surrender or may prohibit them from surrendering. The game regulation regarding surrender shall be conspicuously posted at the location where blackjack is played.
10. Insurance. The Tribe may allow all players to make insurance wagers, or may prohibit them from so wagering. The game regulation regarding insurance shall be conspicuously posted at the location where Blackjack is played.
11. Doubling Down. The Tribe may allow all players to double down, or may prohibit them from doubling down. The game regulation regarding doubling down shall be conspicuously posted at the location where Blackjack is played.
12. Splitting Pairs. The Tribe may allow all players to split, or may prohibit them from splitting. The game regulation regarding splitting pairs shall be conspicuously posted at the location where Blackjack is being played.
13. Push. Other provisions of this section notwithstanding, the Tribe may deem to be a push the circumstance in which the player has a simple 21 and the dealer a blackjack. The game regulation regarding a push shall be conspicuously posted at the location where Blackjack is played.
14. "Double Pitch" variant. The Tribe may offer this variant of Blackjack as provided below:
    a. Tables at which this variant is played shall be conspicuously posted "Double Pitch."
    b. This variant may be conducted at not more than one-third of the Blackjack tables in a gaming facility.
    c. Par. C.6. notwithstanding, dealing from the hands shall be permitted using one, but not more than two, complete decks of cards.
    d. Subdiv. C.7.d. notwithstanding, this variant may be conducted with one or both of the players' cards dealt face down.
    e. Subdiv. C.7.i.notwithstanding, a player may be permitted to hold cards dealt to that player.
    f. Each table at which this variant is being conducted shall be subject to the continuous surveillance prescribed in par. D.2. at all times during play.
15. Drawing of Additional Cards by Players and Dealers.
    a. A player may elect to draw additional cards whenever that player's point count total is less than 21 except that:
        (1) A player having a blackjack or a hard total of 21 may not draw additional cards;

(2) A player electing to double down may draw up to the posted limit; and

(3) A player splitting Aces shall only have one card dealt to each Ace and may not elect to receive additional:cards.

b. Except as provided in subdiv. c., below, the dealer shall draw additional cards until the dealer accumulates the total posted on the layout, at which point no additional cards shall be drawn.

c. A dealer shall draw no additional cards, regardless of the point count, if all players have made their elections on their respective hands and the point count of the dealer's hand will have no effect on the outcome of the round of play.

16. A Player Yagering on More Than One Circle. The Tribe may permit a player to wager on more than one circle at the Blackjack table provided, however, that the Tribe shall have the authority and discretion to prohibit this during hours when there are insufficient seats at the location where Blackjack is played to accommodate patron demand.

17. Distribution of Blackjack Tips.
All tip bets won by a dealer and all other tips shall be paid in chips, deposited in a locking tip box in the dealer's pit area, pooled with all other tips and tip bets accumulated by all other dealers, and divided not more frequently than weekly between dealers and supervisory management personnel as defined by the Tribe upon a formula established by the Tribe. Cash tipping shall be prohibited.

18. Blackjack Tournament.
The Tribe may allow the play of Blackjack tournaments where, in addition to the wager, players may win other prizes as provided for in the regulations of that particular tournament. Any such Blackjack tournament must otherwise be played as provided in this section.

19. Availability of Blackjack Rule.
The regulations of Blackjack or of a Blackjack tournament must be made readily available in writing to players or potential players on request.

20. House Count and Inspection of Cards Upon Closing.

a. Upon closing of the location where Blackjack is played all cards utilized in games of Blackjack shall be re-grouped into complete 52-card decks.

b. A dealer who dealt cards from a shoe may not regroup the cards from that shoe.

c. Any irregularities discovered as a result of regrouping cards, such as missing or marked cards, shall be reported to the casino manager first and then to security personnel for investigation and resolution.

D. Staffing and Surveillance Requirements.
The following staffing and surveillance requirements shall apply to the game of Blackjack:

1. At all times during the conduct of Blackjack games the following staff must be present:
    a. At least one cashier;
    b. One dealer per table; and
    c. At least one pit boss or floor person for each four tables or fraction thereof.
2. At all times during the conduct of Blackjack games the following surveillance shall be required:
    a. Video cameras capable of providing pan, tilt and zoom surveillance of the tables at which Blackjack is being played;
    b. Domes that completely enclose each video camera required under this paragraph and conceal such cameras' actions yet accommodate clear, unobstructed camera views;
    c. At least one employee or management official monitoring the video surveillance feed on closed circuit video monitors; and
    d. Video recordings of video surveillance camera feed.
3. Where the limits at a table are greater than $200 after double-down or splitting, there must be surveillance as required under par. 2. above.
4. Video recordings of video surveillance feed gathered under par. 2., above, shall be preserved and stored for a period of 30 days and shall not be erased, recorded-over, nor otherwise altered during that time.

**XVII. PULL-TABS OR BREAK-OPEN TICKETS.**

A. Standards. Pull-tab or break-open ticket games, when conducted as Class III gaming pursuant to this Compact, shall be conducted in accord with the most recent published standards of the North American Gaming Regulators Association.

B. Game locations. Unless the State by amendment to this Compact consents to additional locations, games authorized and operated under this section XVII. shall be conducted only in Gaming Facilities authorized for electronic games of chance pursuant to subsction XV.H. of this Compact.

C. Class II Gaming. This section shall not apply to pull-tab or break-open tickets when conducted as Class II gaming pursuant to the Act.

**XVIII. AMENDMENTS TO REGULATORY AND TECHNICAL STANDARDS FOR ELECTRONIC GAMES OF CHANCE AND BLACKJACK.** The State and the Tribe acknowledge the likelihood that technological advances or other changes will occur during the duration of this Compact that may make it necessary or desirable that the regulatory and technical standards set forth in sections XV. and XVI. for electronic games of chance and Blackjack, respectively, be modified to take

advantage of such advances or other changes in order to maintain or improve game security and integrity. Therefore, any of the regulatory or technical standards set forth in section XV. and XVI. may be modified for the purposes of maintaining or improving game security and integrity by mutual agreement of the Executive Director of the Wisconsin Lottery and the Wisconsin Winnebago Business Committee or its Chairperson, upon the written recommendation and explanation of the need for such change made by either party.

## XIX. ALLOCATION OF JURISDICTION.

A. Civil jurisdiction.

This Compact does not change the allocation of civil jurisdiction among federal, state, and tribal courts, unless specifically provided otherwise in this Compact.

B. Criminal jurisdiction.

1. The State, except as provided in par. B.2. and sec. XXIII, shall have jurisdiction to prosecute such criminal violations of its gambling laws, including amendments thereto, as may occur on tribal lands. This jurisdiction may be exercised in a similar manner as the State exercises general criminal jurisdiction pursuant to Public Law 280, 18 U.S.C. section 1162. Consent of the Attorney General of Wisconsin shall be a condition precedent to commencement of any prosecution. This provision shall not survive the term and termination of this Compact.
2. The State shall not initiate criminal prosecution against any individual authorized by the Tribe to, on behalf of the Tribe, engage in Class III activities authorized by this Compact or against any individual authorized by the Tribe to engage in Class I or Class II activities under the Act. Any dispute as to the authority of the Tribe relating to such authorization shall be resolved through the Dispute Resolution procedures set forth within this Compact.
3. The Tribe shall have jurisdiction to prosecute violations of its Gaming Code against all individuals subject thereto.
4. Except as specifically set forth in this subsection, this Compact does not change the allocation of criminal jurisdiction among federal, state and tribal authorities.

## XX. LIABILITY FOR DAMAGE TO PERSONS AND PROPERTY.

A. During the term of this Compact, the Tribe shall maintain public liability insurance with limits of not less than $250,000 for any one person and $4,000,000 for any one occurrence for personal injury, and $2,000,000 for any one occurrence for property damage.

B. The Tribe's insurance policy shall include an endorsement providing that the insurer may not invoke tribal sovereign

immunity up to the limits of the policy required under subsec. A.

C. The Tribe shall indemnify, defend and hold harmless the State, its officers, directors, employes and agents from and against any claims, damages, losses or expenses asserted against or suffered or incurred by the State or its officers, directors, employes and agents based upon or arising out of any bodily injury or property damage resulting or claimed to result in whole or in part from any act or omission of the Tribe relating to the inspection of any gaming or gaming related facilities, or any rectification thereof, pursuant to this Compact or tribal ordinances regarding public health, safety and welfare.

**XXI. ENFORCEMENT.**

A. The Lottery Board and the Department of Justice shall have the right to monitor the Tribe's Class III gaming to ensure Tribal compliance with the provisions of this Compact. Authorized agents of the Lottery Board and the Division of Criminal Investigation of the Department of Justice shall, upon the presentation of appropriate identification, have the right to gain access with notice or without notice, and without warrant, to all facilities used for the operation or conduct of Class III gaming or the storage of equipment and records related thereto, and may inspect all premises, equipment, records, documents or items related to the operation or conduct of Class Ill gaming in order to verify compliance with the provisions of this Compact. Inspections pursuant to this section shall be conducted in the company of a tribal official as designated by the Wisconsin Winnebago Business Committee or Chairman and shall not be conducted in a manner which disrupts normal business operations.

B. If either party believes that the other party has, in respect to the subject matter of this Compact, failed to prosecute any offender under its criminal laws or code, it may invoke the Dispute Resolution procedures in section XXII.

C. If any party to this Compact has reason to believe that the other party is not complying with the provisions of this Compact, it may invoke the Dispute Resolution procedures in section XXII.

D. In order to administer and enforce state laws, the Department of Justice and the Lottery Board may investigate the activities of the Tribal officers, employes, contractors, or gaming participants who may affect the operation or administration of Tribal gaming, and shall report suspected violations of state or federal laws, or tribal ordinances the appropriate prosecution authorities, and suspected violations of this Compact to the Lottery Board. Pursuant to such investigation, the Lottery Board or the Yisconsin Attorney General may issue a subpoena, in accordance with state law, to compel the production of any books, papers, correspondence, memoranda, agreements, or other documents or

records which the State reasonably deems relevant or material to the investigation. Section 885.12, Wis. Stats., shall apply to a failure to obey a subpoena under this subsection.

E. The Wisconsin Attorney General shall have jurisdiction to commence prosecutions relating to Class III gaming for violations of any applicable state civil or criminal law, or provision of this Compact.

**XXII. INCORPORATION.**

The Gaming Code of the Tribe, as it may be from time-to-time amended, is incorporated by reference into this Compact.

**XXIII. DISPUTE RESOLUTION.**

A. If either party believes that the other party has failed to comply with any requirement of this Compact, it shall invoke the following procedure:

1. The party asserting the noncompliance shall serve written notice on the other party. The notice shall identify the specific statutory, regulatory or Compact provision alleged to have been violated and shall specify the factual basis for the alleged noncompliance. The State and Tribe shall thereafter meet within thirty days in an effort to resolve the dispute.
2. If the dispute is not resolved to the satisfaction of the parties within ninety days after service of the notice set forth in par. 1., either party may pursue any remedy which is otherwise available to that party to enforce or resolve disputes concerning the provisions of this Compact.

B. Nothing in this section shall be construed to preclude, limit or restrict the ability of the parties to pursue, by mutual agreement, alternative methods of dispute resolution, including but not limited to mediation or arbitration; provided that neither party is under any obligation to agree to such alternative method of dispute resolution.

**XXIV. SOVEREIGN IMMUNITY; COMPACT ENFORCEMENT.**

A. Except as expressly provided in section XIX., neither the State nor the Tribe waive their sovereign immunity, under either state or federal law, by entering into this Compact and no provision of this Compact is intended to constitute a waiver of State or Tribal sovereign immunity.

B. This Compact in no way limits the application of section 11(d)(7)(A) of the Act.

C. In addition to the enforcement mechanism under subsec. B., both the State and the Tribe agree that suit to enforce any provision of this Compact may be brought in federal court by either the State or the Tribe against any official or employe of either the State or the Tribe. Said suit may be brought for any violation of the terms of this Compact or violation of any applicable state or federal law. Relief in said suit shall be limited to prospective declaratory or injunctive

relief. An allegation that an official or employe violated this Compact shall be deemed as an allegation that said official or employe is acting in excess of his/her authority for purposes of jurisdiction only. The State and the Tribe will bear their own costs of litigation for any action to enforce this Compact, including but not limited to, attorneys' fees.

D. These enforcement provisions are an essential part of this Compact, and if they are found to violate the sovereign immunity of either the State or the Tribe or should the courts otherwise determine they lack jurisdiction to enforce the Compact, the parties will take all steps necessary to create an effective enforcement mechanism.

**XXV. REIMBURSEMENT OF STATE COSTS.**

A. Until such time as all tribes within the State that have requested negotiation of Class III gaming compacts have concluded compacts with the State, the Tribe shall pay to the State, as reimbursement for State costs of regulation under this Compact, the sum of $25,000 for each State fiscal year (ending June 30), or part thereof, that this Compact is in force, except that for the fiscal year ending June 30, 1992, the Tribe shall pay the State $2,083.33. Payments under this subsection shall be made on or before the end of each fiscal year.

B. As soon as all tribes within the State that have requested negotiation of Class III gaming compacts have concluded compacts with the State, the Tribe shall pay to the State, as reimbursement for State costs of regulation under this Compact, an annual amount for each State fiscal year computed as follows: the share of $350,000 determined by multiplying that amount by a fraction whose denominator is the sum of the gross annual Class III gaming handle of those tribes for the previous fiscal year, and whose numerator is the Tribe's gross annual Class III gaming handle for that same fiscal year. Payments shall be made within 30 days after the Tribe receives a statement from the State setting forth the amount to be paid by the Tribe under this section.

C. Payments under subsecs. A. and B., shall be made payable to the State of Wisconsin and sent to:

Secretary
Department of Administration
State of Wisconsin
P.O. Box 7864
Madison, Wisconsin 53707-7864

D. The Tribe shall also directly reimburse the Department of Justice and the Lottery Board for their actual and necessary costs of providing services and assistance at the request of the Tribe.

E. For purposes of this section, "gross gaming handle" means total amount wagered.

**XXVI. DURATION.**

A. This Compact shall be in effect for a term of seven years after it becomes binding on the parties.

B. The duration of this Compact shall thereafter be automatically extended for terms of five years, unless either party serves written notice of nonrenewal on the other party not less than one hundred eighty days prior to the expiration of the original term of this Compact or any extension thereof.

C. In the event written notice of nonrenewal is given by either party as set forth in this section, the Tribe shall cease all Class III gaming under this Compact upon its expiration date or upon the date the procedures in subsec. E. are concluded and a successor compact, if any, is in effect.

D. The Tribe may operate Class III gaming only while this Compact, or any extension thereof under this section, is in effect.

E. In the event that written notice of nonrenewal of this Compact is given by one of the parties under subsec. B., above, the Tribe may, pursuant to the procedures of the Act, request the State to enter into negotiations for a successor compact governing the conduct of Class III gaming activities to become effective following the expiration of this Compact. Thereafter the State shall negotiate with the Tribe in good faith concerning the terms of a successor compact (see sec. 11 (d)(3)(A) of the Act). If a successor compact is not concluded by the expiration date of this Compact, or any extension thereof under subsec. B., the Tribe shall do one of the following:

1. Immediately cease all Class III gaming upon the expiration of this Compact, or any extension thereof under subsec. B.; or
2. Commence action in the United States District Court pursuant to section 11 (d)(7) of the Act, in which event this Compact shall remain in effect until the procedures set forth in section 11 (d)(7) of the Act are exhausted.

**XXVII. GAMING LOCATIONS.**

A. For purposes of this section XXVII., and sections XV., XVI. and XVII., "location" means the Tribe's Lands within a county enumerated in this section.

B. On or before May 1, 1992, the Tribe operated gaming on the Tribe's Lands at locations in Sauk, Jackson and Wood Counties. The Tribe proposes to conduct Class III gaming pursuant to this Compact at these locations and on Tribal Lands at additional locations. The State agrees that the Tribe may operate Class III gaming as provided in this Compact on Tribal Land in Sauk, Jackson, and Wood Counties, but only as provided in this Compact. The State has offered to include a fourth location in this Compact, subject to certain conditions which are not now acceptable to the Tribe.

This section may be amended at a later date to enumerate the fourth location.

**XXVIII. TRIBAL GAMING ORDINANCES AND STATE LAW.**
To the extent that State law or Tribal: ordinances, or any amendments thereto, are inconsistent with any provision of this Compact, this Compact shall control.

**XXIX. RIGHTS UNDER THE ACT.**
Nothing in this Compact shall be construed to limit the rights or remedies available to the parties under the Act, except as specifically provided herein.

**XXX. NOTICES.**

A. All notices required or authorized to be served shall be served by first class mail at the following addresses:

Wisconsin Winnebago Business Committee
Post Office Box 667
Black River Falls, Wisconsin 54615

Governor
115 East, State Capitol
Post Office Box 7863
Madison, Wisconsin 53707

B. The Tribe now intends to conduct the games described in sections XV. and XVI. at Jackson and Sauk Counties. The Tribe shall provide at least 30 days written notice to the State if the Tribe intends to move these games to another location as permitted in this Compact.

C. The Tribe now intends to conduct the games subject to the two location, 400 game total limitation, described in paragraph XV.H.2, in Wood County. The Tribe shall provide at least 30 days written notice to the State if the Tribe intends to designate another location as subject to this limitation.

**XXXI. AGREEMENT DATE.**
This Compact shall become binding on the Tribe and the State upon signature by the duly authorized representative of the Wisconsin Winnebago Tribe and by the Governor of the State of Wisconsin. This Compact shall cease to be binding upon the parties in the event it is not approved by the Secretary of the United States Department of the Interior.

**XXXII. AMENDMENT.**
This Compact shall not be modified, amended or otherwise altered without the prior written agreement of both the State and the Tribe.

**XXXIII. SEVERABILITY.** If a court of competent jurisdiction should hold that any section or provision of this Compact is void,

ineffective, or contrary to law, then the remaining provisions of the Compact shall remain in full force and effect.

IN WITNESS WHEREOF, The Wisconsin Winnebago Tribe and the State of Wisconsin have hereunto set their hands and seals.

**WISCONSIN WINNEBAGO BUSINESS COMMITTEE**

By: ______________________
John R. Mann
Vice-Chairman

**STATE OF WISCONSIN**

By: ______________________
Tommy G. Thompson
Governor

30th day of July, 1992.

______________________
Acting Assistant Secretary - Indian Affairs
United States Department
Interior

# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, D.C. 20240

JAN 22 1999

Honorable Jacob Lonetree
President, Ho-Chunk Nation
P.O. Box 667
Black River Falls, Wisconsin 54615

Dear President Lonetree:

We are in receipt of the Amendments to the Ho-Chunk Nation (Tribe) and the State of Wisconsin (State) Gaming Compact of 1992 dated December 11, 1998. We have completed our review of these Amendments and conclude that they do not violate the Indian Gaming Regulatory Act of 1988 (IGRA), Federal law, or our trust responsibility. Therefore, pursuant to Section 11(d)(8)(A) of IGRA, 25 U.S.C. § 2710(d)(8)(A) and delegated authority in 209 DM 8.1, we approve the Amendments. The Amendments shall take effect when the notice of our approval, pursuant to Section 11 (d)(3)(B) of IGRA, 25 U.S.C. § 2710(d)(3)(B), is published in the FEDERAL REGISTER.

We note that the Amendments (Section XXXIV of the Compact) memorialize that the Tribe and State agree to discuss modification of the Compact should the State enact a law which purports to impose a tax, fee, assessment or other charge directly on the Tribe's Class III gaming revenues, or a tax on winnings generated at a Class III gaming facility. Our approval of these Amendments should not be construed as, and is not, authorization for the State to impose such taxes, fees, assessments or charges.

We wish the Tribe and the State success in their economic venture.

Sincerely,

Kevin Gover

Assistant Secretary - Indian Affairs

Enclosure

Identical Letter Sent to: Honorable Tommy G. Thompson
Governor of Wisconsin
Madison, Wisconsin 53707

# AMENDMENTS TO THE WISCONSIN WINNEBAGO TRIBE, NOW KNOWN AS THE HO-CHUNK NATION, AND THE STATE OF WISCONSIN GAMING COMPACT OF 1992

This Agreement is entered into by and between the HO-CHUNK Nation ("Nation") and the State of Wisconsin ("State").

WHEREAS, Section XXXII. of the Wisconsin Winnebago Tribe and the State of Wisconsin Gaming Compact of 1992 provides that it may be amended upon the written agreement of both parties; and Whereas both parties wish the Compact to continue and believe the amendments to the Compact contained herein serve the best interest of both the State and the Nation,

The State and the Nation do hereby agree to amend the Compact as set forth below:

1. The term of the Compact shall, pursuant to Section XXVI.B. be extended for a term of five (5) years, from June 11, 1999 to June 11, 2004, subject to further extensions as provided therein. Upon delivery to the Governor of the County and/or City approvals obtained pursuant to Section XXVII., or January 1, 2000, whichever is earlier, or any time after the earlier of these two events, at the request of the Nation the State shall negotiate in good faith with the Nation for a reasonable period of time regarding whether to grant an additional extension of the Compact, or otherwise extend the duration of the Compact, and whether the Nation may engage in Class II and Class III gaming at additional ancillary sites.

2. Section V.A. of the Compact is amended by deleting the number "18" wherever it appears in this section and replacing it with the number "21." Section V.A. is further amended by adding the following sentence:

   No person under the age of 21 shall be permitted access to any portion of any facility in which any Class III game is conducted, except for purposes of employment pursuant to Section V.B., or to gain access to the Nation's non-Class III gaming facilities.

   The amendments to Section V.A. shall take effect on June 30, 1999.

3. Section XV.H.2. is amended by deleting the phrase "provided that the total number of games shall not exceed 400 among the two locations."

4. Section XVI.B.1. of the Compact is amended by deleting the word "two" wherever it appears in this section and replacing it with the word "three."

5. Section XXVII.B. is amended by adding the following:

   The State and the Nation hereby amend Section XXVII.B. by agreeing that upon delivery to the Governor of a resolution(s) of support approved by a county, or if the site is located within a city, the city and the county, authorizing Class III gaming, the Governor shall meet and negotiate in good faith whether the site may be enumerated as a fourth location pursuant to Section XXVII. If the site is agreed to as a fourth site, the subject of the negotiations will include but not be limited to: (1) the suitability of the site for gaming, (2) the fee, if any, to be paid to the State, and (3) the number of Class III games authorized by the Compact.

6. Section XXXIV. of the Compact entitled "PAYMENT TO THE STATE" is created as follows:

A. The Nation shall make annual payments to the State for each one (1) year period beginning June 11, 1999 through June 11, 2004, as follows. For the period June 11, 1999 through June 11, 2000 the Nation shall pay to the State $6,500,000. For the period June 11, 2000 through June 11, 2001 the Nation shall pay to the State $7,500,000. For the period June 11, 2001 through June 11, 2002 the Nation shall pay to the State $7,500,000. For the period June 11, 2002 through June 11, 2003 the Nation shall pay to the State $8,000,000. For the period June 11, 2003 through June 11, 2004 the Nation shall pay to the State $8,000,000.

B. In the event a change in State law is enacted to permit the operation of electronic games of chance, or other Class III games, as defined in and authorized by this Compact, by any person, organization or entity other than a federally recognized Indian Tribe and/or Nation under the provisions of the Indian Gaming Regulatory Act, 25 U.S.C. 2701 et. seq., or the State Lottery as authorized by Ch. 565 Wis. Stats., or if the State Lottery is authorized to conduct electronic games of chance and does so operate electronic games of chance, the Nation shall be relieved of its obligations to pay these amounts.

C. Method of Payment. The Nation shall make the first payment required by Subsection A. on or before June 30, 2000, and each subsequent payment on June 30, 2001, June 30, 2002, June 30, 2003 and June 30, 2004 respectively.

D. The parties may modify this obligation to pay pursuant to a subsequent agreement.

E. In the event that a natural or man-made disaster renders impossible the operation of fifty (50) percent or more of the electronic games of chance operated by the Nation under this Compact for a period of fourteen (14) consecutive days or more, the payment required under this section for the year in which the disaster occurs shall be reduced by a percentage equal to the percentage decrease in the net win (total amount wagered less winnings paid) for the calendar year in which the natural disaster occurred compared with the net win for the previous calendar year, and the State and Nation shall meet to discuss additional assistance.

F. In the event that, after the effective date of the amendment, the State enacts any law which imposes a new tax, fee, assessment, or other charge which is assessed directly on the Nation's Class III gaming revenues, or a tax exclusively on winnings generated at the Class III gaming facilities, the State and Nation shall meet to discuss a modification to Section XXXIV. of this Compact.

7. Section XXXV. of the Compact entitled "ADDITIONAL BENEFITS TO NATION" is created as follows:

Should the State and any other compacting Tribe within Wisconsin amend a current gaming compact or adopt a new gaming compact with terms that are more favorable to the compacting Tribe or to the State than are the terms of this Compact, upon request by the Nation, the parties shall meet to negotiate the incorporation of substantially similar provisions into the Compact and, if applicable and agreeable to the parties, substantially similar provisions shall be incorporated into this Compact.

8. Section XXXVI. of the Compact is created as follows:

A. In the event that the amendments contained herein are disapproved, in whole or in part, by the Secretary of the Interior, either party may serve on the other a demand for renegotiation of such portion of the Compact amendments of December 1998 as are impacted. The parties shall meet to negotiate revisions to address such objection as may be raised. If a mutually satisfactory solution is not achieved within thirty (30) days of the Secretary's action, either party may during the sixty (60) day period thereafter serve upon the other a notice of nonrenewal of Compact. The Compact shall then expire 180 days after service of a notice of nonrenewal of Compact pursuant to this section, subject to the provisions of Section XXVI.D-E.

B. In the event that a court of competent jurisdiction holds any or all of the amendments to the Compact contained herein to be unenforceable or invalid within six (6) months of the execution of said amendments, either party may serve on the other a demand for renegotiation of such portion of the Compact amendments of December 1998 as are impacted. The parties shall meet to negotiate revisions to address such objection as may be raised. If a mutually satisfactory solution is not achieved within thirty (30) days of the court's holding, either party may during the sixty (60) day period thereafter serve upon the other a notice of nonrenewal of Compact. The Compact shall then expire 180 days after service of a notice of nonrenewal of Compact pursuant to this section, subject to the provisions of Section XXVI.D-E.

C. In the event that a court of competent jurisdiction holds any or all of the amendments to the Compact contained herein to be unenforceable or invalid later than six (6) months after the execution of these Compact amendments, the parties shall meet to negotiate terms to replace those affected by the decision of the court. If a mutually satisfactory solution is not achieved within thirty (30) days of the court's holding, either party may during the sixty (60) day period thereafter serve upon the other a notice of nonrenewal of Compact. The Compact shall then expire 180 days after service of a notice of nonrenewal of Compact pursuant to this section, subject to the provisions of Section XXVI.D-E.

9. The Nation has proposed the development of a plan for the creation of a Tribal revolving loan fund program to promote economic development and enhance employment opportunities. The purpose of the program shall be to make low interest loans to Nations and other eligible Tribal entities that would not otherwise be able to secure said loans. The Nation shall offer to work with the other Wisconsin Nations to establish the program guidelines and eligibility criteria. The program shall not require the Nation to make more than one (1) monetary contribution to finance the program. The program guidelines shall be developed by the Nation and submitted to the State on or before March 31, 1999.

10. Section XXXVII. of the Compact is created as follows:

By July 1, 1999 the Nation shall have made reasonable offers to enter into written agreements with all units of local governments that provide services to a Class III gaming facility of the Nation, to fully reimburse those units of local governments for such services actually provided to said facilities.

11. Section XXXVIII. of the Compact is created to read:

If a subsequent agreement or amendment thereof regarding Class III gaming causes a substantial reduction of the Nation's Class III gaming revenues, the State and the Nation shall meet to negotiate whether the reduction in the Nation's Class III gaming revenues was caused by the subsequent agreement and if so, negotiate a reduction of the amount required pursuant to Section XXXIV. As express and unique consideration for this promise made by the State, the Nation waives its rights to conduct Class II gaming, and agrees not to conduct Class II gaming, at all locations in the State except for the locations at which the Nation is currently conducting Class II gaming as identified in the records of the Department of Administration, Division of Gaming, and two counties in the State to be determined by the Nation.

12. The State and Nation agree to execute contemporaneous with the execution of these Compact Amendments a document entitled Memorandum of Understanding Regarding Technical Matters, which document is incorporated herein by reference.

HO CHUNK NATION

By: ______________________
Clarence Pettibone
Vice-President

Date Signed: 12 11 98

STATE OF WISCONSIN

By ______________________
Tommy G. Thompson
Governor

Date Signed: December 11, 1998

**Consistent with 25 U.S.C.A. Sec. 2710 (d)(8), the Amendments to the Tribal-State Compact for Class III Gaming between the Ho-Chunk Nation and the State of Wisconsin dated December 11, 1998, is hereby approved on this 22nd day of January, 1999, by the Assistant Secretary - Indian Affairs, United States Department of the Interior.**

**UNITED STATES DEPARTMENT OF THE INTERIOR**

Kevin Gover

**Kevin Gover**
**Assistant Secretary - Indian Affairs**

# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, D.C. 20240

AUG 1 5 2003

Honorable Troy Swallow
President, Ho-Chunk Nation
P.O. Box 667
Black River Falls, Wisconsin 54615

Dear President Swallow:

On April 29, 2003, we received the Second Amendment (Amendment) to the Wisconsin Winnebago Tribe, now known as the Ho-Chunk Nation, and the State of Wisconsin Gaming Compact of1992, executed on April 25, 2003. On June 6, 2003, we received an amendment to the original submission modifying Section XXVII (B) of the compact.

Under the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2710(d)(8)(C), the Secretary of the Interior (Secretary) may approve or disapprove the Amendment within forty-five days of the Tribe's submission. If the Secretary does not approve or disapprove the Amendment within the forty-five days, IGRA provides that the Amendment is considered to have been approved, but only to the extent that the Amendment is consistent with the provisions of IGRA. Under IGRA, the Secretary can disapprove the Amendment ifit is determined that the Amendment violates IGRA, any provision of Federal law that does not relate to jurisdiction over gaming on Indian lands, or the trust obligations ofthe United States to Indians.

We have completed our review of the Amendment, along with the submission of additional documentation submitted by the parties and a number ofthird parties. Pursuant to Section 11 of IGRA, we have decided to allow the Amendment to take effect without Secretarial action for the following reasons.

Under the Amendment, Section IV.A of the Compact is amended by adding, *inter alia,* electronic keno, roulette, craps, poker and similar non-house banked card games, and games played at blackjack style tables. We need to determine whether the inclusion ofthese gaming activities in the Compact complies with the requirements of Section 1 1 (d)(l)(B) of IGRA. In our view, whether the addition ofelectronic keno and casino table games complies with the Section 11(d)(l)(B) of IGRA, Section U.S.C. § 2710(d)(l)(B), which requires that such gaming activities be permitted in the State of Wisconsin "for any purpose by any person, organization, or entity" is an unsettled issue. As you are well aware, the scope of gaming question is one ofthe issues raised in the state court litigation in *Dairyland Greyhound Park v. Doyle,* No. 0l-CV-2906. In addition, a petition has been filed with the Wisconsin Supreme Court on April 2, 2003, by the Majority Leader ofthe Wisconsin Senate and the Speaker ofthe Wisconsin Assembly seeking a declaratory judgement on several issues relating

to the Amendment, including the permitted scope of gaming in the state. Although we are mindful that in the *Dairyland* case, the Dane County Circuit has ruled in favor of the Governor, the decision has been appealed to an intermediate court which is unlikely to be the final appeal of the case within the state court system. As a result, we believe that the best alternative available to the Department of the Interior under IGRA is to have the Amendment go into effect by operation oflaw.

In addition, the new Section XXVII (B) of the Compact provides that if another Indian tribe submits an application to the Secretary of the Interior for a two-part determination under Section 20(b)(1)(A) of IGRA, the Governor of the State of Wisconsin shall not concur in any positive Secretarial determination unless the state has entered into a binding indemnification agreement with the Ho-Chunk Nation to compensate it for any substantial reduction of its Class III gaming revenues. There is no question that the intent of this section of the Compact is to preserve the Ho Chunk Nation's gaming market by providing additional burdens upon new negotiations between a new gaming tribe and the state, thus arguably creating a disincentive for the state to concur in a Secretarial two-part determination. As we told the Ho-Chunk Nation's representatives during our review of the provision, we find this provision anathema to basic notions offairness in competition, and repugnant to the spirit of IGRA. In our view, regardless of the short term benefits that you may realize from this type of provision, it is decidedly not in the long term interest of Indian tribes or Indian gaming, and, for that reason, we will continue to refuse to affirmatively approve any compact that contains such a provision. Ofcourse, in the event that a court finds such provisions to violate the terms of IGRA, we will treat these provisions accordingly in the future.

Our decision to neither approve nor disapprove the Amendment within forty-five days means that the Amendment is considered to have been approved, "but only to the extent that it is consistent with the provisions of [IGRA]." The Amendment will take effect when notice is published in the FEDERAL REGISTER pursuant to Section 11(d)(3)(B) of IGRA, 25 U.S.C. § 2710(d)(3)(B).

Sincerely,

Acting Assistant Secretary - Indian Affairs

Similar letter sent to:

Honorable Jim Doyle
Governor of Wisconsin
State Capitol Madison,
Wisconsin 53707

# SECOND AMENDMENT TO THE WISCONSIN WINNEBAGO TRIBE, NOW KNOWN AS THE HO-CHUNK NATION, AND THE STATE OF WISCONSIN COMPACT OF 1992

This Amendment ("Second Amendment") is entered into on this 25th of April 2003 by and between the Ho-Chunk Nation ("Nation") and State of Wisconsin ("State"). The Nation and the State shall hereinafter be referred to collectively as the "Parties". The term Nation shall mean the "Wisconsin Winnebago Tribe" or "Tribe" as those terms are used in both the "Compact" and "Amendent" defined below.

RECITALS

WHEREAS, Section XXXII of the Wisconsin Winnebago Tribe and State of Wisconsin Gaming Compact of 1992 ("Compact") provides that it may be amended upon written agreement of both Parties; and

WHEREAS, on December 11, 1998, the Parties amended ("Amendment") the Compact; and

WHEREAS, the Parties believe that it is in their mutual interest to amend the terms of the Compact and Amendment in accordance with the terms and conditions set forth in this Second Amendment.

NOW THEREFORE, in consideration of the mutual promises contained herein the Parties agree that the Compact and Amendment may be modified as follows:

1. Section IV ofthe Compact shall be amended by adding the following sentences before Section IV (A) of the Compact: The States of Illinois, Iowa and Michigan authorize within their borders a full range of casino games. In order to make· Wisconsin Indian· gaming facilities competitive with these surrounding States, the Parties have agreed that the Nation can offer for play the games authorized by this Section IV. The Parties agree that amendment of this Section is in the best interests of the State and its citizens because amendment of this Section will create additional employment opportunities and generate additional revenue for the State that can be used to provide services to its citizens.

2. Section IV (A) of the Compact shall be amended by deleting the word "and" in subsection 3; deleting the period after the word "played" at the end of subsection 4 and replacing the period with a semi-colon, and adding the following subsections: "5. All other banking, percentage and pari-mutual card games; 6. All forms of Poker, to the extent that these games are not included in the previous subsection; 7. Craps; 8. All other banking and non-banking dice games; 9. Roulette; 10. Keno; 11. Wheel of Fortune; 12. Baccarat-chemin de fer; 13. Pari-mutual wagering on live simulcast of horse, harness and dog racing events; 14. All finite lottery and lottery games; and 15. Any other game, whether played as a table game or played on an electronic or mechanical device, including devices that operate like slot machines, which consist of the elements of prize, chance and consideration, provided however, that nothing herein shall

be construed as authorizing the placing of a wager on an event conducted outside of the Nation's Class III gaming facilities except those games specified in subsection 13 above, and provided further, that nothing herein shall be construed as prohibiting the Nation from offering progressive jackpots or participating in a wide area progressive system as authorized under Section XV (D) (17)."

3. Section V(B) of the Compact is amended by deleting the Section in its entirety and substituting in its place the following sentence: No person under the age of 21 shall be permitted access to any portion of any facility in which any Class III game is conducted, except for the purposes: (1) of employment, provided the person qualifies for licensing pursuant to Section IX of the Compact, or (2) to gain access to the Nation's non-Class III gaming facilities.

4. Section XV of the Compact shall be amended by adding the following subsection:

I. MINIMUM STANDARDS FOR THE PLAYING OF GAMES. Within sixty (60) days from the date of execution of this Second Amendment by the Parties, the Nation shall submit to the State Minimum Internal Control Standards ("MICS") for, at a minimum, all areas subject to the MICS established by the National Indian Gaming Commission ("NIGC"). These procedures shall meet or exceed the MICS as established by the NIGC. Within ninety (90) days from the date of submission of the Nation's MICS to the State, the State shall submit to the Nation any objection that may have to any or all of the MICS submitted to the State. If the State submits any objection(s) to the Nation, the Parties shall, within ten (10) days of submission of the State's objection(s), meet and confer in Madison, Wisconsin at the State's Department of Administration for a reasonable period of time not to exceed sixty (60) days for the purpose of attempting in good faith to resolve the State's objection(s) to the proposed MICS. If at the end of the sixty (60) day period, the State's objection(s) have not been resolved to the mutual satisfaction of the Parties, then either Party may request, and if requested, the Parties shall agree to resolve the dispute by binding arbitration in accordance with the procedures established herein. The arbitration shall be conducted in Madison, Wisconsin at a location approved by the arbitrators. Each Party shall select one arbitrator, and the two arbitrators shall select a third neutral arbitrator. The arbitrators shall be certified public accountants with casino auditing experience or substantial experience in preparing casino internal controls. The arbitrators shall conduct the arbitration in accordance with the arbitration rules of the American Arbitration Association ("AAA") applicable for conducting hearings, or any other arbitration rules mutually agreed upon by the Parties, but the arbitration shall not be conducted by or through the AAA. The arbitrators shall render a written decision within thirty (30) days from the conclusion of the arbitration hearing by selecting from the two proposals submitted by the Parties the one which best ensures: (1) the fairness of the playing of the game ("Game") that the MICS seeks to regulate; (2) that the revenue generated from the playing of the Game is adequately counted and accounted for in accordance with Generally Accepted Accounting Principles for casinos; (3) a system of internal controls consistent with industry standards and practices; and (4) that the MICS are not clearly contrary to the law. Except as modified herein, either Party may enforce any arbitration decision or award entered pursuant to this Section in accordance with the provisions of Section XXIII (A)

and (B) and Section XXIV of the Compact as amended by Section 11 of this Second Amendment. Either Party may propose a change or amendment to the MICS, or propose a new area to be subject to the MICS, at any time during the term ofthis Compact. The new proposed MICS and any MICS or changes to the MICS proposed thereafter, shall be subject to the objection and arbitration process set forth herein until the proposed MICS are either not objected to by either Party or are approved by the Arbitrators. Each Party shall bear one-half ofthe cost of the arbitration and shall bear their own costs and attorneys fees. The Nation shall promulgate the rules of play for all Class III games conducted by the Nation as MICS pursuant to this Section.. Until a set of MICS is established addressing the software, hardware and other requirements currently governed by Sections XV and XVI ofthe Compact, the Nation may continue to conduct gaming under Sections XV and XVI, and the MICS in effect as of the effective date of this Amendment. MICS addressing the software, hardware, and other requirements currently governed by Sections XV and XVI shall supersede those provisions upon promulgation pursuant to this Section, and said · Sections XV(A) through (H) and XVI(A) through (D) shall be deleted from the Compact.

5. Section XVI of the Compact is amended by adding the following subsection:

E. LOCATION OF GAMING FACITIES. Except as otherwise provided for in this Compact, unless the State by amendment to this Compact consents to additional locations, the Class III games authorized under this Compact may be conducted with one Gaming Facility located in each of the following Counties: Jackson, Sauk, Wood and Dane. In addition, the Nation may conduct any of the Class III games authorized under this Compact at five Ancillary Facilities two of which are located in Jackson County and one of which is located in each of he following Counties: Sauk, Monroe, and Shawano. As used herein the term Gaming Facility means a facility whose Primary Business Purpose is gaming, and the term Ancillary Facility means a facility where fifty percent or more of the lot coverage of the trust property upon which the facility is located, is used for a Primary Business Purpose other than gaming. All Class III games authorized under this Compact are subject to the days and hours of operation set by the Nation.

6. Section XVII of the Compact shall be amended by deleting the phrase: "set forth in sections XV and XVI for electronic games of chance and Blackjack, respectively" that appears in the first sentence of the Section and substituting in its place the following: "adopted pursuant to Section XV". In addition, Section XVID of the Compact shall be amended by deleting all of the second sentence of the Section that appears after the word "standards" and substituting the following: "adopted under Section XV may be modified in accordance with the procedures set forth in said Section XV, as amended.

7. Section XXVI of the Compact and Paragraph 1 of the Amendment shall be deleted in their entirety. In their place shall be substituted the following Section XXVI to the Compact:

"XXVI. DURATION. This Compact shall remain in full force and effect,

notwithstanding any other provision of the Compact, the Amendment, and this Second Amendment to the contrary, until one of the following events occur:

A. This Compact is terminated by mutual consent of the Parties; or
B. The Nation duly adopts a resolution revoking tribal authority to conduct Class III gaming upon tribal land as provided for in the Indian Gaming Regulatory Act (hereinafter IGRA)."

8. Section XXVII (B) of the Compact shall be amended by adding the words· "Monroe, Shawano" after the word "Sauk" and before the word "Jackson" in the third sentence of the subsection.

9. Paragraph 5 of the Amendment shall be amended by: (1) inserting the words: "Except for conducting Class III gaming at DeJope within the City of Madison" at the beginning of the first sentence in the paragraph and making the capitol "T" in the word "the" lower case; (2) deleting the ("s") at the end of the word "resolution" that appears in the second line of the Paragraph; (3) inserting the word "by" after the word "city" but before the word "the" in the third line of the paragraph; (4) deleting the words "and the county" after the word "city" but before the word "authorizing" in the first sentence of the Paragraph, and (5) deleting all of the Paragraph after the word "Governor" that appears in the third line of the Paragraph and substituting in its place the following shall approve the site as the Nation's fourth location under the Compact." In addition, Paragraph 5 of the Amendment shall be amended by adding the following sentences at the end of the Paragraph:

"The Compact, as amended, has provided since 1991 that the Nation has the right to conduct Class III Gaming at a fourth (4th) location *(i.e:,* one site in addition to its current Class III Gaming Facilities).

Since July 25, 1999, the Nation has conducted Class II gaming on its existing pre-October 18, 1988 tribal trust land ("Site") at an existing gaming facility commonly referred to as "DeJope". This Class II gaming consists of the playing of the games of bingo and pull tabs played both in their traditional form and on electronic and mechanical devices, including devices that operate like slot machines.

The Nation has entered into an Intergovernmental Agreement with the City of Madison. Under that agreement, the Nation pays to the City the same fees and taxes that any other property owner would pay to the City.

Given these facts, the Parties agree that, rather than pursue an off-reservation site, at this time, as its fourth location, the Nation's Site at DeJope can be the Nation's fourth location for conducting Class III gaming, subject to the following conditions:

A. Referendum. In the event: (i) the City of Madison (the "City") Common Council passes a

resolution recommending that the Dane County Board of Supervisors conducts a county wide referendum and the County of Dane (the "County") Board of Supervisors passes a resolution on or before December 1, 2003 providing for a County wide referendum ("Referendum") election to be conducted in 2004 (the cost of which shall be borne by the Nation) on the question of whether the Nation should be able to conduct Class III gaming at DeJope, and (ii)the voters approve the Referendum authorizing the Nation to conduct Class III gaming at DeJope, the Governor shall authorize the Nation to conduct Class ID gaming at DeJope, if requested by the Nation, if to do so would be consistent with the public interest.

B. <u>No Referendum or Failed Referendum.</u> In the event that the City and County do not pass the resolutions required in subparagraph A above on or before December 1, 2003, the Governor shall authorize the Nation to conduct Class III gaming at DeJope if requested to do so by the Nation, and if to do so would be consistent with the public interest. In the event the Referendum required by subparagraph A above is held but not approved, the Governor may approve DeJope as a Class III gaming facility only after the City Council passes a resolution approving DeJope as a Class III gaming Facility as provided above in this Paragraph 9."

10. Section XXXII of the Compact shall be amended by adding the following at the end of the Section:

"At any time after June 1, 2010, but not later than August 30, 2010, and at any time after June 1, 2006, if the Nation is unable to obtain the Governor's approval of a fourth site to conduct Class III gaming, as set forth in Paragraph 9 of this Second Amendment, either Party may request negotiations for an amendment to Paragraph 12 of this Second Amendment establishing the fee the Nation shall pay to the State under the Compact. All requests to amend or renegotiate Paragraph 12 of this Second Amendment shall be in writing, addressed to the President of the Nation or the Governor of the State, as the case may be, and shall include the proposed amendment language. Upon receipt of the request, the Parties shall meet and confer promptly, but in no case more than ten (10) days from receipt of the request, to determine a schedule for commencing negotiations within thirty (30) days of the request. The Parties shall meet and negotiate in good faith for a reasonable period of time not to exceed ninety (90) days. If at the end of the ninety (90) day period, the Parties have not reached agreement, or if prior to the expiration of the ninety (90) days the Parties agree that they have reached impasse, then the Parties shall submit the dispute to binding arbitration before a single arbitrator in accordance with the provisions of Section XXIII (B) of the Compact as amended herein (para. 11, below). The decision of the arbitrator shall be in writing, giving the reason for the decision, and shall be binding on the Parties. The decision of the arbitrator shall be limited to increasing the fee to no more than ten percent (10%) of the Nation's "net win" and to reducing the fee to no less than two

percent (2%) of the Nation's "net win". Net win shall mean the total amount wagered on Class III games less fills, and minus the amount paid out in jackpots and prizes, including the actual cost of non-monetary prizes, which shall mean any personal property distributed to a patron as the result of a specific legitimate wager, before the deduction of costs and expenses.

In addition, within thirty (30) days preceding each fifth (5th) annual anniversary of June 11, 2004, the State or the Nation may propose amendments to the Compact to enhance the regulation of gaming under the Compact. The Nation and the State shall enter into good faith negotiations regarding the proposed amendments. Disputes over the obligation to negotiate in good faith under this Section may be resolved by binding arbitration as provided for in Paragraph 11 of this Second Amendment. In addition, any dispute between the Parties regarding a proposed amendment to the Compact to enhance the regulation of gaming under the Compact shall be resolved by binding arbitration. in accordance with the procedure established in Paragraph 11 of this Second Amendment.

Furthermore, within the thirty (30) days preceding each twenty-fifth (25th) annual anniversary of June 11, 2004, the State, by the Governor as directed by an enactment of a session law by the Wisconsin Legislature, or the Nation may propose amendments to any provision of the Compact, as amended herein. The Nation and the State shall enter into good faith negotiations regarding the proposed amendments. Disputes over the obligation to negotiate in good faith under this Section may be resolved by binding arbitration as provided for in Paragraph 11 of this Second Amendment."

11. Section XXIII (Dispute Resolution) and Section XXIV (Sovereign Immunity: Compact Enforcement) of the Compact shall be amended by deleting both Sections in their entirety and by substituting in their place the following paragraphs:

Section XXIII. DISPUTE RESOLUTION.

If any dispute arises between the Parties regarding the interpretation or enforcement of the Compact, Amendment and this Second Amendment except as otherwise provided in this Second amendment, that dispute ("Dispute") shall be resolved in accordance with the following procedure:

A. Meet and Confer. Any Party may serve a written notice of violation on the other Party setting forth the nature of the violation and a proposed remedy. If the Party upon whom the notice is served has not implemented the proposed remedy within three (3) business days from the date of service, the Parties shall meet and confer within three (3) business days from the date of expiration of the first notice, for a reasonable period of time not to exceed ten (10) days, unless the Parties agree prior to the expiration of the ten (10) day period that they have reached impass. The Parties shall meet at a time and location mutually agreed to, or if the Parties cannot agree, then in the City of Madison, if the State serves the notice, or at Black River Falls if the Nation serves the notice, beginning at 10:00 a.m.

B. Binding Arbitration. If the Parties do not resolve the dispute to their mutual satisfaction through the meet and confer process set forth above, either Party may serve a demand for arbitration on the other Party. In that event, the Parties shall resolve the Dispute by binding arbitration. Within five(5) business days from the date of receipt of the demand by the other Party, the Parties shall meet to select an arbitrator from the list of arbitrators attached hereto as Exhibit A. The Parties shall appoint arbitrators to the list that do not possess a conflict of interest or are not biased in favor of either Party and who are qualified. Each Party shall have the right to remove any arbitrator(s) appointed to the list. In the event that an arbitrator(s) is removed from the list, a substituted arbitrator shall be appointed. The arbitrators shall have experience in gaming and federal Indian law. Exhibit A shall be prepared by each Party providing the other with the names, addresses and telephone numbers of five arbitrators. Within thirty (30) days from the execution of this Second Amendment by the Parties, the Parties shall provide each other with the names, addresses, and telephone numbers of their arbitrators which shall be inserted into Exhibit A. The Parties shall have the right to update the arbitrator list from time to time, as is necessary by providing the other Party with written notice of the names of the replacement arbitrators. If the Parties cannot agree to an arbitrator, each Party shall se1ect an arbitrator and the two arbitrators shall select a single arbitrator from the list, who shall conduct the arbitration. The arbitration shall be conducted in accordance with the Federal Rules of Civil Procedure and Evidence. Within "thirty (30) days from the date the arbitrator is appointed, the arbitrator shall hold a scheduling conference at which the arbitrator shall establish a date for the filing of pre-hearing motions, completion of discovery for conducting a hearing on the matter. The schedule shall provide that the arbitration process shall be completed within 180 days from the date of the arbitrator's order establishing the schedule, unless the Parties agree otherwise. Each Party shall pay for one half (½) of the cost of the arbitration. The Parties shall be bound by any award entered by the arbitrator. The arbitrator shall have the authority to provide such relief and issue such orders as are authorized by the Federal Rules of Civil Procedure. Any action to compel arbitration, determine whether an issue is arbitrable or to confirm an award entered by the arbitrator shall be brought in the United States District Court for the Western District of Wisconsin under the Federal Arbitration Act, 9 U.S.C. Sections 1,et seq.

C. Temporary Injunctive Relief. In addition to the binding arbitration provisions provided for in Section XXIII (B) above, both the State and Nation agree that suit to enforce any provision of this Compact may be brought directly in the United States District Court for the Western District of Wisconsin by either the State or the Nation, without exhausting the requirements of Section XXIII (A) and (B) above, against any official or employee of either the State or the Nation for a temporary or preliminary injunction to prevent immediate irreparable harm within the meaning of the Federal Rules of Civil Procedure, other than money damages, for the sole purpose of maintaining the status quo of the Parties, as it existed prior to the alleged violation, until such time as the provisions of Section XXIII (A) and (B) above can be completed. Relief in said suit shall be limited to prospective declaratory or injunctive relief. An allegation that an official or employee violated this Compact shall be deemed an allegation that said official or employee is acting in excess of his/her authority for purposes of jurisdiction only. The State and the Nation shall each bear their own costs of litigation for any action brought under this

Section XXIII (C), including but not limited to, attorneys' fees.

Section XXIV. SOVEREIGN IMMUNITY

A. Unless the Parties agree otherwise, if a dispute arises regarding compliance with or the proper interpretation of the requirements of the Compact under Sections IV (Authorized Class III Gaming), XXIII (Dispute Resolution), XXIV (Sovereign Immunity), XXXIV (Payment to the State), and XXV (Reimbursement of State Costs), the dispute shall be resolved by the United States District Court for the Western District of Wisconsin.

B. Nothing contained herein shall be construed to waive the immunity of the State or the Nation except for suits a r i sing under Sections XXIII and XXIV of this Compact. The Nation and the State expressly waive, to the extent the State or the Tribe may do so pursuant to law, any and all sovereign immunity with respect to any claim brought by the State or the Nation to enforce any provision of this Compact. This waiver includes suits to collect money due to either Party pursuant to the terms of the Compact, or this Second Amendment; to obtain an order to specifically enforce the terms of any provisions of the Compact or this Second Amendment; or to obtain a declaratory judgment and/or to enjoin any act or conduct in violation of this Compact. This waiver also includes a suit to enforce Section XXIII of this Compact. This waiver also includes a suit under Section XXIV by either Party to restrain actions by the officials of either Party that are in excess of their authority under the Compact. This waiver does not extend to other claims brought to enforce other obligations that do not arise under the Compact or to claims brought by parties other than the State and the Nation.

C. In granting the waiver of immunity provided above, the Parties expressly waive any requirement that either Party exhaust any administrative remedies, in accordance with applicable law including but not limited to any remedies provided by Sections 16.007 and 775.01 of the Wisconsin Statutes, as a precondition to initiating any dispute resolution provisions contained in this Compact and Second Amendment. In addition, each Party agrees not to assert any immunity provided by law that either Party possesses, as a defense to the assertion of jurisdiction by the United States District Court for the Western District of Wisconsin or in any arbitration proceeding set forth in this Second Amendment.

D. The enforcement provisions set forth in Sections XXIII and XXIV are an essential part of this Compact and this Second Amendment, and if they are found unenforceable against the Nation or the State, the Parties will immediately resume negotiations in accordance with the procedures set forth in Section XXIII of the Compact, as amended herein, to create a new enforcement mechanism.

E. In the event that the Nation is unable to obtain a judicial resolution, under any procedures provided for by law including the procedures set out in Sections

16.007 and 775.01 of the Wisconsin Statutes, of a dispute regarding an obligation by the State to make payments to the Nation pursuant to the terms of this Compact or this Second Amendment due to the immunity of the State from suit, then the waiver of immunity granted by the Nation to allow suits for money owing to the State by the Nation pursuant to the terms of this Compact or this Second Amendment shall be automatically revoked, void, and of no effect. The foregoing provisions of this Section or subsection shall not apply and any waiver. of immunity which has been nullified shall be reinstated, if the State Legislature of Wisconsin, through the passage of legislation, ratifies the State's waiver of sovereign immunity in paragraph 11 of this Second Amendment or otherwise waives the State's sovereign immunity for judicial enforcement of the obligation of the State to make payments to the Nation pursuant to the terms of this Compact or this Second Amendment.

F. In the event that it is necessary for either Party to seek any remedy pertaining to arbitration as provided in Section XXIII(B) and/or declaratory and/or injunctive relief pursuant to Section XXIII(C), and the Party is unable to obtain the judicial remedy because the other Party is immune from suit, then any waiver of immunity authorizing suit pursuant to Paragraph 11 of this Second Amendment, granted by the party seeking relief shall be automatically revoked, void and of no effect. The foregoing provisions of this subsection (F) shall not apply, and any waiver of immunity which has been nullified shall be reinstated, if the State Legislature, through passage of legislation, ratifies the waiver of the State's sovereign immunity in Section XXIV, or waives the State's sovereign immunity for judicial resolution of disputes pursuant to Section XXIII(B).

12. Paragraph 6(A) of the Amendment shall be amended by deleting the paragraph in its entirety and by substituting in its place the following: The Nation shall make annual payments to the State for each one (1) year period-beginning June 30, 2004 as follows: for the period July 1, 2003 through June 30, 2004, the Nation shall pay the State $30,000,000. For the period July 1, 2004 to June 30, 2005, the Nation shall pay to the State $30,000,000. For the period July 1, 2005 to June 30, 2006, the Nation shall pay the State,8% of net win. For the period July 1, 2006 to June 30, 2007, the Nation shall pay the State 7% of net win. For the period July 1, 2007 to June 30, 2008, the Nation shall pay the State 7% of net win. For the period July 1, 2008 to June 30, 2009, the Nation shall pay the State 6% of net win. For the period July 1, 2009 to June 30, 2010, the Nation shall pay the State 6% of net win. For the period beginning on June 30, 2010 and continuing in perpetuity, the Nation shall pay to the State 6% of net win unless either of the Parties requests renegotiations as provided under Paragraph 10 above. The payment required under this Paragraph shall be made by the Nation on or before June 30th of each year beginning with the first payment being due on or before June 30, 2004. As used herein the term "net win" shall have the same meaning as defined in Paragraph 10 above. One half of any payments made by the Nation to the City of Madison and/or the County of Dane pursuant to any agreement entered into between the Nation and the City and/or County after the effective date of this Second

Amendment shall be paid from monies that the Nation would otherwise pay to the State under this Second Amendment. Specifically, the payments made by the Nation to the State pursuant to this paragraph shall be reduced by fifty per cent (50%) of the amount paid by the Nation to the City of Madison and/or the County of Dane relative to the DeJope facility in the years 2006 and thereafter, provided however that the reduction shall not exceed a total of Three Million Dollars ($3,000,000) in the years 2006 and 2007, and shall not exceed Four-Million Dollars for the year 2008 and every year thereafter for as long as the Nation makes such payments to the City and/or County.

Commencing with the fifth (Year 2007) annual payment that the Nation is required to make to the State under this Compact or Second Amendment and continuing thereafter for as long as the Nation is required to pay a fee to the State under the Compact and this Second Amendment, the Nation shall deduct from it's annual payment to the State made pursuant to this Paragraph 12, One Thousand Dollars ($1,000.00) paid to each county for every acre of land owned by the United States of America in trust for the Nation as of the effective date of this Compact and Second Amendment which is located within the county's jurisdiction. The payment made by the Nation to the county(s) under this Paragraph, may be expended by each county for any purpose as determined by each county in its sole discretion, except that the county cannot use any of the funds paid to it under this Paragraph that would diminish the Nation's governmental jurisdiction or, have an adverse financial impact on the Nation ("Prohibited/Purpose"). If the county uses the funds paid to it by the Nation for a Prohibited Purpose, the Nation shall cease making payments to said county and shall instead pay said county's payment to the State.

13. Paragraph 6 (B) of the Amendment shall be modified by deleting the words "these amounts" at the end of the sentence in the Paragraph and substituting the words: "any amounts required to be paid to the State under this Compact and the State shall refund to the Nation the amount paid to the State by the Nation under the first and second years of this Amendment." In addition, Paragraph 6 (B) of the Amendment shall be modified by inserting the following sentence at the end of the Paragraph: "If the State authorizes any person, organization or entity to conduct, play or participate in any Class III game, as defined by the IGRA, other than those games authorized under a Tribal-State Class III Gaming Compact approved by the Secretary of the Interior as defined by the IGRA, or any games conducted by the Wisconsin State Lottery or any pari-mutual wagering at a facility whose owners were licensed by the State prior to January 1, 2003, within a Sixty-Five (65) mile radius of any facility that the Nation is authorized to conduct gaming at under this Second Amendment, the Nation shall be relieved of its obligations to pay any amounts required to be paid to the State under this Compact and the State shall refund to the Nation the amount paid to the State by the Nation under the first and second years of this Second Amendment.

14. Paragraph 6 (c) of the Amendment shall be deleted in its entirety.

15. Paragraph 8 of the Amendment shall be modified by deleting it in its entirety and substituting in its place the following subparagraphs A, B, and C:

A. In the event that Paragraph 7 (Duration) of this Second Amendment is disapproved, in whole or in part, by the Secretary of the Interior or is found unenforceable or invalid by a court of competent jurisdiction, the State shall refund the amounts paid by the Nation to the State in the first two years under Paragraph 12 of this Second Amendment. In addition, the Nation shall not be required to make any further payments under Paragraph 12 of this Second Amendment, and the Parties shall negotiate in good faith to reach agreement one substitute provisions for Paragraphs 7 and 12. Ifa mutually satisfactory solution is not achieved within sixty (60) days of the Secretary's action or the court's decision, the Parties shall resolve the dispute pursuant to Paragraph 11 of this Second Amendment.

B. In the event that any portion of this Second Amendment, other than Paragraph 7, is disapproved, in whole or in part, by the Secretary of the Interior or is found by a court of competent jurisdiction to be unenforceable or invalid, either Party may serve on the other a demand for renegotiation of such portions of this Second Amendment as are determined to be invalid or unenforceable and the Parties shall negotiate in good faith to reach agreement on substitute provisions.

C. If either Paragraph 2 (Scope of Games) or Paragraph 12 (Payment to the State) of this Second Amendment, is disapproved, in whole or in. part, by the Secretary of the Interior or are found by a court of competent jurisdiction to be unenforceable or invalid, the Parties shall negotiate in good faith to reach agreement on substitute provisions. If a mutually satisfactory solution is not achieved within sixty (60) days of the Secretary's action or the court's decision, the Parties shall resolve the dispute pursuant to Paragraph 11 of this Second Amendment.

16. Paragraph 9 of the Amendment shall be modified by deleting it in its entirety and substituting in its place the following Paragraph:

If another federally-recognized Indian tribe submits an application to the Secretary of the Interior, under 25 U.S.C. §2719(b)(l)(A), for a determination that a proposed gaming establishment on off-reservation· trust lands acquired by the United States after January 1, 2003, is in the best interest of that tribe and its members, and not detrimental to the surrounding community, the State will not concur in any positive determination made by the Secretary of the Interior where the Ho-Chunk Nation has notified the State that the operation of the proposed gaming establishment will cause a substantial reduction of Class III gaming revenues at any of the Nation's existing gaming facilities, unless that other tribe has entered into a binding indemnification agreement with the Nation to compensate it for the loss of revenue, if any, it will incur as a result of the other tribe engaging in gaming activities at the off-Reservation site. The agreement between the Nation and the other tribe must provide that if the parties cannot reach agreement on whether the operation of the proposed gaming establishment will cause a substantial reduction of Class III gaming revenues at any of the Nation's existing gaming



11

facilities or on the amount of compensation to be paid to the Nation, the matter will be resolved through binding arbitration to be conducted under the AAA's commercial rules, or by an arbitrator under such rules as are mutually agreed to by the parties. The parties shall be bound by the arbitrator's decision which shall be enforceable in any federal or state court of competent jurisdiction, and the parties to the arbitration shall expressly agree to waive exhaustion of any administrative and tribal court remedy as a precondition or defense to the arbitration and any court judgment confirming any award entered by the arbitrator under this Paragraph. At any time, but not more frequently than once every twelve (12) months, either Party may request renegotiation of any payment established pursuant to this Paragraph. Such renegotiation shall be subject to the negotiation, arbitration and enforcement provisions of this Paragraph. If the State concurs in the Secretarial two-part determination under 25 U.S.C. §2719(b)(l)(A) without a binding indemnification agreement between the Nation and the other tribe, as provided by this Paragraph the Nation shall be relieved of its obligation to make payments to the State pursuant to Paragraph 12 of this Second Amendment, unless the Nation refuses to negotiate such a binding indemnification agreement with the other tribe.

17. Paragraph 10 and 12 of the Amendment shall be amended by deleting them in their entirety and substituting in place of Paragraph 12 the following paragraph: Out of the revenues that the Nation pays to the State under Paragraph 6 (A) above, the State shall either, at its option,

(1) include in its budget; or budgets for the fiscal years 2003 through 2010 the cost of constructing or providing the public work projects or governmental services listed in the attachment entitled "Government Projects" which is hereby incorporated by this reference and attached hereto as Exhibit B or (2) have the Nation pay for the cost of constructing the project(s) or providing the service(s) listed in Exhibit B. In the event that the State elects to have the Nation pay for all or a portion of the projects and/or services listed in Exhibit B, the Nation's payment to the State under Paragraph 12 above shall be reduced by the amount expended by the Nation to fund the project(s) and/or service(s) listed in Exhibit B. The amount expended by the Nation to fund said project(s)/service(s) shall be credited against the Nation's payment to the State in the same year in which the Nation paid for the project(s)/service(s). Within thirty (30) days from the execution of this Second Amendment, the State shall submit to the Nation a plan setting forth how, on or before December 31, 2010, it will budget, fund and pay for all ofthe project(s)/service(s) listed in Exhibit B.

18. Section XXXI of the Compact shall be amended by deleting the first sentence of the Section in its entirety and substituting in its place the following: "The Nation and the State intend that each will have vested rights and obligations, and that the terms will be binding on the Nation and the State, upon the signature by the President of the Nation and the Governor ofWisconsin." The Nation and the State intend that this Second Amendment will be construed to have been entered into and amended on the date set forth in the Preamble to this Second Amendment and that the terms hereof shall be binding on the Nation and on the State on that date despite the later effective date determined by the approval ofthe Secretary ofthe Interior, pursuant to 25 U.S.C. Section 2710 (d)(3) (B)."

19. Paragraph 12 of the Amendment shall be amended by adding the following sentences at the end of the Paragraph: "The Parties agree that the Nation shall report information from its slot accounting systems to the Data Collection System ("DCS") maintained by the State, utilizing the hardware, software and reporting formats for the specified information in use on the date of this Second Amendment. The Parties acknowledge that participation in the DCS satisfies the obligations of the Nation contained in paragraph 2 of the Memorandum of Understanding Regarding Technical Matters, dated December 11, 1998. The Parties shall meet and confer in accordance with Section XXIII (A) of the Compact regarding any proposed modifications to the hardware, software and reporting formats utilized by the DCS which affects the manner in which the Nation reports the information. Any amendments or modifications proposed by either Party shall be implemented by the other Party, unless the other Party objects to the modification pursuant to the procedures contained in Section XXIII of the Compact. The arbitrators shall approve the proposed modification if it is determined to be reasonably necessary to allow the State to maintain electronic monitoring of the specified information or shall reject the modification if it is determined to be unreasonably burdensome on the Nation. In addition, the Nation shall submit to the Department of Administration, Division of Gaming, in an electronic format maintained by the Nation, the following daily revenue information for table games: (1) Type of table game; (2) Table number; (3) Shift; (4) 0pening Inventory; (5) Fills; (6) Credits; (7) Adjustments; (8) Closing Inventory; (9) Drop, and (10) Win/(loss). This information shall be submitted no later than fourteen (14) days after the conclusion of the previous month."

20. If any of the provisions of this Second Amendment conflict with the provisions of the Compact or the Amendment, the provisions of this Second Amendment shall control. Except to the extent modified by this Second Amendment, the provisions of the Compact and the Amendment shall remain in full force and effect.

Executed on the day and year first written above in Madison, Wisconsin.

| HO-CHUNK NATION | STATE OF WISCONSIN |
|---|---|
| By: _______________ | By: _______________ |
| Troy Swallow, President | James Doyle, Governor |

# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240

NOV 0 5 2008

Honorable Wilford Cleveland
President, Ho-Chunk Nation
W9814 Airport Road
P.O. Box 667
Black River Falls, Wisconsin 54615

Dear President Cleveland:

On September 23, 2008, we received the Third Amendment to the Wisconsin Winnebago Tribe, now known as the Ho-Chunk Nation (Tribe) and the State of Wisconsin (State) Gaming Compact of 1992, executed on September 17, 2008 (Amendment). We have completed our review of this Amendment and conclude that it does not violate the Indian Gaming Regulatory Act of 1988 (IGRA), Federal law, or our trust responsibility. Therefore, pursuant to my delegated authority and Section 11 of IGRA, we approve the Amendment. This Amendment shall take effect when the notice of our approval, pursuant to Section 11(d)(3)(B) of IGRA, 25 U.S.C. §2710(d)(3)(B), is published in the FEDERAL REGISTER.

A similar letter is being sent to the Honorable Jim Doyle, Governor, State of Wisconsin. We wish the Tribe and the State success in their economic venture.

Sincerely,

George T. Skibine
Acting Deputy Assistant Secretary for
Policy and Economic Development

Cc: Lester J. Marston, Esq

# THIRD AMENDMENT TO THE WISCONSIN WINNEBAGO TRIBE, NOW KNOWN AS THE HO-CHUNK NATION, AND THE STATE OF WISCONSIN GAMING COMPACT OF 1992

The State of Wisconsin and the Ho-Chunk Nation have determined that the following amendments to the Wisconsin Winnebago Tribe, Now Known as the Ho-Chunk Nation, and the State of Wisconsin Gaming Compact of 1992, serve the best interests of both parties, and do hereby agree to amend the Compact as follows:

**1. Section XXIII.D. is amended to read as follows:**

D. Last, Best Offer Format. When required by the terms of the Compact, or when agreed to by the parties, the arbitration shall proceed in a last best offer format in accordance with the following procedures:

1. Selection of Arbitrator. Within 7 days of service of the notice of demand for arbitration each party shall propose to the other a list of 3 persons with experience in Indian law and Indian gaming to serve as an arbitrator. If the parties cannot agree on an arbitrator within 14 days of service of the notice of demand for arbitration the parties shall acknowledge an impasse in the appointment of an arbitrator and shall petition, no later than 21 days after the service of the notice of demand for arbitration, the United State District Court for the Western District of Wisconsin for appointment of an arbitrator. If either party challenges the ability of the court to appoint an arbitrator, or the court declines to do so, either party may request the Judicial Arbitration Mediation Service (JAMS), or similar commercial arbitration firm if JAMS is unavailable or unwilling, to appoint an arbitrator from the parties' list of arbitrators. In selecting the arbitrator, the third party neutral or JAMS shall choose the person that is most qualified to resolve the arbitration given the issues in dispute. The arbitrator so appointed shall conduct the arbitration.

2. Procedures. Unless otherwise agreed to by the parties the following procedures shall be followed. The arbitrator shall conduct a scheduling conference within 7 days of the appointment. No later than 30 days after the scheduling conference each party shall submit to the arbitrator and the other party a last, best offer for those issues that will be decided using the last, best offer format. If either party requests a hearing for development of a factual record in support of its last, best offer, the arbitrator shall conduct a hearing if it is determined necessary for the resolution of the dispute. If a hearing is determined to be necessary to resolve the dispute the hearing shall be conducted after submission of the last best offers.

3. Decision. For each issue to be decided using the last, best offer format, the arbitrator shall, for its decision on the issue, adopt one of the last, best offers submitted, and no other remedy, except remedies in aid of the arbitrators decision. The arbitrator shall select from the two proposed offers the one which best comports with the terms of the Act, the Compact, as amended, and any other applicable federal law. If the arbitrator expressly determines that a last, best offer submitted by a party with respect to an issue or

issues does not comply with the Act and/or the Compact or other applicable federal law, as they may be amended and are interpreted by courts of competent jurisdiction, then the arbitrator shall reject that last, best offer and shall not consider it in rendering its decision. If the arbitrator expressly determines that all of the last, best offers submitted by the parties with respect to an issue or issues are not consistent with or do not comply with the Act and/or the Compact or other applicable federal law, as they may be amended and as they are interpreted by courts of competent jurisdiction, then the arbitrator shall reject all of the last, best offers and shall allow both parties an opportunity to resubmit last, best offers. If the arbitrator determines that the resubmitted last best offers should both be rejected, then the arbitrator shall decide the related issue or issues as if the parties had elected to have the issue or those issues decided without using the "last, best offer" format. In that instance, the arbitration shall be conducted in accordance with Section XXIII.B. If the arbitration is to determine Compact provisions, the arbitrator shall have no authority to award money damages against either party, regardless of whether a last, best offer proposes an award of damages. All proceedings shall be completed and a decision rendered within 120 days of appointment of the arbitrator.

2. **Section XXVI. of the Compact shall be deleted in its entirety and replaced with the following:**

XXVI. EFFECTIVE DATE AND DURATION

A. The parties acknowledge and affirm that the Compact is in effect and has been in effect since approval of the Second Amendment to the Compact. The Compact shall be extended for a term of 25 years from the date notification of approval of this 2008 Amendment is published in the Federal Register pursuant to 25 U.S.C. 2710(d)(8)(D).

B. Thereafter the Compact shall be extended automatically pursuant to subsec. B.2., unless either party serves a notice of nonrenewal pursuant to subsec. B.1.

1. Notice of Nonrenewal.

   a. By the State. The Governor shall serve a notice of nonrenewal on the Nation not later than 180 days prior to the expiration of the term of the Compact set out in subsec. A., or any extension thereof, but only if the State first enacts a statute directing the Governor to serve a notice of nonrenewal and consenting, on behalf of the State, to be bound by the remedies in subsection E.

   b. By the Nation. The Nation may serve a notice of nonrenewal on the State not less than 180 days prior to the expiration of the term of the Compact set out in subsec. A., or any extension thereof.

2. Automatic Renewal. If neither party serves a notice of nonrenewal on the other, the procedures in subsec. F. shall be followed.

C. In the event written notice of nonrenewal is given by either the State or the Nation as set forth in subsection B.1., the Nation shall cease all Class III gaming under this Compact upon the expiration of the Compact or the expiration of any amended, renewed, or successor compact. The Compact remains in effect until the procedures in subsec. E. are concluded.

D. The Nation may operate Class III gaming while this Compact, or an extension thereof under this Section XXVI., is in effect.

E. In the event that written notice of nonrenewal of this Compact is given by the State or by the Nation under subsec. B.1., the Nation may, pursuant to the procedures of the Act, request the State to enter into negotiations for an amended, renewed, or successor compact governing the conduct of Class III gaming activities to become effective following the date this Compact is scheduled to expire. Thereafter, the State shall negotiate with the Nation in good faith concerning the terms of an amended, renewed, or successor compact (see sec. 11 (d)(3)(A) of the Act). If an agreement between the Nation and the State is not reached before the expiration date of this Compact, or any extension thereof, the Nation shall do one of the following:

1. Immediately cease all Class III gaming upon the expiration of this Compact, or any extension thereof; or

2. Commence an action in the United States District Court pursuant to section 11 (d)(7) of the Act, or commence any applicable procedures adopted by the Secretary of the Interior, such as 25 C.F.R. Part 291, in which event this Compact shall remain in effect until the procedures set forth in section 11 (d)(7) of the Act, or 25 C.F.R. Part 291 are completed.

F. In the event neither party serves a notice of nonrenewal, either party may propose amendments to any term of the Compact, or propose new terms, and the parties shall negotiate in good faith to reach agreement. If the parties have not reached agreement by the expiration of the term of the Compact set out in subsec. A., or any extension thereof, either party may require that disagreements regarding proposed Compact terms be resolved through last best offer arbitration proceedings pursuant to Section XXIII.D The Nation may continue to conduct Class III gaming pursuant to the terms of the Compact in effect at the time of the expiration of the term of the Compact set out in subsec. A., or any extension thereof, until such time as Compact amendments have been executed or the arbitration has resulted in the selection of Compact terms and notification of this Compact Amendment is published in the Federal Register pursuant to 25 U.S.C. 2710(d)(8)(D).

G. Intermediate Extension

1. On the fifteenth anniversary of the publication of the Notice of Approval of the Compact Amendments in the Federal Register the Compact shall be automatically extended for 25 years in addition to the duration set out in subsec. A. unless the

State serves notice on the Nation, within 90 days preceding the fifteenth anniversary of the publication of the Notice of Approval of the Compact Amendments in the Federal Register, alleging any of the following:

a. Either party has served a notice of nonrenewal, in which case the Compact shall expire at the conclusion of the initial 25 year duration specified in subsec. A.

b. The Nation has not made all payments required to date under the terms of the Compact, as amended;

c. The Nation has been found to be in material breach of the Compact under the dispute resolution procedures of the Compact, or the Nation has refused to participate in a dispute resolution procedure contained in the Compact; or

d. The State has served notice on the Nation that it is in material breach of the Compact. and that allegation has not been finally resolved under the dispute resolution procedures of the Compact. In this event if the allegation is finally resolved in favor of the Nation, the Compact shall extend as set forth above 30 days after the final resolution.

Disputes regarding whether these conditions have occurred shall be resolved pursuant to Section XXIII.A and B.

2. If the Compact is to be extended pursuant to this subsection G., either party may serve notice on the other, within 90 days preceding the fifteenth anniversary of the publication of the Notice of Approval of the Compact Amendments in the Federal Register, a demand for negotiation of Compact amendments pursuant to subsection F, and the provisions and procedures in subsection F. shall apply, except the length of the Compact extension shall be an additional 25 years.

**3. Section XXXII of the Compact shall be amended by deleting the following language:**

~~"At any time after June 1, 2010, but not later than August 30, 2010, and at any time after June 1, 2006, if the Nation is unable to obtain the Governor's approval of a fourth site to conduct Class III gaming, as set forth in Paragraph 9 of this Second Amendment, either Party may request negotiations for an amendment to Paragraph 12 of this Second Amendment establishing the fee the Nation shall pay to the State under the Compact. All requests to amend or renegotiate Paragraph 12 of this Second Amendment shall be in writing, addressed to the President of the Nation or the Governor of the State, as the case may be, and shall include the proposed amendment language. Upon receipt of the request, the Parties shall meet and confer promptly, but in no case more than ten (10) days from receipt of the request, to determine a schedule for commencing negotiations within thirty (30) days of the request. The Parties shall meet and negotiate in good faith for a reasonable period of time not to exceed ninety (90) days. If at the end of the ninety (90) day period, the Parties have not reached agreement, or if prior to the expiration of the ninety (90) days the Parties agree that they have reached impasse, then the Parties shall submit the dispute to binding arbitration before a single arbitrator in accordance~~

~~with the provisions of Section XXIII (B) of the Compact as amended herein (para. 11, below). The decision of the arbitrator shall be in writing, giving the reason for the decision, and shall be binding on the Parties. The decision of the arbitrator shall be limited to increasing the fee to no more than ten percent (10%) of the Nation's "net win" and to reducing the fee to no less than two percent (2%) of the Nation's "net win." Net win shall mean the total amount wagered on Class III games less fills, and minus the amount paid out in jackpots and prizes, including the actual cost of non-monetary prizes, which shall mean any personal property distributed to a patron as the result of a specific legitimate wager, before the deduction of costs and expenses.~~

~~Furthermore, within the thirty (30) days preceding each twenty-fifth (25th) annual anniversary of June 11, 2004, the State, by the Governor as directed by an enactment of a session law by the Wisconsin Legislature, or the Nation may propose amendments to any provision of the Compact, as amended herein. The Nation and the State shall enter into good faith negotiations regarding the proposed amendments. Disputes over the obligation to negotiate in good faith under this Section may be resolved by binding arbitration as provided for in Paragraph 11 of this Second Amendment."~~

**4. Section XXXII. of the Compact shall be amended as follows:**

The words "In addition," shall de deleted and the words "June 11, 2004" will be deleted and replaced with "October 1, 2008" from the remainder of the Section such that the amended Section shall read as follows:

> ~~In addition~~, Within thirty (30) days preceding each fifth (5th) annual anniversary of ~~June 11, 2004~~ October 1, 2008, the State or the Nation may propose amendments to the Compact to enhance the regulation of gaming under the Compact. The Nation and the State shall enter into good faith negotiations regarding the proposed amendments. Disputes over the obligation to negotiate in good faith under this Section may be resolved by binding arbitration as provided for in Section XXIII(A) through (C) of this Second Amendment.

**5. Section XXXIV.A. which was numbered Paragraph 12 in the Second Amendment, shall be deleted in its entirety and replaced with the following:**

XXXIV. Payment To The State

A. The Nation shall pay to the State the total sum of $90 million, minus a credit for the $30 million previously paid, for a total of $60 million. This payment shall satisfy the Nation's obligations to make payments to the State under this Compact for the period up to and including June 30, 2008, except for the use of the period July 1, 2007, through June 30, 2008, to calculate the payment due May 1, 2009, as set out in the following paragraph, and the obligations arising from Section XXV. This payment shall be made upon publication of the Notice of Compact Amendment in the Federal Register. Failure to make this payment shall revoke and cause this Third Amendment of 2008 to be void, and the parties shall immediately resume the current arbitration proceeding.

On May 1, 2009, and each May 1 thereafter that this Compact, as amended, is in effect, the Nation shall pay to the State, in addition to any payment required under Section XXV., an annual payment (the "Annual Payment") of 5% of the net win from the Nation's Class III gaming facilities. The calculation of the Annual Payment shall be based on the net win for the July 1 through June 30 period preceding the date on which the payment is due. If at any time during the period July 1 through June 30 preceding the date on which the payment is due. If the net win at the Nation's Class III gaming facilities for any July 1 through June 30 period is greater than $350 million, the Nation shall pay to the State an amount equal to 5.5% of the net win for that period.

Net win shall be defined as the amount wagered in Class III gaming, less fills and the amount paid out in jackpots and prizes, including the actual cost to the Nation of any noncash prize which is distributed to a patron as the result of a specific, legitimate wager.

**6. Section XXXIV.B. shall be amended to reflect the following changes:**

The words "the amount paid to the State by the Nation under the first and second years of this amendment" shall be deleted and replaced with "$45 Million" and the words "the amount paid to the State by the Nation under the first and second years of this Second Amendment" shall be deleted and replaced with "$45 Million" so that the amended paragraph reads as follows:

B. In the event a change in State law is enacted to permit the operation of electronic games of chance, or other Class III games, as defined in and authorized by this Compact, by any person, organization or entity other than a federally recognized Indian Tribe and/or the Nation under the provisions of the Indian Gaming Regulatory Act, 25 U.S.C. 2701 et. seq., or the State Lottery as authorized by Ch. 565 Wis. Stats., or if the State Lottery is authorized to conduct electronic games of chance and does so operate electronic games of chance, the Nation shall be relieved of its obligations to pay any amounts required to be paid to the State under this Compact and the State shall refund to the Nation ~~the amount paid to the State by the Nation under the first and second years of this amendment~~ $45 Million. If the State authorizes any person, organization or entity to conduct, play or participate in any Class III game, as defined by the IGRA, other than those games authorized under a Tribal-State Class III Gaming Compact approved by the Secretary of the Interior as defined by the IGRA, or any games conducted by the Wisconsin State Lottery, any charitable games authorized by Wisconsin law on or before January 1, 2003, or any pari-mutual wagering at a facility whose owners were licensed by the State prior to January 1, 2003, within a Sixty-Five (65) mile radius of any facility that the Nation is authorized to conduct gaming at under this Second Amendment, the Nation shall be relieved of its obligations to pay any amounts required to be paid to the State under this Compact and the State shall refund to the Nation ~~the amount paid to the State by the Nation under the first and second years of this Second Amendment~~ $45 Million.

**7. The following language shall be deleted from Section XXXIV. A. of the Compact and shall be inserted as Section XXXIV.C.1. of the Compact, and amended to reflect the following changes:**

The words "with the fifth (Year 2007) annual payment that the Nation is required to make to the State under this Compact or Second Amendment" shall be deleted and replaced with "May 1, 2010".

The words "to pay a fee to the State under this Compact or Second Amendment" shall be deleted and replaced with "to make the Annual Payment,"; and

The words "annual payment to the State made pursuant to this paragraph 12" shall be deleted and replaced with "Annual Payment" so that Section XXXIV.C.1, as amended, shall read as follows:

C. Credits

1. <u>Payments to Counties.</u> Commencing <u>May 1, 2010</u> ~~with the fifth (Year 2007) annual payment that the Nation is required to make to the State under this Compact or Second Amendment~~ and continuing thereafter for as long as the Nation is required ~~to pay a fee to the State under this Compact or Second Amendment~~, <u>to make the Annual Payment,</u> the Nation shall deduct from it's ~~annual payment to the State made pursuant to this paragraph 12~~ <u>Annual Payment</u> One Thousand Dollars ($1,000.00) paid to each county for every acre of land owned by the United States of America in trust for the Nation as of the effective date of this Compact and the Second Amendment which is located within the county's jurisdiction. The payment made by the Nation to the county(s) under this Paragraph, may be expended by each county for any purpose as determined by each county in its sole discretion, except that the county cannot use any of the funds paid to it under this Paragraph that would diminish the Nation's governmental jurisdiction or have an adverse financial impact on the Nation ("Prohibited Purpose"). If the county uses the funds paid to it by the Nation for a Prohibited Purpose, the Nation shall cease making payments to said county and shall instead pay said county's payment to the State.

**8. The following shall be inserted in Section XXXIV.C., entitled "Credits", to create subsections XXXIV.C.2 through 6.**

2. Payments for Public Works. Beginning with the Annual Payment due May 1, 2010, the Nation may deduct amounts paid by the Nation for public works projects that benefit both the Nation and the State, including its political subdivisions, up to $1 million. Examples of such projects include, but are not limited to, those listed in Exhibit B of the Second Amendment, which is incorporated in this Compact as Exhibit A. The Nation may make this deduction from the Annual Payment in any year between the first Annual Payment and the Annual Payment made on May 1, 2019, provided that the deduction may be no more than $1 million from any Annual Payment and the deductions may not exceed $5 million in total. The Nation shall consult with, but does not need the prior consent of,

the State regarding which public works projects qualify for the deduction prior to initiating the projects.

3. Projects of Substantial Public Benefit. The Nation may deduct from its Annual Payment any additional amounts paid by the Nation for projects that the State and the Nation agree provide a substantial public benefit in the areas of economic development, infrastructure improvement, or public health, welfare or safety. Deductions from the Annual Payment for these purposes may not exceed $4 million in total. Deductions from the Annual Payment for these purposes under this paragraph may not be taken prior to the Annual Payment on May 1, 2019, or after the final credit pursuant to subsec. 2 is taken, whichever is earlier, without the written consent of the State. The Nation shall obtain the agreement of the Secretary of the Department of Administration regarding any project which the Nation uses to authorize a deduction pursuant to this subsection, which agreement shall not be unreasonably withheld. Deductions pursuant to this subsection shall not be greater than $1 million from any Annual Payment unless a greater amount is agreed to by the State.

4. Development of Future Projects. The parties acknowledge that, due to the dispute giving rise to the Compact Amendments of 2008, the public works projects contemplated in paragraph 17 of the Second Amendment, and used as illustrative examples in subsec. 2 and included as Exhibit A to this Compact, were not completed. The parties agree that, within 120 days of January 1, 2019, they will meet and confer to develop a new listing of projects of comparable cost and public value. Upon completion of the list of the projects the parties shall begin the procedures set out in Paragraph 17 of the Second Amendment. Paragraph 17 of the Second Amendment shall remain in effect except as amended by this Paragraph 4.

5. Enforcement Credits. In the event the State intentionally fails to comply with a final decision of an arbitrator pursuant to Section XXIII., and the Nation cannot obtain judicial enforcement of the arbitration award and that inability is due to the assertion of immunity by a State officer and/or employee exercising their duties and responsibilities under the authority of the Governor, or under applicable State law, the Nation may demand binding arbitration pursuant to Section XXIII. of the Compact to obtain a determination of the monetary value of the loss to the Nation due to the inability of the Nation to obtain judicial enforcement of the arbitration award. This amount will be increased by 50% of the amount of the award. Any amount determined pursuant to these procedures is a debt of the State, which may be recovered by the Nation under the procedures set out in Sections 16.007 and 775.01 of the Wisconsin Statutes. If the arbitrator cannot proceed because of the State's assertion of immunity from suit, then the Nation's sovereign immunity waiver is revoked pursuant to XXIV.F.

   This provision shall not apply if the State ratifies the State's waiver of sovereign immunity in Section XXIV., or waives the State's sovereign immunity from suit to enforce the terms of the Compact. Any amount awarded pursuant to these provisions may be deducted by the Nation from any future Annual Payments due under Section XXXIV.

6. Credits if Notice of Nonrenewal is Served. The parties acknowledge the disruption to the Nation's governmental revenues and programs that would be occasioned by the service of a notice of nonrenewal by the State. In order to prepare for the cessation of Class III gaming activities, the parties agree that in the event the State serves a notice of nonrenewal, the Nation shall be excused from making the final three Annual Payments due under this Section. XXXIV. Annual Payments due after the date the State enacts a law requiring the Governor to serve the notice of nonrenewal shall be reduced by 15% for the remainder of the term of the Compact.

**9. The text of Section XXXV. shall be deleted in its entirety and replaced with the following:**

In the event that, after the publication of the Notice of Approval of these Compact Amendments of 2008 in the Federal Register, a Compact with a Tribe with an annual net win over $200 million is amended, the Nation may demand the State amend its Compact with the Nation to include the same amended provision. Upon receipt of this demand the State shall amend its Compact with the Nation to include the new provision and any concession, provision or consideration provided to the State to induce it to agree to the amendment with the other Tribe. Failure by the Nation to agree to any concession, provision or consideration provided to the State to induce it to agree to the amendment with the other Tribe shall void the obligation of the State to amend its Compact with the Nation. This provision shall not apply to any amendments affecting the payment to the State.

**10. Section XXXVI. of the Compact shall be amended by adding the following subsection D.**

D. In the event that any of these Compact amendments of 2008 are disapproved in whole or in part by the Secretary of the Department of the Interior, or found invalid or unenforceable by a court of competent jurisdiction, then all of these amendments shall be null and void and the parties shall immediately resume the current arbitration proceeding in *State of Wisconsin v. Ho-Chunk Nation* before Hon. William Norris in accordance with the District Court's July 10, 2008 order compelling arbitration.

| HO-CHUNK NATION | STATE OF WISCONSIN |
|---|---|
| [signature] | By: [signature] |
| Vice-President | Jim Doyle<br>Governor |
| Executed on this 17TH day of September, 2008 | Executed on this 16th day of September, 2008 |

Consistent with 25 U.S.C.A. Sec. 2710 (d)(8), the Third Amendment to the Wisconsin Winnebago Tribe, now known as the Ho-Chunk Nation, Gaming Compact, dated September 17, 2008, is hereby approved on this fifth day of November, 2008, by the Acting Deputy Assistant Secretary for Policy and Economic Development, United States Department of the Interior.

UNITED STATES DEPARTMENT OF THE INTERIOR

# EXHIBIT A

## GOVERNMENT PROJECTS

1. Ho-Chunk Nation fee payments received by the State shall be credited and rebated to the Ho-Chunk Nation for any Waste Water Facility Cost shares with another municipality entered into by an Intergovernmental Agreement.

2. Ho-Chunk Nation fee payments for any Wisconsin Department of Transportation upgrades, construction and maintenance shall be credited and rebated to the Ho-Chunk Nation for any cost shares with another municipality entered into by an Intergovernmental Agreement.

3. Ho-Chunk Nation fee payments for any basic Municipal Services offered to the Ho-Chunk Nation shall be credited and rebated to the Ho-Chunk Nation.

4. The State shall provide access and right-of-way to Ho-Chunk Nation trust and heirship lands through adjacent or contiguous properties known as the Joe Wolf, Swallow, Hopinka parcels located in Jackson County, Wisconsin.

5. A portion of the Ho-Chunk Nation Gaming Fee payments shall be provided to essential positive public programs such as Wisconsin Judi-care and public housing assistance grants.

6. From Ho-Chunk Nation Gaming Fee payments, based on the cooperative Memorandum of Understanding Concerning Badger Army Ammunition Plant by and between the State and the Ho-Chunk Nation from the 1998 Compact Amendment, the State shall commit a grant to the Ho-Chunk Nation Badger Army Ammunition Plant environmental restoration plan.

7. From Ho-Chunk Nation Gaming Fee payments, based on the cooperative Agreement By and Between the State and the Ho-Chunk Nation, the State shall commit a grant to the Ho-Chunk Nation Kickapoo Reserve environmental restoration plan to match the State of Wisconsin Kickapoo Reserve Management Board (KRMB) grant.

8. From Ho-Chunk Nation Gaming Fee payments, the State shall provide the Ho-Chunk Nation Department of Health and Social Services a grant for the creation of a Community Based Residential Facility Program and a Tribal Government Day Care Program cooperatively with the existing State Programs.

9. From Ho-Chunk Nation Gaming Fee payments, the State shall provide a grant for the purchase and maintenance of needed medical equipment by tribal and non-tribal communities consisting of the following: breast cancer diagnosis equipment, diabetes

dialysis, cancer research, chemotherapy, and administrative support for services at Indian Health Centers provided to non-tribal communities.

10. From Ho-Chunk Nation Gaming Fee payments, the State shall provide a grant for local law enforcement to tribal and non-tribally shared communities such as towns and villages, in addition to County Tribal Law Enforcement Grants.

11. From Ho-Chunk Nation Gaming Fee payments, the State shall provide a grant to the State Department of Commerce exclusively for Business and Enterprise Development for Wisconsin.

United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240

JAN 07 2025

The Honorable Jon Greendeer
President, Ho-Chunk Nation
P.O. Box 667
Black River Falls, Wisconsin 54615

Dear President Greendeer:

On October 11, 2024, the Office of Indian Gaming received for review and approval the 2024 Amendments to the Ho-Chunk Nation (Nation) and the State of Wisconsin (State) Gaming Compact of 1992, as Amended in 1999, 2003, and 2008 (Amendment).

Under the IGRA the Secretary of the Interior (Secretary) may approve or disapprove a compact within 45 days of its submission. 25 U.S.C. § 2710(d)(8). If the Secretary does not affirmatively approve or disapprove the compact within 45 days, the IGRA provides that the compact is considered to have been approved by the Secretary by operation of law, "but only to the extent that the compact is consistent with the provisions of [IGRA]."[1]

The Department of the Interior (Department) has undertaken a thorough review of the Amendment, and the additional materials provided by the Tribe and State on November 7, 2024, and November 15, 2024, respectively. I have significant concerns with the amended provisions in Section XXXV(C)(3) & (C)(4). These provisions discuss the types and maximum amounts of deductions from the Nation's exclusivity payment to the State. As a result, the Amendment was approved by operation of law, but only to the extent that its provisions are consistent with IGRA. 25 U.S.C. § 2710(d)(8)(C). The Amendment takes effect upon the publication of notice in the *Federal Register* pursuant to IGRA.

**Permissible Subjects of Compact Negotiation**

The IGRA established a statutory scheme that limited Tribal gaming and sought to balance Tribal, state, and federal interests in regulating gaming activities on Indian lands. To ensure an appropriate balance between Tribal and state interests, Congress limited the subjects over which Tribes and states could negotiate a Class III gaming compact. Pursuant to the IGRA, a Tribal- State gaming compact may include provisions relating to:

i. the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for the licensing and regulation of such activity;
ii. the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;
iii. the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;
iv. taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;
v. remedies for breach of contract;
vi. standards for the operation of such activity and maintenance of the gaming facility, including licensing; and

[1] *See* 25 U.S.C. § 2710(d)(8)(A).

vii. any other subjects that are *directly related to the operation of gaming activities.*

25 U.S.C. § 2710(d)(3)(C). *Emphasis added.*

**Impermissible Subjects of Compact Negotiation**

When we review a Tribal-State compact or amendment under the IGRA, we look to whether the provisions fall within the scope of categories prescribed above at 25 U.S.C. § 2710(d)(3)(C).

One of the most challenging aspects of this review is determining whether a particular provision adheres to the "catch-all" category at § 2710 (d)(3)(C)(vii), "…subjects that are directly related to the operation of gaming activities." To aid Tribes and states in determining if a subject is directly related to the operation of gaming activities, earlier this year the Department updated its compact regulations at 25 C.F.R. Part 293 (Part 293). The regulations at 25 C.F.R. § 293.23 codify this "direct connection" test and provide examples of both permitted and prohibited terms in a compact. The updated regulations became effective on March 22, 2024.[2]

The Part 293 regulations provide that Tribal infrastructure projects or economic development activities that are funded by gaming revenue and may service or otherwise provide a benefit to the gaming activity are not directly related to the conduct of gaming without other evidence of a direct connection.[3] The inclusion of provisions for which the parties cannot show a direct connection to the Tribe's conduct of Class III gaming activities may be considered evidence of a violation of the IGRA.[4]

**Directly related to Gaming Activities**

Even if a compact, such as this one, contains revenue sharing in exchange for concessions by the State, the Department must still evaluate whether these provisions, including deductions against revenue sharing obligations, meet the requirements of a direct connection to the operation of gaming activities.[5] IGRA and its implementing regulations allow for compact terms that are directly related to the operation of gaming activities to be negotiated. Because IGRA is very specific about the lawful reach of a compact to protect the sphere of Tribal sovereignty, we must construe its provisions narrowly and avoid inferences that diminish Tribal sovereignty.

The following provisions do not appear to be directly related to gaming activities as required by IGRA and the Part 293 regulations:

*Section XXXV (C)(3) and (C)(4)*

Section (C)(3) changes deductions from the annual payment to the State from $4 million in total to $6 million in total for projects that provide a substantial public benefit in the areas of economic development, infrastructure, improvement, or public health, welfare or safety. Additional changes include an increase in single-year deductions from $1 million to $2 million, thus decreasing the Tribe's annual exclusivity payment by an additional $1 million.

Section (C)(4) outlines that Exhibit (A) provides a list of governmental projects whose expenses may be deducted by the Tribe, up to $17 million, from its annual payments to the State. Examples of projects listed under Exhibit A include wastewater facility construction by the Tribe or a municipality, food sovereignty and

[2] *See* Class III Tribal State Gaming Compacts, 89 Fed. Reg. 13232 (Feb. 21, 2024).
[3] 25 C.F.R. § 293.23(b).
[4] 25 C.F.R. § 293.23(d).
[5] 25 C.F.R. § 293.23.

sustenance measures, home health services programs for Tribal members, a youth residential facility, emergency housing for tribal members, cultural centers, environmental restoration, and business development corridors.

The State and Nation argue that the Department should not utilize the direct connection test for these provisions because they simply reduce the amount of exclusivity payment the Tribe is required to remit to the State. Furthermore, they represent that the provision is a meaningful concession in that the Tribe would be otherwise required to send those funds to the State, while the provision allows the Tribe to choose specific projects to invest in.

While many of those causes could be considered admirable and worthy of consideration for donation, the Department is concerned that the governmental projects are not directly related to the operation of Class III gaming activities. They appear to create a credit and tax system to direct Tribal funding to certain public policy objectives. The majority of the intended governmental projects do not appear to maintain even a tenuous connection to the regulation or operation of Class III gaming.

The Department's implementing regulations at 25 C.F.R. Part 293 provide that Tribal infrastructure projects or economic development activities that are funded by gaming revenue, and may service or otherwise provide a benefit to the gaming activity, are not directly related to the conduct of gaming without other evidence of a direct connection.[6] The inclusion of provisions for which the parties cannot show a direct connection to the Tribe's conduct of Class III gaming activities may be considered evidence of a violation of IGRA.[7] The parties have not shown a direct connection to the Tribe's conduct of class III gaming as required by Section 293.23, therefore the terms may not be consistent with IGRA.

**Conclusion**

I did not take action on the Amendment within the prescribed 45-day review period. As a result, the Amendment is "considered to have been approved by the Secretary, but only to the extent [it] is consistent with the provisions of [IGRA]." 25 U.S.C. § 271 0(d)(8)(C). I hope after reviewing this letter, the Tribe and the State will recognize that these provisions may run afoul of the IGRA, and that the Tribe and State will work to remove such provisions from future amendments to the Tribe's compact.

The Amendment is effective upon the publication of notice in the *Federal Register*, as required by 25 U.S.C. § 2710(d)(8)(D). A similar letter is being sent to the Honorable Tony Evers, Governor State of Wisconsin.

Sincerely,

Wizipan Garriott
Principal Deputy Assistant Secretary – Indian Affairs
Exercising by delegation the authority of the
Assistant Secretary – Indian Affairs

[6] 25 C.F.R. § 293.23(b).
[7] 25 C.F.R. § 293.23(d).

# FOURTH AMENDMENT
# TO THE
# WISCONSIN WINNEBAGO TRIBE, NOW KNOWN AS THE HO-CHUNK NATION, AND THE STATE OF WISCONSIN GAMING COMPACT OF 1992

The State of Wisconsin and the Ho-Chunk Nation have determined that the following amendments to the Wisconsin Winnebago Tribe, Now Known as the Ho-Chunk Nation, and the State of Wisconsin Gaming Compact of 1992 ("Compact"), serve the best interests of both parties, and do hereby agree to amend the Compact as follows:

1. **Amendments to wording throughout the Compact:**

   a. The word "Tribe" is deleted and replaced with "Nation" throughout the Compact.

   b. The phrase "Wisconsin Winnebago Tribe" is deleted and replaced with "Ho-Chunk Nation" throughout the Compact.

   c. The word "employe" is deleted and replaced with "employee" throughout the Compact.

   d. The word "employes" is deleted and replaced with "employees" throughout the Compact.

   e. The phrase "Lottery Board" is deleted and replaced with "Department" throughout the Compact.

2. **Section I, Title, is amended as follows**: The phrase "Wisconsin Winnebago" is deleted and replaced with "Ho-Chunk Nation".

3. **Section III, Definitions, is amended as follows:**

   a. The existing text of subsection B, defining "Cash Basis", is deleted in its entirety and replaced with the following:

      "Department" means the Wisconsin Department of Administration and any successor regulatory entity.

   b. Subsection D, defining "Executive Director," is deleted.

   c. Existing subsection E, defining "Lottery Board," is deleted.

d. Existing subsection F, defining "Management contract," is re-lettered as subsection D.

e. New subsection E is created and states:

> "Net win" means the amount wagered in Class III gaming, less fills and the amount paid out in jackpots and prizes, including the actual cost to the Nation of any noncash prize which is distributed to a patron as the result of a specific, legitimate wager. For purposes of clarity: 1) fees paid to any wide area progressive vendor are not subtracted from the amount wagered in Class III gaming in calculating New Win; and 2) the amount wagered on a gaming device that participates in a wide area progressive jackpot funded by a third party is reduced by the Nation's total contribution as of the date the jackpot is paid.

f. Existing subsection G, defining "Person," is re-lettered as subsection F, and is amended as follows:

   i. the phrase "limited liability company or its equivalent," is inserted after "corporation," and before "or other legal entity."

g. Existing subsection H, defining "Primary Business Purpose," is re-lettered as subsection G.

h. Existing subsection I, defining "State," is re-lettered as subsection H.

i. New subsection I is created and states:

> "State Fiscal Year" means the period beginning July 1 of a given year and ending June 30 of the following year.

j. New subsection J is created and states:

> "Tribal Fiscal Year" means the period beginning July 1 of a given year and ending June 30 of the following year, or such other time period as the Tribe and State mutually agree in writing.

k. Existing subsection J, defining "The Tribe's Lands," is re-lettered as subsection K.

l. Existing subsection K, defining "Tribe," is re-lettered as subsection L, and all of the text is deleted and replaced with the following:

"Nation" means the Ho-Chunk Nation, its authorized officials, agents and representatives, including but not limited to the Ho-Chunk Nation Legislature, the Ho-Chunk Nation Gaming Commission, and any successors to those entities.

m. New subsection M is created and states:

"Wagering Account" means an electronic ledger administered by the Nation for use by, and that is accessible to, a customer for purposes of placing wagers and recording deposits and withdrawals of funds used for purposes of placing wagers. A "Wagering Account" does not include an electronic ledger that prohibits deposits to an account by the customer and is used solely for purposes of tracking reward or loyalty points, credits, or similar benefits issued by the gaming operation to a customer, even if such benefits are redeemable for cash.

**4. Section IV, Authorized Class III Gaming, is amended as follows:**

a. In paragraph A.6., the comma after "Poker" is deleted and the phrase "that are not Class II gaming," is inserted after "Poker".

b. In paragraph A.14., the word "and" is deleted after the semicolon.

c. New paragraph A.15. is created and statese

Event Wagering. "Event Wagering" means accepting wagers on the outcomes of, and occurrences within, sports and non-sports games, competitions, and matches, but shall not include pari-mutuel wagering on horse, harness, and dog-racing events.

d. Existing paragraph A.15. is renumbered as paragraph A.16.

e. New paragraph A.16. is amended as follows:

i. The comma at the end of the phrase "subsection 13 above" is deleted;

ii. The phrase "and forms of remote wagering permitted under Section XIX and the Nation's minimum internal control standards," is inserted after "subsection 13 above . . ." and before ". . . and provided further, . . . ."

**5. Section V, Conduct of Games; Generally, is amended as follows:**

a. In paragraph B.(1), the word "or" is deleted.

b. In paragraph B.(2), the period at the end is deleted and replaced with a comma, and the word "or" is added to the end.

c. New paragraph B.(3) is created and states: "to gain access to the Nation's non-gaming venues."

d. The text of subsection C is deleted in its entirety and replaced with the following:

> No person who is visibly under the influence of an intoxicant, a controlled substance, a controlled substance analog, or any combination thereof, shall be permitted to play any game authorized by this Compact.

e. The text of subsection D is deleted in its entirety and replaced with the following:

> Except as herein provided, no person shall be extended credit or receive an advance of funds for gaming by any Nation gaming facility, nor shall the Nation permit any other person to offer such credit or advance for a fee. This subsection shall not restrict the right of the Nation to install third-party automated teller machines or accept bank card or credit card transactions in the same manner as would normally be permitted at any retail business within the state. This subsection shall not prohibit the use of Wagering Accounts pursuant to the terms of this Compact or the Nation's minimum internal control standards, where such Wagering Accounts do not extend credit or advance funds to the account holder.

**6. Section VII, Gaming Related Contractor; Contractor to Hold State Certificate, of the Compact is amended as follows:**

a. New paragraph A.7. is created and states:

> Contracts for event wagering goods or services, including but not limited to event wagering systems, event wagering risk management services, betting line services, integrity providers, and hardware and software used for purposes of placing event wagers.

b. New paragraph A.8. is created and states:

> Contracts for geolocation, geo-tracking, or geofencing services for purposes of tracking the location of customers using remote wagering devices.

c. In subsection B, the word "$10,000" is deleted and replaced with "$100,000".

d. In subsection C, the word "$10,000" is deleted and replaced with "$100,000".

e. New subdivision D.1.e.(4) is created and states:

> A limited liability company or its equivalent (collectively "LLC"), then subdiv. a. applies to the LLC and each member and manager of the LLC or their equivalents.

f. Existing subdivision D.1.f. is deleted and replaced with the following:

> The restrictions under subdiv. a. do not apply to the partnership, association, LLC, or corporation if the Department determines that the partnership, association, LLC, or corporation has terminated its relationship with the partner, officer, director, member, manager, or owner who was convicted or entered the plea or with the partner, officer, director, member, manager, owner or other individual whose actions directly contributed to the partnership's, association's, LLC's, or corporation's conviction or entry of plea.

g. In subparagraph E.2.a., the phrase "Executive Director of the Lottery Board" is deleted and replaced with "Secretary of the Department".

h. In subparagraph E.2.b., the phrase "Executive Director" is replaced with "Secretary".

i. Subsection G, titled "Transitional Provision", is deleted in its entirety.

**7. Section IX, Criminal and Background Restrictions, is amended as follows:**

a. In subsection A.1.c., add a comma "," after the word "Fraud", and then add the word "theft" after the new comma.

b. In subsection B, the phrase "Wisconsin Winnebago Business Committee" is deleted and replaced with "Ho-Chunk Nation Legislature".

**8. Section XII, Audits, is amended as follows:**

a. In subsection A:

i. The phrase "(commencing with the current tribal fiscal year)" is deletede

ii. The phrase "fiscal year" is replaced with "Tribal Fiscal Year" throughout.

b. In subsection B, the phrase "tribal fiscal year" is deleted and replaced with "Tribal Fiscal Year".

c. In paragraph C.1.:

i. ""Accounting and Audit Guide -- Casinos"" is deleted and replaced with ""Gaming Audit and Accounting Guide"".

**9. Section XIV, Public Health and Safety, is amended as follows:**

a. In subsection A, all of the text beginning with "chs. ILHR 14 . . ." and ending with " . . . 81-86 (Plumbing)," is deleted and replaced with:

> chs. SPS 314 (Fire Prevention), 316 (Electrical), 328 (Smoke Detectors and Carbon Monoxide Detectors), 366 (Existing Buildings), 377 (Theatres and Assembly Halls), and 381-387 (Plumbing),

**10. Section XV, Electronic Games of Chance, is amended as follows:**

a. Paragraph C.3., titled "Existing Games", is deleted in its entirety.

b. Paragraph D.14., titled "Maximum Wagers", is deleted in its entirety.

c. Existing paragraphs D.15. through D.17. are renumbered as D.14. through D.16.

d. In existing paragraph D.17.b. (now D.16.b.), the phrase "Executive Director of the Lottery Board" is deleted and replaced with "Department".

e. Subsection F, titled "Transitional provision", is deleted in its entirety.

f. In subparagraph G.1.b., the semicolon at the end is deleted and replaced with a period.

g. Subparagraph G.1.c. is deleted.

h. Paragraph H, titled "Game locations", is deleted in its entirety.

i. Subsection I, titled "Minimum Standards for the Playing of Games", is deleted in its entirety. Minimum Internal Control Standards are addressed in new Section XXXIX as set forth in paragraph 24 below.

**11. Section XVI, Blackjack, Regulation and Play of, is amended as follows:**

a. Subsection B is deleted in its entirety.

b. Subsection E is deleted in its entirety.

c. Subsections C and D are re-lettered as subsections B and C.

**12. Section XVII, Pull-Tabs or Break-Open Tickets, is amended as follows:**

a. Subsection B is deleted in its entirety.

b. Existing subsection C is re-lettered as subsection B.

**13. New Section XIX, Event Wagering, is created and states:**

**XIX. EVENT WAGERING.**

A. The Nation shall adopt minimum internal control standards and rules of play governing event wagering which shall be approved by the Department as provided in this Compact. All minimum internal controls governing event wagering shall be considered non-confidential documents that are available to the public. Rules of play for event wagering shall be publicly posted and a copy shall be made readily available to players upon request.

B. Event wagers placed using remote wagering devices shall be placed only from locations permitted by the Nation's minimum internal control standards governing event wagering.

C. Event wagers shall be placed only on permitted events as set forth in the Nation's minimum internal control standards governing event wagering.

D. The Nation shall engage the services of an integrity provider approved by the Department, which approval shall not be unreasonably withheld. For purposes of this subsection, an

"integrity provider" means a third-party service that provides information regarding potential fraud, improper manipulation, misuse of insider information, and other improper conduct regarding event.

E. If the scope of permissible event wagering in the state is expanded in any of the manners set forth below, then, upon written notice by the Nation to the Department, the Nation's minimum internal control standards shall be deemed to include such expansion of scope and promptly thereafter the Nation and the State shall negotiate in good faith to amend the Nation's minimum internal control standards to reflect the change:

1. The State legalizes event wagering on an event or events note included as permitted events in the Nation's minimum internal control standards.

2.The State legalizes event wagering which allows a customer located outside of land owned by a Wisconsin Indian Tribe or held in trust by the federal government for the benefit of a Wisconsin Indian Tribe to place an event wager through the use of a remote wagering device.

3.The State enters a Tribal-State gaming compact or gaming compact amendment with another Wisconsin Indian Tribe, or agrees to minimum internal control standards with another Wisconsin Indian Tribe, which allow event wagering on an event or events not included as permitted events in the Nation's minimum internal control standards, or the Secretary of the United States Department of the Interior prescribes procedures for another Wisconsin Indian Tribe pursuant to section 1 1((d)(7)(B)(vii) of the Act which allow event wagering on an event or events not included as permitted events in the Nation's minimum internal control standards.

4.The State enters a Tribal-State gaming compact or gaming compact amendment with another Wisconsin Indian Tribe, or agrees to minimum internal control standards with another Wisconsin Indian Tribe, which allow event wagering through the use of remote wagering devices under terms more favorable than those set forth in the Nation's minimum internal control standards, including but not limited to permitted locations, or if the Secretary of the United States Department of the Interior prescribes procedures for another Wisconsin Indian Tribe pursuant to section 1 1((d)(7)(B)(vii) of the Act which allow event wagering through the use of

remote wagering devices under terms more favorable than those set forth in the Nation's minimum internal control standards, including but not limited to permitted locations.

5.The State enters a Tribal-State gaming compact or compact amendment with another Wisconsin Indian Tribe, or enters an agreement with another Wisconsin Indian Tribe, or agrees to minimum internal control standards with another Wisconsin Indian Tribe, which provide for a different procedure or procedures than set forth in the Nation's minimum internal control standards for adding permitted events for event wagering.e

F. Promptly, but no later than ten (10) business days after entering a Tribal-State compact or compact amendment with another Wisconsin Indian Tribe, or entering an agreement with another Wisconsin Indian Tribe, or agreeing to minimum internal control standards with another Wisconsin Indian Tribe, which address permitted events for event wagering and/or permitted locations for remote wagering and/or procedures for adding permitted events for event wagering, the State shall provide written notice to the Nation together with a copy of such compact, compact amendment, agreement, and/or minimum internal control standards.

Both the Nation and the State have legitimate interests in protecting the integrity of events subject to event wagering.

**14. Existing Sections XIX through XXXVI are renumbered as Sections XX through XXXVII and all cross-references to these Sections and their subparts in the Compact are renumbered to conform with this renumbering.**

**15. Existing Section XXI (renumbered as Section XXII), Enforcement, is amended as follows:**

a. In subsection A:

i. the phrase "Wisconsin Winnebago Business Committee" is deleted and replaced with "Ho-Chunk Nation Legislature".

ii. "Chairman" is deleted and replaced with "President".

**16. Existing Section XXIII (renumbered as Section XXIV), Dispute Resolution, is amended as follows:**

a. The opening text of the section, beginning with "If any dispute arises . . ." and ending with ". . . following procedure:" is deleted and replaced with the following:

> Except as otherwise provided in this Compact, if any dispute arises between the Parties regarding interpretation or enforcement of the Compact that dispute ("Dispute") shall be resolved in accordance with the following procedure:

b. In subsection B, the phrase "this Second Amendment by the Parties" is deleted and replaced with "the Second Amendment to this Compact".

**17. Existing Section XXIV (renumbered as Section XXV), Sovereign Immunity, is amended as follows:**

a. In subsection C, the phrase "Second Amendment" is replaced with "Section XXV".

b. In subsection E, the phrase "paragraph 11 of this Second Amendment" is deleted and replaced with "this Section XXV".

c. In subsection F, the phrase "Paragraph 11 of this Second Amendment" is deleted and replaced with "this Section XXV".

**18. Existing Section XXVI (renumbered as Section XXVII), Duration, is amended as follows:**

a. In subsection A, delete the first sentence and amend the second sentence to read:

> The Compact shall have a term of 25 years from the date of notification of approval of the Fourth Amendment to the Compact as published in the Federal Register pursuant to 25 U.S.C. 2710(d)(8)(D).

b. Subsection G is deleted in its entirety.

**19. The text of existing Section XXVII (renumbered as Section XXVIII), Gaming Locations, is deleted in its entirety and replaced with the following:**

**XXVIII. GAMING LOCATIONS.**

The Class III games authorized under this Compact may be conducted within one Gaming Facility located in each of the following counties: Jackson, Sauk, Wood, and Rock. In addition, the Nation may conduct any of the Class III games authorized under this Compact at five Ancillary Facilities two of which are located in Jackson County and one of which is located in each of the following counties: Sauk, Monroe, and Shawano. As used herein the term "Gaming Facility" means a facility whose Primary Business Purpose is gaming, and the term "Ancillary Facility" means a facility where fifty percent or more of the lot coverage of the trust property upon which the facility is located, is used for a Primary Business Purpose other than gaming. All Class III games authorized under this Compact are subject to the days and hours of operation set by the Nation.

**20. Existing Section XXX (now renumbered as Section XXXI), Notices, is amended as follows:**

a. "Wisconsin Winnebago Business Committee" is deleted and replaced with "Ho-Chunk Nation Legislature".

b. The Nation shall also send by email to DOAGaming@wisconsin.gov a copy of all notices it serves on the Governor, or such other email or mailing address as the Department may specify.

c. The State shall also send by email to the Ho-Chunk Nation Attorney General and the Ho-Chunk Nation Legislative Counsel, a copy of all notices it serves on the Ho-Chunk Nation.

d. Subsection B is deleted in its entirety.

e. Subsection C is deleted in its entirety.

**21. The text of existing Section XXXI (now renumbered as Section XXXII), Agreement Date, is deleted in its entirety and replaced with the following:**

The Nation and the State intend that each will have vested rights and obligations, and that the terms of this Compact and any amendments thereto will be binding on the Nation and the State upon execution by the Nation and the State, despite any later effective date determined by the approval of the Secretary of the Interior, pursuant to 25 U.S.C. Section 2710 (d)(3)(B)

or approval by operation of law pursuant to 25 C.F.R. § 293.12. In the event an amendment to this Compact is disapproved by the Secretary of the United States Department of the Interior, the amendment shall cease to be binding on the parties and the Compact as it existed before the execution of the amendment shall remain in effect.

**22. Existing Section XXXIV (now renumbered as Section XXXV), Payment to the State, is amended as follows:**

a. In paragraph C.3.:

i. in the second sentence, "$4 million in total" is deleted and replaced with "$6 million in total, a portion of which was already taken by the Nation prior to the Fourth Amendment to this Compact."; and

ii. "$1 million" is deleted and replaced with "$2 million".

b. The existing text of paragraph C.4. is deleted in its entirety and replaced with the following:

Government Projects. Consistent with the agreement reached by the State and the Nation in 2003 as reflected in paragraph 17 of the Second Amendment to this Compact, and which was restated in 2008 in paragraph 8 of the Third Amendment to this Compact, the Nation may deduct from its Annual Payment amounts paid by the Nation for the government projects identified on Exhibit A to the Fourth Amendment to the Compact, subject to the following limitations:

i. The Nation shall not take the deductions set forth in this paragraph until after:

a) The Substantial Public Benefit deduction set forth in paragraph C.3. is exhausted; and

b) The Nation's permanent new casino in Rock County is fully constructed and has been in operation for one full Tribal Fiscal Year.

ii. The deductions may be taken for a period of not longer than 15 consecutive Annual Payments, beginning with the Annual Payment due immediately following the Tribal Fiscal Year in which the conditions of subparagraph C.4.i. are satisfied.

iii. The deductions shall not exceed $17 million in total.

iv. The annual amount of the deduction shall not exceed the amount of the Annual Payment that would otherwise be due in the absence of the deduction.

v. Prior to applying the deductions to an Annual Payment, the Nation shall provide to the Department copies of the Nation's general ledger or other official accounting or financial documents sufficient to show that the claimed amounts were paid by the Nation for purposes of one or more of the Government Projects identified on Exhibit A to the Fourth Amendment to the Compact.

c. The existing text of subsection E is deleted in its entirety and replaced with the following:

In the event that a natural or human-made disaster renders impossible the operation of fifty (50) percent or more of the Class III electronic games of chance operated by the Nation under this Compact for a period of fourteen (14) consecutive days or more (the "Closure Period"), the May 1 payment date for each State Fiscal Year during which all or a portion of the Closure Period occurs shall be extended and the Nation's Annual Payment shall be reduced as set forth in this section. For purposes of clarity, the Nation's decision to reduce operations at its gaming facilities in response to a public health emergency shall be deemed a disaster for purposes of this section.

1. To invoke the provisions of this subsection, prior to the May 1 payment date of each State Fiscal Year in which the disaster occurs the Nation shall provide the State with written notice describing the nature of the disaster and the number of Class III electronic games of chance that ceased operation.

2. The Nation's Annual Payment for each State Fiscal Year during which all or a portion of the Closure Period occurs shall be reduced by a percentage equal to the percentage decrease in the Net Win for the Tribal Fiscal Year in which the Closure Period occurred compared with the Net Win for the previous Tribal Fiscal Year.

3. The Nation's Annual Payment shall be due on or before 60 days from the end the Tribal Fiscal Year in which the Closure Period occurred.

For all Closure Periods, the State and Nation shall meet to discuss the possibility of providing the Nation additional assistance in light of the severity of the disaster.

**23. Existing Section XXXVIII (which remains numbered as XXXVIII, because there is no existing Section XXXVII) is amended as follows:**

a. The section shall be titled "DATA REPORTING.".

b. The first paragraph of the section is moved to renumbered Section XXXVII and becomes subsection E of that section.

c. The remainder of the existing section is deleted in its entirety.

d. New subsection A is created and states:

> A. On or before fourteen (14) days after the conclusion of each calendar month, the Nation shall report information for all forms of Class III gaming to the Data Collection System ("DCS") maintained by the State, utilizing the hardware, software and reporting formats mutually agreed to by the State and the Nation. The Nation's participation in the DCS satisfies the obligations of the Nation contained in paragraph 2 of the Memorandum of Understanding Regarding Technical Matters, dated December 11, 1998. The Parties shall meet and confer in accordance with Section XXIV.A. of the Compact regarding any proposed modifications to the hardware, software and reporting formats utilized by the DCS which affects the manner in which the Nation reports the information. Any amendments or modifications proposed by either Party shall be implemented by the other Party, unless the other Party objects to the modification pursuant to the procedures contained in Section XXIV of the Compact. The arbitrators shall approve the proposed modification if it is determined to be reasonably necessary to allow the State to maintain electronic monitoring of the specified information or shall reject the modification if it is determined to be unreasonably burdensome on the Nation.

e. New subsection B is created and states:

> B. The Nation shall submit the following to the Department on a monthly basis, in an electronic format mutually agreed upon by the State and the Nation, not later than fourteen (14) days after the conclusion of each calendar month:
>
> 1. Daily revenue information for table games: type of table game, table number, shift, opening inventory, fills, credits, adjustments, closing inventory, drop, and win/loss; and

2. Daily revenue information for event wagering: the total amount of all wagers received less voided or canceled wagers and amounts paid out for winning wagers and the total amount of the write on events or games that occur during the month or will occur in subsequent months, less gaming payouts.

**24. New Section XXXIX, Minimum Internal Control Standards, is created and states:**

**XXXIX. MINIMUM INTERNAL CONTROL STANDARDS (MICS) AND RULES OF PLAY.**

A. Minimum Internal Control Standards. The Nation shall at all times maintain minimum internal control standards ("MICS") that, at a minimum, cover all subjects addressed in the MICS established by the National Indian Gaming Commission ("NIGC") and meet or exceed the requirements set forth in the NIGC MICS. The State and the Nation agree that the Nation's MICS in effect and approved by the Department as of the date of the Fourth Amendment to this Compact satisfy this requirement.

B. Rules of Play. As a component of its MICS, the Nation shall at all times maintain rules of play governing all Class III games offered at its facilities. The rules of play shall be ensure the fairness of play of each game and shall meet or exceed industry standards and practices. The State and the Nation agree that the Nation's rules of play in effect and approved by the Department as of the date of the Fourth Amendment to this Compact satisfy this requirement.

C. Amendments. Either Party may propose an amendment to the MICS (including rules of play), including new areas to be subject to the MICS, at any time, according to the procedures set forth below.

1. For amendments to MICS not directly related to event wagering or remote wagering, the Party proposing the amendment shall submit a copy to the receiving Party. Within thirty (30) days of receipt of such amendment, the receiving Party shall submit any objection it may have to such amendment serving a written notice of objection on the proposing Party. The notice of objection shall state with specificity the reasons therefor. All objections must be based on the amendment not adequately ensuring:

a. the fairness of the playing of the game ("Game") that the

MICS seeks to regulate;

b. that revenue generated from the playing of the Game is adequately counted and accounted for in accordance with Generally Accepted Accounting Principles for casinos;

c. a system of internal controls consistent with industry standards and practices; and

d. that the MICS are not clearly contrary to the law.

Within thirty (30) days of submission of any objection, the Parties shall meet in an attempt to resolve the objection. If the objection is not resolved within twenty (20) days of such meeting, either Party may serve upon the other a demand for binding arbitration pursuant to paragraph 3 below. The Nation may continue to utilize any amended MICS subject to objection by the Department while the procedures set forth in paragraph 3 below are completed.

2. Amendments to MICS directly related to event wagering or remote wagering shall be made only by mutual agreement of the Parties. The Party proposing the amendment shall submit a copy to the receiving Party. The Parties shall enter into good faith negotiations regarding such proposed amendments within thirty (30) days of the receiving Party's receipt of the proposed amendments, except that the State shall have no obligation to negotiate regarding proposed amendments to MICS governing events occurring in Wisconsin or involving Wisconsin teams that do not occur on land owned by the Tribe or held in trust for the Nation by the federal government. Disputes regarding the obligation to negotiate in good faith under this provision shall be resolved under the provisions of Section XXIV (Dispute Resolution).

3. The provisions of this paragraph 3 apply only to proposed amendments to MICS not directly related to event wagering or remote wagering. Arbitration shall be conducted in Madison, Wisconsin at a location approved by the arbitrator. The arbitration shall be conducted by a single arbitrator. Each Party shall select one arbitrator, and the two arbitrators shall select a third neutral arbitrator who shall conduct the arbitration. The arbitrators doing the selection and the arbitrator selected shall be certified public accountants with casino auditing experience or substantial experience in preparing casino internal controls. The arbitrator shall conduct the arbitration in accordance with the arbitration rules of the American Arbitration Association

("AAA") applicable for conducting hearings, or any other arbitration rules mutually agreed upon by the Parties, but the arbitration shall not be conducted by or through the AAA. The arbitrator shall render a written decision within thirty (30) days from the conclusion of the arbitration hearing by selecting from the two proposals submitted by the Parties the one which best complies with the standards set forth in paragraph 1.a-d. above.

HO-CHUNK NATION

By [signature]
Danielle DeLong
Vice-President

Executed on this 1st day of October, 2024

STATE OF WISCONSIN

By: [signature]
Tony Evers
Governor

Executed this 7th day of October, 2024

Consistent with 25 U.S.C.A. § 2710(d)(8), the Fourth Amendment to the Wisconsin Winnebago Tribe, now known as the Ho-Chunk Nation, and the State of Wisconsin Gaming Compact of 1992 is hereby approved on this ____ day of ____________________, 2024, by the Assistant Secretary – Indian Affairs, United States Department of the Interior.

UNITED STATES DEPARTMENT OF THE INTERIOR

## APPENDIX CERTIFICATE OF COMPLIANCE

I hereby certify that the appendix contains all of the materials required by Circuit Rule 30(a)-(b).

September 21, 2026

*/s/ Olivia S. Choe*
Olivia S. Choe

*Counsel for Defendants-Petitioners Kalshi Inc. and KalshiEX LLC*